John T. Gilbert, #004555
Steven G. Ford, #016492
**ALVAREZ & GILBERT PLLC**
14500 N. Northsight Blvd. Ste. 216
Scottsdale, AZ 85260
(602) 263-0203 (phone)
(480) 686-8708 (facsimile)

Of Counsel:
Jerry S. McDevitt, Esq., Pro hac vice
Curtis B. Krasik, Esq., Pro hac vice
Amy L. Barrette, Esq., Pro hac vice
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (facsimile)

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ULTIMATE CREATIONS, INC., an Arizona corporation; WARRIOR and DANA WARRIOR, husband and wife,<br><br>　　　　Plaintiffs,<br>　vs.<br><br>VINCENT K. McMAHON and LINDA McMAHON, husband and wife; TITAN SPORTS, INC., a Connecticut corporation; WORLD WRESTLING ENTERTAINMENT, INC., a Connecticut corporation,<br><br>　　　　Defendants.<br><br>VINCENT K. McMAHON and LINDA McMAHON, husband and wife; TITAN SPORTS, INC., a Connecticut corporation; | Case No.  CV06-0535-PHX-ROS<br><br>**MOTION FOR JUDGMENT ON THE PLEADINGS AS TO DEFENDANTS' COUNTERCLAIM**<br><br>**(Oral Argument Requested)** |

WORLD WRESTLING ENTERTAINMENT, INC., a Connecticut corporation,

        Counterclaim-Plaintiffs,

  vs.

WARRIOR,

        Counterclaim-Defendant.

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendants/ Counterclaim Plaintiffs' Vincent K. McMahon, Linda McMahon, Titan Sports, Inc. and World Wrestling Entertainment, Inc. ("WWE"), respectfully move this Court to enter judgment based on the pleadings filed in this action on behalf of WWE with respect to liability only on WWE's Counterclaim, finding that Plaintiff/Counterclaim-Defendant Warrior ("Warrior") materially breached the settlement agreement entered between the parties on March 3, 2000.

This motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

On March 3, 2000, WWE and Warrior entered into a Settlement Agreement (the "Settlement Agreement") that resolved two pending lawsuits among the parties.[1] (Am. Compl. ¶¶ 8-9, Ex. 1); (Def. Ctrclm. ¶¶ 4-5); (Pl. Ans. to Def. Ctrclm. ¶¶ 4-5). The

---

[1] Cause No. CV96-15377 in the Superior Court of the State of Arizona in and for the County of Maricopa, and Civil Action No. 3:98CV00467 in the United States District Court for the District of Connecticut.

2

Settlement Agreement provided, among other things, that the parties would not disparage one another in any form of media (the "Non-Disparagement Provision") and would keep the terms of the settlement confidential (the "Confidentiality Provision").  See (Am. Compl., Ex. 1 at pp. 3-5, 8-10, 13).  Upon entering into the settlement, WWE was concerned that Warrior would not honor his obligations under the Settlement Agreement, including, specifically, the Confidentiality Provision and the Non-Disparagement Provision.  WWE, therefore, insisted on including in the Settlement Agreement the requirement that a portion of the settlement payment be escrowed for a period, payable only if Warrior complied with the Confidentiality Provision.  (Id. at pp. 3-4).

Although Warrior restrained himself long enough to collect the escrow, he shortly thereafter launched a campaign of disparagement against WWE on his personal internet website, www.ultimatewarrior.com, and in numerous public speeches and interviews.  (Def. Ctrclm. ¶¶ 10-20, Exs. 1-7).  Warrior's complete disregard for the Non-Disparagement Provision began in or around June 2002, continued for years prior to the release of the DVD entitled "The Self-Destruction of the Ultimate Warrior" (the "DVD") and even continues to this day.  (Id.)  Many of the disparaging statements made by Warrior during this time are set forth in WWE's Counterclaim and attached as exhibits thereto.  (Id.)  In addition to flouting the Non-Disparagement Provision, Warrior also publicly disclosed terms of the Settlement Agreement in breach of the agreement's Confidentiality Provision.  (Def. Ctrclm. ¶¶ 21-24, Exs. 4, 6).

Significantly, Warrior admits that he published each article attached as an exhibit to WWE's Counterclaim and that he made each and every disparaging statement contained therein.  (Pl. Ans. to Def. Ctrclm. ¶¶ 10-20).  Warrior also admits to publicly disclosing

terms of the Settlement Agreement. (Pl. Ans. to Def. Ctrclm. ¶¶ 21-24). These admissions unequivocally establish that Warrior materially breached the Settlement Agreement. Accordingly, there are no factual issues in dispute and this Court should grant judgment for WWE on its Counterclaim, including, in particular, declaring that WWE was excused from performance of the Non-Disparagement Provision of the Settlement Agreement at the time of the release of the DVD in or around August 2005.

## II. LAW AND ARGUMENT

### A. Legal Standard

"After the pleadings are closed, a party may move for judgment on the pleadings if no material facts remain at issue and the parties' dispute can be resolved on the pleadings." Giddings v. Vison House Prod., Inc., No. CV 05-2963-PHX-MHM, 2007 WL 2274800, at *1 (D. Ariz. Aug. 7, 2007) (citing Robinson v. Fred Meyers Stores, Inc., 252 F. Supp. 2d 905, 910 (D. Ariz. 2002)); see also Frew v. Coit Servs., Inc., No. CV-07-1372-PHX-DGC, 2007 WL 2903026, at *1 (D. Ariz. Oct. 2, 2007). "Judgment on the pleadings under Fed.R.Civ.P. 12(c) 'is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.'" Loughney v. Allstate Ins. Co., 465 F. Supp. 2d 1039, 1041 (S.D. Cal. 2006) (quoting Nelson v. City of Irvine, 143 F.3d 1196, 1200 (9th Cir. 1998)).

In reviewing a Rule 12(c) motion, a court may consider "certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion … into a motion for summary judgment." U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003); see also Y.C. Yang v. Dar Al-Handash Consultants, No. 05-15325, 2007 WL 1492877, at *1 (9th Cir. Jan. 11, 2007) (finding that the

4

district court could consider exhibits to a party's pleading without converting a 12(c) motion into a motion for summary judgment). This Court, therefore, may consider the exhibits attached to WWE's Counterclaim in connection with this Motion.

**B.     Warrior's Admissions in his Answer Mandate Entry of Judgment on WWE's Breach of Contract Counterclaim**

A settlement agreement is interpreted according to general principles of contract law.[2] See, e.g., US West Commc'ns, Inc. v. Arizona Corp. Comm'n, 915 P.2d 1232, 1235 (Ariz. Ct. App. 1996); Citibank (Arizona) v. Bhandhusavee, 937 P.2d 356, 357 (Ariz. Ct. App. 1996). To prevail on a claim for breach of contract, a plaintiff must show "[1] the existence of a contract, [2] breach of that contract's terms, and [3] resulting damage." Howell v. Midway Holdings, 362 F. Supp. 2d 1158, 1160 (D. Ariz. 2005), citing Graham v. Asbury, 540 P.2d 656, 657 (Ariz. 1975); Clark v. Compania Ganadera de Cananea, S.A., 387 P.2d 235, 238 (Ariz. 1963).[3] "Interpretation of a contract is a purely legal question which is susceptible to a motion for judgment on the pleadings." Gerlinger v. Amazon.com, Inc., 311 F. Supp. 2d 838, 843 (N.D. Cal. 2004); see also Loughney, 465 F.Supp.2d at 1042 (granting Rule 12(c) motion for judgment on the pleadings based on the interpretation of a contract when the underlying facts were undisputed).

---

[2] While the Settlement Agreement is silent as to the governing law, it is assumed for purposes of this Motion that WWE's breach of contract counterclaim is governed by Arizona law.

[3] Many courts also require that a party prove that it performed its obligations under the contract before prevailing on a breach of contract claim. See Pavlovich v. Nat'l City Bank, 435 F.3d 560, 565 (6th Cir. 2006) ("To establish a breach of contract, a plaintiff must show that … the plaintiff performed …."); Altimore v. Mount Mercy Coll., 420 F.3d 763, 770 (8th Cir. 2005) (same); Burrell v. City of Mattoon, 378 F.3d 642, 651 (7th Cir. 2004) (same); Sport Supply Group v. Columbia Cas. Co., 335 F.3d 453, 465 (5th Cir. 2003) (same); First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998) (same). The pleadings establish that WWE fulfilled its obligations under the Settlement Agreement up to and long after Warrior materially breached the agreement. See (Am. Compl. ¶ 18); (Def. Ctrclm. ¶¶ 10-24, Exs. 1-7).

5

On these standards, WWE's Counterclaim undeniably can and should be resolved pursuant to Fed.R.Civ.P. 12(c). The salient facts are undisputed: WWE and Warrior entered into a valid settlement agreement. (Am. Compl. ¶¶ 8-9, Ex. 1); (Def. Ctrclm. ¶¶ 4-5); (Pl. Ans. to Def. Ctrclm. ¶¶ 4-5). In particular, it is undisputed that Warrior was subject to and agreed to abide by the Settlement Agreement's Non-Disparagement and Confidentiality Provisions. (Am. Compl. ¶¶ 11, 17, Ex. 1 at pp. 3-5, 8-10, 13); (Def. Ctrclm. ¶¶ 6, 21); (Pl Ans. to Def. Ctrclm. ¶ 6). Warrior also expressly admits that he made each disparaging statement contained in WWE's Counterclaim as set forth in the exhibits attached thereto. (Pl. Ans. to Def. Ctrclm. ¶¶ 10-20). Accordingly, the only issue is whether Warrior's admitted statements constitute material breaches of the Non-Disparagement and Confidentiality Provisions of the Settlement Agreement as a matter of law. Quite plainly they do.

### 1. Warrior Breached The Non-Disparagement Provision of The Settlement Agreement

The Non-Disparagement Provision broadly provides that the parties shall not disparage one another on the internet, television, print or media of any kind at anytime or anyplace. (Am. Compl., Ex. 1 at p. 8); (Def. Ctrclm. ¶¶ 6, 21); (Pl. Ans. to Def. Ctrclm. ¶¶ 6, 21). While the term "disparage" is not expressly defined in the Settlement Agreement, it is well-established that Arizona courts are bound to ascribe to a contractual term its plain and common meaning. Smith v. Melson, Inc., 659 P.2d 1264, 1267 (Ariz. 1983). Indeed, "[t]he controlling rule of contract interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning is applicable." Chandler Med. Bldg. Partners v. Chandler Dental Group, 855 P.2d 787, 791 (Ariz. Ct. App. 1993).

Pertinently, courts have uniformly construed "disparage" in the context of a contractual non-disparagement provision to be unambiguously defined by its common dictionary definition.  See Patlovich v. Rudd, 949 F. Supp. 585, 595 n.12 (N.D. Ill. 1996) (finding meaning of "disparage" in non-disparagement provision of severance agreement must be "determined by reference to ordinary principles of contract interpretation" and applying "ordinary, non-technical" definition from Webster's New Riverside Univ. Dictionary); Ondris v. Rossington, No. Civ. A. 3:98-CV-1677X, 1999 WL 558572, at *5 (N.D. Tex. July 30, 1999) (applying Webster's dictionary definition to define "disparaging" and "derogatory" in non-disparagement provision of settlement agreement); Halco v. Davey, 919 A.2d 626, 630 (Me. 2007) (finding parties' agreement in settlement agreement not to "disparage or discredit" each other was unambiguous and applying "plain and ordinary" meanings of words based on Webster's II New Riverside Univ. Dictionary definition); Eichelkraut v. Camp, 513 S.E.2d 267, 269 (Ga. Ct. App. 1999) (finding that court is "bound to ascribe to words 'their usual and common signification'" and applying Webster's Third New Intl. Dictionary definition of "disparagement" to non-disparagement provision of settlement agreement) (citations omitted); City Group v. Ehlers, 402 S.E.2d 787, 788 (Ga. Ct. App. 1991) (applying Webster's Third New Intl. Dictionary definition of "disparagement" to non-disparagement provision of severance agreement).

Under the dictionary definitions applied by these courts, disparage generally means "[t]o speak of in a belittling way; to reduce in rank or esteem." Patlovich, 949 F. Supp. at 595 (citing Webster's New Riverside Univ. Dictionary); see also Ondris, 1999 WL 558572, at *5 (applying Webster's dictionary definition to define terms "disparage" and "derogatory" as used in parties' agreement); Halco, 919 A.2d at 630 ("The dictionary definition of disparage

is: '1. To speak of in a belittling way: Decry.  2.  To reduce in rank or esteem.'") (citing Webster's II New Riverside Univ. Dictionary); Eichelkraut, 513 S.E.2d at 269 ("The term 'disparagement' is defined in Webster's Third New Intl. Dictionary as 'dimunition of esteem or standing and dignity; disgrace …, the expression of a low opinion of something; detraction'" and also citing Webster's New Universal Unabridged Dictionary "defining disparagement as 'anything that detracts or discredits'"); City Group, Inc., 402 S.E.2d at 788 ("The term, 'disparagement' is defined in Webster's Third New Intl. Dictionary (1961) as 'diminution of esteem or standing and dignity; disgrace . . ., the expression of a low opinion of something; detraction . . . .").[4]

The determination of whether a statement is disparaging and, in turn, violates a contractual non-disparagement provision, is a question of law for the court. Patlovich, 949 F. Supp. at 595 (denying defendant's motion to dismiss and finding it "self-evident that the statements of which [plaintiff] complains constitute disparagement"); Ondris, 1999 WL 558572, at *5 (granting summary judgment for defendants on breach of contract claim because statements were not "disparaging or derogatory"); Eichelkraut, 513 S.E.2d at 723-24 (granting summary judgment for plaintiff and finding that statements were disparaging in breach of non-disparagement clause of parties' settlement agreement); City Group, Inc., 402 S.E.2d at 788 (granting summary judgment for defendant on breach of contract claim based on finding that statements were not capable of disparagement).

---

[4] In contrast to a tort claim for commercial disparagement, a breach of contract claim for violation of a non-disparagement provision—as is alleged here—includes any disparaging statements without regard to whether a statement is true or false. See Patlovich, 949 F. Supp. at 595 n. 12 ("There is no reason to believe that the use of the word 'disparage' in the severance agreement was meant to be equivalent to 'commercial disparagement'—a term of art."); Eichelkraut, 513 S.E.2d at 269 (finding that "disparage" in a contract sense is dissimilar to the term in a tort sense because the former includes true as well as false statements).

Case 2:06-cv-00535-ROS   Document 94   Filed 01/11/08   Page 9 of 19

The pleadings in this case indisputably establish that Warrior disparaged WWE, as that term is commonly defined, in statements he admittedly made in articles posted on his website, www.ultimatewarrior.com, and in public speeches and interviews:[5]

*First*, in or around June 2002, Warrior admits that he authored and published an article on his internet website, www.ultimatewarrior.com, which asserted the following disparaging statements regarding WWE and Mr. McMahon:

- addressing a witness's testimony that was unfavorable toward Warrior in the parties' prior litigation, "His memory had been radically manipulated … and he had been bought by Vince McMahon . . . ." (Def. Ctrclm. ¶ 10, Ex. 1 at p. 2.)

- "the product [WWE and the McMahons] put out is sick and repugnant." (Id. at p. 5).

- "Titan, spearheaded by the McMahons, long ago crossed over the propriety line. All the bank in the world does not change that. You know it. I know it. The whole thinking world knows it. All their arguments defending their right to do it are nothing more than baseless rationalizations and base denials." (Id.)

- "[t]he absence of moral principle in the business, along with the crude, profane creativity, is why I don't, and will not, entertain anymore for a company such as Titan." (Id.)

See also (Pl. Ans. to Def. Ctrclm. ¶ 10).

---

[5] Warrior attempts to deny that the statements he admittedly made about WWE were disparaging because the statements were "opinion." This denial is a red herring. Whether a statement purportedly expresses an opinion is irrelevant to whether the statement is disparaging within the meaning of a contractual non-disparagement provision. See, e.g., Eichelkraut, 513 S.E.2d at 269 (finding contractual non-disparagement provision to apply "to all derogatory communications, whether true or not."); Boston Partners Asset Mgmt., L.P. v. Archambo, No. 025614BLS, 2003 WL 1861557, at *3 (Mass. Super. Ct. Mar. 13, 2003) (rejecting arguments that alleged statements were not actionable under contractual non-disparagement provision because they were not alleged to be materially false and thus protected by First Amendment). Indeed, by definition, any disparaging statement could and likely would be characterized as opinion. Warrior's position, therefore, effectively would render the Non-Disparagement Provision meaningless, a construction prohibited by settled Arizona law. See Scholten v. Blackhawk Partners, 909 P.2d 393, 396 (Ariz. Ct. App. 1995) ("[A] contract should be construed to . . . prevent any of the provisions from being rendered meaningless."); Norman v. Recreation Centers of Sun City, Inc., 752 P.2d 514, 517 (Ariz. Ct. App. 1988).

*Second*, Warrior admittedly authored and posted on his website an article dated May 14, 2003 entitled "Addressing Death in Wrestling," which continued his disparaging attacks on WWE and Mr. McMahon.  (Def. Ctrclm. ¶ 11, Ex. 2); (Pl. Ans. to Def. Ctrclm. ¶ 11).  In the article, Warrior laid bare his intention to disparage WWE: "[L]et me enlighten you and be more bold, come out of my shell a little here, even chance offending people unlike how I have tried very hard not to do up till now—WWE needs the debauchery and death."  See (Def. Ctrclm. ¶ 11, Ex. 2 at p. 5).  Warrior went on to unseemly claim that "[n]obody in the WWE cares" about the death of its wrestlers.  (Id. at p. 6.)  Warrior's vitriol against WWE went so far as to claim that WWE does not care if its wrestlers die because "it lessens the headaches over what to do with used up talent begging to be kept on the payroll for life.  And it's a quick, non-litigious way to get rid of done-for talent ….  Unlikely to admit it, this selective elimination is a convenience I'm sure WWE would like to be able to depend on."  (Id. at pp. 5-6).

*Third*, less than one week later, Warrior admits to authoring and publishing an article on his website entitled "Animal Rebuttal . . . Morals and Professional Wrestling," in which he described WWE as "a great company to those who have no principles and the people who run it are great only to those who enjoy working for people who are just as unprincipled." (Def. Ctrclm. ¶ 12, Ex. 3 at p. 2); (Pl. Ans. To Def. Ctrclm. ¶ 12).  He added that the McMahons "have no problem making those who come back on their hands and knees suffer."  (Def. Ctrclm. ¶ 12, Ex. 3 at p. 2).  Warrior even accused WWE of doing "degenerate and immoral things," criticizing another wrestler by stating, "[y]ou do your thing, thinking that you're a kind of moral corrective, and WWE is doing 50 degenerate and immoral things (at least)

behind your back having laughs a-mile-minute disrespecting you and what you believe." (Id. at p. 5).

*Fourth*, on October 16, 2003, Warrior gave a speech at Penn State University (a summary of the contents of which was posted on Warrior's internet website) in which he asserted that he left wrestling because "wrestling became perverse." (Def. Ctrclm. ¶¶ 15-16, Ex. 4); (Pl. Ans. to Def. Ctrclm. ¶¶ 15-16). Moreover, at least four times during the speech Warrior admits that he referred to Mr. McMahon as a "scumbag." (Def. Ctrclm. ¶ 16, Ex. 4); (Pl. Ans. to Def. Ctrclm. ¶ 16).

*Fifth*, Warrior admittedly gave an interview that was posted in a four-part series in June 2004 on the internet website www.flynnfiles.com in which he continued his smear tactics against WWE and Mr. McMahon by stating:

- that "Vince McMahon and other males … were essentially getting paid big money to behave a lot like kids." See (Def. Ctrclm. ¶ 17, Ex. 6 at Part 1, p. 1).

- that "Vince and I had some professional fallouts. Through the handling of those fallouts, I came to see him in an unethical, unfavorable light, and began to question his and others' definitions of success and their definitions of what they thought it was to be man, or how they thought one should think and act like a man." (Id. at Part 1, p. 1).

- with respect to certain "born-again Christians" who wrestle for WWE like Shawn Michaels, "Vince is laughingly stabbing them with their own Devil's pitchfork." (Id. at Part 1, p. 4).

- that he "fought Vince in a five-year litigation, on principle. I stood up to his ways, the ways he screwed many, many others. While others have never done that, yet every single person I worked with knew and expressed how Vince had wronged them." (Id. at Part 1, p. 4).

- that "[t]he people who have their heads up their asses the farthest and have really off-putting unhealthy egos are Vince and [Hulk] Hogan. They really do deserve each other. They are cons all the way through and weirdly get off living their lives that way." (Id. at Part 3, p. 5).

- that "Vince, in subtle, covert ways, was always screwing people over. His entire business, in many ways, has been built on the backs of people he's screwed." (Id. at Part 3, p. 6).

- that "[o]n the whole, I have absolutely no respect or admiration for him. I see him as unmanly. … People like this also have little trouble at being phonies, liars, and backstabbers. They just see being so as coming with the territory. I'd say Vince has been very good at hiding his, in truth, losing hand. He's gotten good at that over years. After all, he's the ringmaster of a "work." But he still has to face his own disappointment and ugliness each day when he looks in the mirror." (Id. at Part 4, p. 6).

*Finally*, on July 27, 2005, Warrior admittedly authored and published an article on his website that is filled with profane and vituperative attacks against WWE and Mr. McMahon. (Def. Ctrclm. ¶ 18, Ex. 7); (Pl. Ans. to Def. Ctrclm. ¶ 18). Specifically, Warrior admits that he made the following statements contained in the article:

- Mr. McMahon is "a man who doesn't always put good business sense over his own ego and stupid ideas. He is like a child who throws his toys when he doesn't get his own way, and is very malicious and vindictive." See (Def. Ctrclm. ¶ 18 at Ex. 7, p. 5).

- addressing Mr. McMahon, "[a]fter all these years, though, it's really disappointing to see that you've only become more juvenile and childlike. It's quite obvious, shrivel by shrivel, you've lost your balls altogether. So I know you can't be in any pain straddling that fence." (Id.)

- Mr. McMahon is a "malicious and vindictive kook" and that WWE is a "company run by liars." (Id. at pp. 5-6).

- addressing Mr. McMahon, "[t]he only thing really left to do is push your overmasturbated, [sic] seedy creative envelope more open, since you obviously intend to keep beating limp meat, would be for you to actually televise the fucking you've been doing to so many over just as many years." (Id. at p. 7).

- addressing Mr. McMahon, "[j]ust as you worked so hard to do, you are now surrounded by ass-licking sycophants and mostly slavish, non-thinking, sunken chest talent, but the consequence is that you are burnt out, slow and stuck, have no new ideas and would have a heart attack if true passion, real manliness and legitimate challenge walked into one of the pyrogenic-laden [sic] arenas you use to

- entertain your equally passionless, mindless and sycophantic audiences." (Id.)

- addressing Mr. McMahon, "[o]f course, if this wisdom doesn't work for you, Vince, we can just stick with you making an ass of yourself, and kissing mine. While you are down there notice, *again*, the real balls." (Id. at p. 9).

- addressing Mr. McMahon, "[t]he failure that eats away at you the most Vince? …it is that you didn't OWN me like you do all the others. That you never emasculated me, turned my balls into squirrel nuts like you've done to all the others." (Id. at p. 8).

See also (Pl. Ans. to Def. Ctrclm. ¶ 18).

It is self-evident that the foregoing statements, all of which Warrior admits to making, establish beyond dispute Warrior's disparagement of WWE and Mr. McMahon in breach of the Non-Disparagement Provision of the Settlement Agreement. Indeed, these statements are substantially more egregious than statements that other courts have found to have breached contractual non-disparagement provisions. See, e.g., Patlovich, 949 F.Supp. at 589, 595 (finding that statements contained in numerous letters claiming that plaintiff engaged in "unethical behavior" and was involved in "cover-up" of malpractice issues were disparaging); Eichelkraut, 513 S.E.2d at 269-70 (finding that party breached non-disparagement provision of settlement agreement by sending letters to third parties claiming that defendant was the subject of a criminal investigation and that he engaged in a "blatant disregard of professional ethics").

### 2. Warrior Breached The Confidentiality Provision Of The Settlement Agreement

Not only has Warrior run roughshod over the Non-Disparagement Provision of the Settlement Agreement, he also admits to repeatedly breaching its Confidentiality Provision. (Def. Ctrclm. ¶¶ 23-24); (Pl. Ans. to Def. Ctrclm. ¶¶ 23-24). The parties intended to prohibit

13

the disclosure of "any term o[r] conditions of this settlement, or what has been agreed today [at the March 3, 2000 settlement conference] other than the fact that the case has been settled and the cases have been dismissed." (Am. Compl., Ex. 1 at p. 13). The parties further agreed, and the Court explicitly noted, that the "confidentiality agreement is an agreement that runs through the entire course of the agreement in perpetuity." (Id. at p. 9).

Undaunted by these proscriptions, Warrior admits that he stated during a February 25, 2003, speech at Bentley College that "after a long ordeal, Warrior finally prevailed in court over the WWF and should have been in the clear." (Def. Ctrclm. ¶ 23, Ex. 4); (Pl. Ans. to Def. Ctrclm. ¶ 23). Likewise, in his June 28, 2004 interview posted at www.flynnfiles.com, Warrior admits to publicly stating, with regard to the parties' prior litigation, "[t]he short answer is that I prevailed …. I have all the intellectual property rights and everything to it." (Defs.' Ctrclm. ¶ 24, Ex. 6 at Part 3, p. 2); (Pl. Ans. to Def. Ctrclm. ¶ 24). In addition to being factually inaccurate, such statements vitiate the fundamental purpose of the Confidentiality Provision that was essential to WWE's entry into the Settlement Agreement.[6]

### 3. Warrior's Indisputable Breaches Of The Non-Disparagement and Confidentiality Provisions Of The Settlement Agreement Were Material And Thus Excused WWE From Future Performance Of Its Obligations Under The Contract

Arizona has long recognized the rule that a contracting party is excused from performance upon the other party's material breach of the contract. See Zancanaro v. Cross,

---

[6] It is also noteworthy that Warrior admits in his Answer to making the statements that breached the Confidentiality Provision. (Def. Ctrclm. ¶¶ 22-24); (Pl. Ans. to Def. Ctrclm. ¶¶ 22-24). In response to WWE's averments regarding each of the above statements as well as WWE's averment that he has repeatedly breached the Confidentiality Provision, Warrior responded that, "Warrior admits to making the statement but states that it was taken out of context, he denies that it is disparaging, and states that it is opinion." Although Warrior's boilerplate response (which he asserted in response to most of the allegations of WWE's Counterclaim) largely misses the mark as these allegations are not alleged to be disparaging, Warrior tellingly does not, because he cannot, deny making the underlying statements. (Pl. Ans. to Def. Ctrclm. ¶¶ 21-24).

339 P.2d 746, 749 (Ariz. 1959) ("One of the remedies available at common law upon a material breach of contract is the right to cease performance . . . ."); QC Constr. Products, LLC v. Cohill's Bldg. Specialties, Inc., 423 F.Supp.2d 1008, 1013 (D. Ariz. 2006) (Silver, J.) (noting that "a defendant who refuses to perform and is sued for breach of contract should be excused from liability if the plaintiff has personally failed in a material particular to perform the contract …") (citing Williston on Contracts § 43:12).

In strikingly similar circumstances, the breach of a non-disparagement provision of a settlement agreement has been found to constitute a material breach. See Keifer v. Lithia Motors, Inc., No. Civ. 02-3030-TC, 2006 WL 1371657, at *1 (D. Or. May 11, 2006) ("Based on evidence presented at the hearing, I found that plainiff published disparaging comments about defendants in a public forum, and the plaintiff materially breached the non-disparagement provision of the settlement agreement.").

Moreover, nondisparagement and confidentiality provisions have been recognized "as among the most material in a settlement agreement." Dillard v. Starcon Int'l, Inc., 483 F.3d 502, 509 (7th Cir. 2007) (noting that "many defendants would consider these terms [nondisparagement and confidentiality clauses] to be among the most material in a settlement agreement"); see also Higbee v. Sentry Ins. Co., 253 F.3d 994, 997-98 (7th Cir. 2001) (finding "the wording of the confidentiality and nondisparagement clause was a material term" to the defendant). In fact, the Seventh Circuit's analysis in Dillard and Higbee is particularly germane here. Like the defendant in Higbee (as discussed in Higbee and later in Dillard), as reflected in the Settlement Agreement, WWE made clear on the record that the Non-Disparagement and Confidentiality Provisions were material to its agreement to settle the case. (Am. Compl., Ex. 1 at pp. 3-5, 8-10, 13). Indeed, the Confidentiality Provison was

so important that WWE insisted on escrowing a portion of the settlement payment to ensure that Warrior (and his wife) complied with the confidentiality obligations for at least one year. (Id. at pp. 3-4, 13). Plainly, therefore, the breach of such material terms consitutes a material breach of contract under Arizona law.

Because of Warrior's antecedent material breaches of the Settlement Agreement between, at a minimum, June 2002 through July 2005, WWE was excused from further performance of its obligations under the Settlement Agreement. In particular, WWE was excused from performance of the Non-Disparagement Provision of the Settlement Agreement at the time of the release of the DVD in or around August 2005.

### 4. WWE Was Damaged As A Result of Warrior's Material Breaches of the Settlement Agreement

"It is axiomatic that when one person agrees to perform in a certain manner upon adequate consideration and fails to keep the agreement, he is liable to the performing party for any damages sustained as a result of his failure to perform." Graham v. Asbury, 540 P.2d 656, 657 (Ariz. 1975) (citing Lorden v. Snell, 4 P.2d 392 (Ariz. 1931)). It is also well-settled that a plaintiff is entitled to recover at least nominal damages for the breach of a contract, even if the plaintiff's actual damages are indefinite or difficult to prove. See Edwards v. Anaconda Co., 565 P.2d 190, 194 (Ariz. Ct. App. 1977) (affirming an award of nominal damages for breach of contract, finding that award of nominal damages was "correct" because plaintiff's damages "were indefinite and cannot be estimated accurately"); Sweet v. Johnson, 337 P.2d 499, 500-01 (Cal. Ct. App. 1959) ("A plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted on him . . . since the defendant's failure to perform a contractual duty is, in

itself, a legal wrong that is fully distinct from the actual damages.") (citations omitted); Ross v. Frank W. Dunne Co., 260 P.2d 104, 109 (Cal. Ct. App. 1953) ("Once a breach of contract has been proven, nominal damages are presumed to follow as a conclusion of law.").

Warrior filed this lawsuit against WWE in January 2006, alleging, among other things, that WWE breached the Settlement Agreement when it produced and released the DVD. As described herein, Warrior's disparagement campaign of WWE and his divulgence of the terms of the Settlement Agreement began years prior to the DVD's release, establishing his antecedent material breaches of the Settlement Agreement. (Def. Ctrclm. ¶¶ 10-24, Exs. 1-7; Pl. Ans. to Def. Ctrclm. ¶¶ 10-24). Despite his numerous antecedent breaches, all of which Warrior undeniably was aware of, Warrior nevertheless filed suit against WWE seeking, inter alia, to enforce the Non-Disparagement Provision that he long ago repudiated. As a result of his antecedent breaches of the Settlement Agreement and his improper institution of litigation against WWE, WWE has been damaged, at a minimum, by the substantial litigation costs that WWE has incurred and continues to incur in this action in consequence of Warrior's breach of contract. Such damages will be proven at a hearing on damages to be scheduled in this action.

### III. CONCLUSION

For all the foregoing reasons, judgment should be entered for WWE and against Warrior with respect to liability on WWE's Counterclaim and this Court should declare that Warrior materially breached the terms of the Settlement Agreement, thereby excusing WWE of further performance of its obligations thereunder.

RESPECTFULLY SUBMITTED this 11th day of January, 2008.

ALVAREZ & GILBERT PLLC

By:  s/John T. Gilbert  
John T. Gilbert, #004555  
Steven G. Ford, #016492  
14500 N. Northsight Blvd. Ste. 216  
Scottsdale, AZ 85260  
(602) 263-0203 (phone)  
(480) 686-8708 (facsimile)

Of Counsel:  
Jerry S. McDevitt, Pro hac vice  
Curtis B. Krasik, Pro hac vice  
Amy L. Barrette, Pro hac vice  
KIRKPATRICK & LOCKHART  
PRESTON GATES ELLIS LLP  
The Henry Oliver Building  
535 Smithfield Street  
Pittsburgh, Pennsylvania  15222  
(412) 355-6500 (phone)  
(412) 355-6501 (facsimile)

COPY of the foregoing mailed  
this 11th day of January, 2008 to:

Daniel D. Maynard, Esq.  
Michael D. Curran, Esq.  
MAYNARD CRONIN ERICKSON  
CURRAN & SPARKS, PLC  
1800 Great American Tower  
3200 North Central Avenue  
Phoenix, Arizona  85012  
Attorneys for Plaintiffs

By:  s/John T. Gilbert