# EXHIBIT 14

**Certified Copy**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

ULTIMATE CREATIONS, INC., an
Arizona Corporation, WARRIOR
and DANA WARRIOR,
husband and Wife,

    Plaintiffs,

vs.

VINCENT K. McMAHON and LINDA
McMAHON, husband and wife;
TITAN SPORTS, INC., a Connecticut
Corporation, WORLD WRESTLING
ENTERTAINMENT, a Connecticut
Corporation,

    Defendants.

CASE NO.

CV06-00535-PHX-ROS

**VIDEOTAPED DEPOSITION OF**

**TERRY G. BOLLEA**

April 18, 2009
1:30 p.m.

4500 140th Avenue North
Suite 101
Clearwater, Florida  33762

AUDREY LANDRY
Notary Public, State of Florida



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 9

1  Q  And when was it that you went back with WWE?
2  A  I don't know the date. It was late 90s. It
3  could be 2000. I don't know. I'm not real good with
4  dates.
5  Q  And how long did you work with WWE when you
6  went back?
7  A  Off and on till probably two years ago,
8  part-time just in and out.
9  Q  What's the relationship that you have at this
10 time with WWE?
11 A  I have no relationship. I don't work there.
12 Q  Do you have any sort of a contractual
13 relationship as an independent contractor where you come
14 in periodically for appearances for them?
15 A  No.
16 Q  So there's no business relationship whatsoever
17 at this time?
18 A  None.
19 Q  Okay. And are you familiar with a DVD that
20 WWE did called "The Self-Destruction of the Ultimate
21 Warrior?"
22 A  No, I'm not.
23 Q  I'll show you the cover.
24 A  No.
25 Q  Have you ever seen that DVD before?

### 10

1  A  No, I haven't.
2  Q  Are you aware of it? Have you ever heard
3  about it?
4  A  No, I -- I haven't heard of it. I probably
5  did an interview for this DVD and many other DVDs.
6  Because when I was working part-time for the WWE, the
7  last time I was there, every time they had a wrestler
8  that they were doing a DVD on, they would always ask me
9  to give my opinion or comment on matches or, you know,
10 whatever. So, I mean, if that is a WWE DVD, there's a
11 huge possibility that -- there's my name on it. I'm on
12 it, so.
13 Q  Yeah. I'll tell you you're on it.
14 A  Yeah. Yeah. Okay. But I haven't seen that.
15 I've never -- I've never seen it.
16 Q  Okay. At some point did the WWE -- someone
17 from the WWE contact you about doing a DVD on Warrior or
18 The Ultimate Warrior?
19 A  I don't remember if they did or not. The
20 thing is, if I did something on this tape it would be
21 when I was there working. Like I'd go to wrestle on a
22 Monday Night Raw or I'd be in a Pay-Per-View, and during
23 the day, as I was waiting for the matches: Hey, come
24 back to the TV room or whatever and do this interview.
25 So it would be during the day when I was there to

### 11

1  wrestle. I never flew in or, you know.
2  Q  Okay. It wasn't done specially just for this
3  one DVD?
4  A  I don't recall if it was or not.
5  Q  And did you routinely do interviews for
6  different DVDs for WWE?
7  A  Yes.
8  Q  Did you -- did you have separate contracts
9  when you did that or was that part of your
10 responsibilities under the contract that you had with
11 WWE at the time?
12     MR. McDEVITT: Object to the form. You can
13 answer.
14 A  There was an original deal that my attorney,
15 Henry Holmes, made with Vince McMahon. It was a
16 merchandising licensing deal which we just kept in
17 place. Whether I was working there or not or if Vince
18 McMahon called me ten years from now, and I go back to
19 work for an old-timers match or something that -- that's
20 etched in some contract, always kicks back in whenever
21 I'm there.
22 Q  Okay. Do you recall how many DVDs you did
23 interviews for?
24 A  No, I don't.
25 Q  If I were to tell you that this was done in

### 12

1  2005, does that help refresh your recollection at all?
2  A  Not at all.
3  Q  But in 2005, you were under contract with WWE
4  at that time?
5  A  I can't say for sure if I was or not.
6  Q  When you did interviews for the various DVDs,
7  were you ever given a script of what the questions were
8  going to be?
9  A  No, never.
10 Q  Do you recall ever receiving any sort of a
11 script that not only would tell you what the questions
12 were going to be, but what kind of answers they were --
13 A  Never.
14 Q  -- looking for?
15 A  Never. That's one of the biggest things I
16 objected to was the writers telling me what to do or
17 say. And it never happened, interviews in the ring,
18 behind the scenes, just wouldn't do it. That's not how
19 it worked.
20 Q  After an interview was done for a DVD, did you
21 have the opportunity to review the footage?
22 A  No.
23 Q  Were you ever asked to review the footage?
24 A  No.
25 Q  Did you have any input into what portion of



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

**37**

1  A  Right.
2  Q  It's good versus evil?
3  A  Right.
4  Q  Okay. If Mr. McMahon had come to you and
5  said: "Geez, this guy's wanting a half a million dollars
6  from me --
7  A  Right.
8  Q  -- before he's going to go out," wouldn't you
9  remember that?
10      MR. McDEVITT: Object to the form and
11  foundation.
12  A  Well, I should remember it because it is an
13  important piece of wrestling history. I mean, things
14  have been said to me about the Ultimate Warrior, that he
15  held people up in Europe when he saw the building is
16  full of people so he demanded more money from the
17  promoter above and beyond what he agreed to. I remember
18  rumors like that.
19      So it seems like I would remember this. But to me,
20  the only thing I can say is that it must not have been
21  important to me not to remember it, because I don't
22  remember Vince McMahon or the Ultimate Warrior holding
23  up Vince McMahon or actually don't remember talking
24  about it.
25  Q  Okay. When you watched this DVD, did you come

**38**

1  away with the impression that Mr. McMahon was saying on
2  the DVD that Jim Hellwig had held him up that day before
3  SummerSlam, demanding money and refusing to go on unless
4  he was paid?
5  A  That's the impression the interview gives you,
6  yes.
7  Q  Do you ever recall instances in your career
8  where talents held up the promoter and refused to go on
9  and do a match unless they were paid more money?
10  A  I remember being in Montreal, I think Bruiser
11  Brody held up the promoter and got more money. It
12  happened occasionally. But I don't remember being in
13  arenas where it happened, you know, on a consistent
14  basis. But there were rumors of guys, you know, holding
15  up promoters, and like Vince said in the tape,
16  hypothetically, putting a gun to their head.
17      I mean, certain guys in this business that don't
18  see the big picture, you know, of being real consistent
19  with their character for 20 or 30 years and the outcome.
20  There's certain guys that may not understand this
21  business, how you have to ride the highs and survive the
22  lows. You know, good paydays and bad paydays. You
23  know, some are short-termers.
24      And most of the guys that really didn't look for
25  the -- well, some people don't want to be in the

**39**

1  wrestling business for 20 or 30 years. Some people will
2  take advantage of promoters and try to get more money
3  out of them on the spot, because they know they need
4  them to perform. It's happened in the business.
5  Q  Did any -- did Vince McMahon ever come to you
6  before any match that the Ultimate Warrior was
7  performing in with you, and tell you that the Ultimate
8  Warrior is holding me up for money today?
9  A  I don't remember him saying that.
10  Q  Looking at Exhibit Number 4. And again we can
11  look at your interview, if you want, but I think it
12  would be easier to go off the transcript.
13  A  Sure.
14  Q  But whatever you want to do is fine. I have a
15  copy of your interview. On the second page under
16  1:21:18, it says: "When I found out the Warrior was
17  demanding money" -- ellipsis -- "there's a certain
18  element of old-school, disappointment, rationale, let's
19  get through this."
20      I'm going to stop there. What are you referring
21  to?
22  A  I was reading as you were talking. I
23  apologize.
24  Q  Under 1:21:18, it says: "When I found out the
25  Warrior was demanding money." What were you referring

**40**

1  to?
2  A  I don't remember what I was referring to. I
3  guess whatever is written here, whoever wrote it, I
4  guess it pertains to the tape I just watched where Vince
5  McMahon said the Ultimate Warrior was asking for more
6  money. I guess I don't really know what it's referring
7  to.
8  Q  Well, I can show you your actual interview,
9  but this is a pretty accurate transcript of your
10  interview. Do you want me to cue up the interview?
11  A  Either way. You can do whatever you want. I
12  don't -- I'm not sure. I mean, common-sense about
13  trying to make a decision here would probably be the
14  subject we're talking about here, the wrestling match at
15  Madison Square Garden.
16  Q  And this is an interview you were doing in
17  2005 concerning the match that happened in 1991. You
18  seemed to have recalled this event in 2005. I'm trying
19  to understand why you don't recall it today.
20      MR. McDEVITT: That's not a question. Object
21  to that. What's your question?
22  A  I don't understand what you're trying to say.
23  BY MR. MAYNARD:
24  Q  Yeah. At the interview in 2005, they seemed
25  to have asked you about this particular event at


ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### Page 69

1  the foundation. You're asking hypotheticals now.
2  A  On a personal level, as far as me, personally,
3  I would consider my ego or personally I would say it
4  would be negative. But if you look at it business-wise,
5  it would probably generate revenue if a lot of people
6  said negative things about Hulk Hogan. People would be
7  interested to hear what they had to say negatively.
8  Q  Would you want to hear in a DVD that was put
9  out on you that Terry Bollea couldn't be counted on,
10 that you didn't show up for matches?
11 A  Well, I mean, I wouldn't want to hear it, you
12 know, because it's not true.
13 Q  If it wasn't true, it would upset you,
14 wouldn't it?
15 A  If they said Terry Bollea didn't show up for
16 matches, that would be -- be not true and that would
17 upset me.
18 Q  And if they said Terry Bollea held a gun to
19 Vince's head and wouldn't wrestle in a match unless he
20 was paid a half a million dollars that day, and it
21 wasn't true, wouldn't that upset you?
22 A  Hypothetically holding or holding?
23 Q  Hypothetically holding. Not -- not as
24 entertainment. But that Terry Bollea, the man, said I'm
25 not going to go perform my Hulk Hogan character unless

### Page 70

1  you give me another half a million dollars, and it
2  wasn't true, would that upset you?
3  A  If it wasn't true, it would upset me.
4  Q  And if somebody were to say in a DVD that you
5  could care less about your father, would that upset you?
6  A  Yeah, that would upset me.
7  Q  And if somebody made comments that made fun of
8  your children, would that upset you?
9      MR. McDEVITT: Object to the form and the
10 foundation.
11 A  Yeah, that would upset me if someone made fun
12 of my children.
13 Q  And as a layperson -- I mean, even though you
14 understand that -- strike that. Even though you
15 understand that these videos are put out for
16 entertainment purposes, if they had false statements in
17 them about the man, Terry Bollea, you'd get upset,
18 wouldn't you?
19 A  Yeah, if they were false.
20     MR. MAYNARD: I have no further questions. I
21 am going to mark a couple of exhibits. We can
22 either do it on the record -- Number 5 will be the
23 actual DVD, The Self-Destruction of the Ultimate
24 Warrior. And then Number 6 will be the interview
25 tape that I played for him to look at.

### Page 71

1     (Exhibit Nos. 5 and 6 marked for
2  identification.)
3           CROSS-EXAMINATION
4  BY MR. McDEVITT:
5  Q  I have just a few questions for you,
6  Mr. Bollea. Would it be fair to say that you did not
7  say anything about Jim Hellwig that you knew to be
8  false, in connection with the interviews you did for
9  this DVD?
10 A  I don't remember what -- what I said, if they
11 were true or false. I mean it was so long ago, I don't
12 recall doing the interview.
13 Q  Well, you didn't go in there with some
14 attitude you were going to go in there and tell lies
15 about Jim Hellwig, did you?
16 A  No. But when I do these tapes, I make sure,
17 you know, the number one priority, which is business is,
18 whether I'm on camera talking about myself or other
19 wrestlers, I'm making sure the Hulk Hogan character is
20 covered. That's the nature of the beast to protect and
21 entertain from a Hulk Hogan point of view.
22     Whether it's fact or not, I'm dealing in a fantasy
23 environment anyway, so you have the artistic liberty to
24 embellish pretty much when you're talking about
25 wrestlers or the wrestling lifestyle to answer, you

### Page 72

1  know, pretty openly and with a few liberties.
2  Q  Let me ask you a few follow-up questions. I
3  think you indicated very early on, you haven't even
4  watched the whole tape, have you?
5  A  No, I haven't. That's the first I've ever
6  seen it.
7  Q  And with respect to all the questions about
8  the title of it, you don't know whether the film,
9  because you haven't watched it, is about his
10 self-destruction of his career?
11 A  Well, it can't be because he's still -- you
12 know, just in the wrestling community, I know he
13 wrestles once in awhile overseas. And if the
14 Ultimate Warrior was self-destructive, he would not have
15 ever wrestled again.
16 Q  When -- I'll come back to that. You were
17 asked questions about how you'd feel if somebody said
18 you would care less about your father dying. Do you
19 recall that Mr. Maynard asked you: Would you be upset if
20 somebody said you cared less about your father dying?
21 A  Yes, I remember.
22 Q  And you -- do you remember hearing that
23 Warrior's father died?
24 A  I have no idea if his father's alive or not.
25 Q  If your father died, would you go to his



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 81

1  how far you can run with it. And a lot of people were
2  given the ball and some people stumbled and fell and
3  some people, you know, scored goals.
4      Q   And in his case, he was given the ball to run
5  with, wasn't he?
6      A   Yes, sir.
7      Q   And would you agree that the promotion put
8  a lot of effort in the promotion and the scheduling of
9  television appearances to promote him to be as big a
10 star as he could be?
11         MR. MAYNARD: Objection to the form.
12     A   At that time -- and I don't know the current
13 situations at that time -- he got one of the biggest
14 pushes I've ever seen.
15     Q   And were you aware that once he got to be a
16 main event, that he was demanding to be treated the same
17 as you?
18     A   I've heard rumors about that.
19     Q   And he wanted to be paid like you?
20     A   I've heard those rumors.
21     Q   And wanted to be treated like you?
22     A   I'm not sure. I know Vince McMahon, you know,
23 did certain things such as the limousines and
24 individual dressing rooms for him, which he didn't do
25 for I don't think anybody other than me.

### 82

1      And one of the reasons that I had a -- and for my
2  own person was -- one of the reasons I had my own
3  dressing room was for many years after Vince's dad died,
4  Vince and I would talk business in private, creatively
5  and -- and different business situations.
6      And me being one of the wrestlers, it was hard for
7  us -- for him to come in a dressing room with 20 or 30
8  guys and go: Terry, let's talk about what we're going to
9  do in Andre's match or the Ultimate Warrior. I actually
10 had to be put in another room because, you know, Vince
11 would come to me a lot, along with Pat Patterson, and
12 other people.
13     There was a time where Vince and I were really
14 close in the beginning when he was really getting up to
15 speed creatively. And it was better if we could talk
16 alone, because it would -- it would affect me with the
17 guys and then it would -- you know, I just couldn't have
18 people hearing stuff Vince and I talked about.
19     So that was the reason why I had an individual
20 dressing room. I don't know why the Warrior did. But
21 he had an individual dressing room for awhile.
22     Q   He didn't turn out to have the staying power
23 that you have had in the business, did he?
24     A   No.
25         MR. MAYNARD: Objection to the form.

### 83

1      Q   In fact, you could say he was somewhat of a
2  flash in the pan, couldn't you?
3          MR. MAYNARD: Objection to the form.
4      A   In my opinion?
5      Q   Yes.
6      A   Yes.
7      Q   And do you know -- let me ask you this,
8  Mr. Bollea. If one wanted to search through the
9  wrestling business to find people who didn't like
10 Jim Hellwig, it wouldn't be hard to find a lot of
11 people, would it?
12         MR. MAYNARD: Objection to the form.
13     A   I have no idea who likes him and who doesn't
14 like him.
15     Q   Do you know who his best friend is?
16     A   No, I don't.
17     Q   Did he have a best friend in the wrestling
18 business?
19     A   I don't know.
20     Q   Do you know in this case there's not a single
21 wrestler to testify on his behalf? Did you know that?
22     A   No, I didn't know that.
23     Q   There's not another witness that will testify
24 on his behalf except him and his wife in this case. Did
25 you know that?

### 84

1      A   Well, I'm here testifying.
2      Q   But you're here on a subpoena; correct?
3      A   Yeah. Yes.
4      Q   Do you know if on that -- I guess if you
5  haven't watched it, you don't know then whether people
6  on that DVD also said good things about him when good
7  things could be said, do you?
8          MR. MAYNARD: Objection to the form.
9      A   I have no idea. I haven't watched it.
10         MR. McDEVITT: Just give me a moment.
11 BY MR. McDEVITT:
12     Q   Has he ever sued you because of what you said
13 on that DVD?
14     A   No, sir.
15     Q   Has he sued anybody for what they said on that
16 DVD, other than Vince McMahon, to your knowledge?
17     A   I -- I don't know. I don't know of anyone
18 else.
19         MR. McDEVITT: Thank you, Mr. Bollea. I have
20 nothing further.
21         MR. MAYNARD: Just a couple of follow-up
22 questions.
23         THE WITNESS: Yeah.
24         REDIRECT EXAMINATION
25 BY MR. MAYNARD:



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

## Page 89

ESQUIRE DEPOSITION SOLUTIONS
101 East Kennedy Boulevard, Suite 3350
Tampa, Florida 33602
(813) 221-2535

April 30, 2009

Mr. Terry G. Bollea
C/O David R. Houston, Esquire
The Law Offices of David R. Houston
432 Court Street
Reno, Nevada 89501

RE: ULTIMATE CREATIONS V. VINCENT McMAHON, ET AL
Esquire Job No. 86343

Dear Mr. Bollea:

Please take notice that on April 18, 2009, your videotaped deposition was taken in the above-referenced matter. At that time, you did not waive signature. The transcript is being furnished to you through David R. Houston, Esquire for your review.

Any corrections you wish to make to the transcript should be made on the errata sheet at Page 88. Please do not write on the transcript itself. Please complete a review of your transcript within 30 days and return the errata sheet to our offices. You need not return the entire transcript.

If you now wish to waive signature, please sign your name on the line below and return this letter to our office.

    Sincerely,

    _____
    Audrey Landry, Court Reporter
    Esquire Deposition Solutions - Tampa, Florida

I do hereby waive my signature:

_____
TERRY G. BOLLEA

Cc: Via transcript: Daniel D. Maynard, Esquire;
    Jerry S. McDevitt, Esquire; David R. Houston, Esquire

## Page 90

CERTIFICATE OF REPORTER

STATE OF FLORIDA   )
COUNTY OF HILLSBOROUGH)

I, Audrey Landry, Court Reporter, certify that I was authorized to and did stenographically report the deposition of TERRY G. BOLLEA, Pages 1 through 91; that a review of the transcript was requested and that the transcript is a true record of my said stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 30th day of April, 2009.


    Audrey Landry
    Court Reporter
    Esquire Deposition Solutions - Tampa, FL

## Page 91

CERTIFICATE OF OATH

STATE OF FLORIDA)
COUNTY OF HILLSBOROUGH)

I, Audrey Landry, Court Reporter, Notary Public, State of Florida, certify that TERRY G. BOLLEA personally appeared before me on the 18th day of April, 2009, and was duly sworn.

Signed this 30th day of April, 2009.

_Audrey Landry_
Audrey Landry
Notary Public
State of Florida at Large
My Commission Number: DD589338
Expires: 10/17/10



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

# EXHIBIT 15

ANDREW WRIGHT DEPOSITION EXHIBIT 24—HARD DRIVE

CONTAINING WRIGHT VIDEOS

Filename: WAR_DOC. STING INTERVIEW 2.MOV

STING INTERVIEW II [14:15 – 15:33]

**Wright:** Have you ever heard anything about the infamous relationship he had with McMahon. There's a story that…as a matter of fact…Rob Van Dam told me this…and he was putting Warrior over. This was when I went to London May the 13th, 14th, 15th of this year. I was there shooting Warrior, he was doing an appearance at a convention, you know, a very rare appearance. That's where I met Matt Hardy, that's where I met Rob Van Dam. And Rob pulled me aside and gave me a few words and said that, he goes, "I have to respect Warrior from a business point, he goes, "you know, that's what you're here for, they are using you for whatever they can and to, you know, to make money on you, to exploit you, and they sign you to these contracts. He said, "I have to give it to Warrior, he goes, I actually heard that he held McMahon up before Summer Slam '91, music's playing, belts on, and I think he is wrestling Randy Savage, loser leaves town in LA and he demands more money and a contractual increase right then and there, and had he not, he was going to do what you guys had done earlier and just walk out of the back of the building. And McMahon gave in and actually signed the contract over. Have you ever heard anything like that?

**Sting:** Yeah, oh yeah. I heard all about those. I mean I heard stories like that all the time, and that one in particular, and I don't know the context and I don't know the details. I don't know if McMahon was, you know, sticking him or what. But I mean, you know, everybody has a different work ethic, you know. And again, I don't know the context, but if I shake hands or if I sign something or if say I am going to do something, then I am going to do it. Period.

# EXHIBIT 16

Page 1

```
IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF ARIZONA


ULTIMATE CREATIONS, INC., an      )
Arizona corporation; WARRIOR and  )
DANA WARRIOR, husband and wife,   )
                                  )
          Plaintiffs,             )
                                  )  Case No.
vs.                               )  CV06-0535-PHX-ROS
                                  )
VINCENT K. McMAHON and LINDA      )
McMAHON, husband and wife; TITAN  )
SPORTS, INC., a Connecticut       )
corporation; WORLD WRESTLING      )
ENTERTAINMENT, INC., a            )
Connecticut corporation,          )
                                  )
          Defendants.             )
                                  )
VINCENT K. McMAHON and LINDA      )
McMAHON, husband and wife; TITAN  )
SPORTS, INC., a Connecticut       )
corporation; WORLD WRESTLING      )
ENTERTAINMENT, INC., a            )
Connecticut corporation,          )
                                  )
          Counterclaim-Plaintiffs,)
                                  )
vs.                               )
                                  )
WARRIOR,                          )
                                  )
          Counterclaim-Defendant. )

**********************************************

            VIDEO DEPOSITION OF
          DAVID CHRISTOPHER LEWIS

              April 22, 2008

**********************************************
```

Page 2

VIDEO DEPOSITION of DAVID CHRISTOPHER LEWIS, called as a witness at the instance of the Defendants/Counter-Plaintiffs, taken pursuant to the Federal Rules of Civil Procedure on the 22nd day of April, 2008, at Gibson Court Reporting, 606 West Main Street, Suite 100, Knoxville, Tennessee, before Jana Neighbors, Registered Professional Reporter and Notary Public for the State of Tennessee.

Page 3

APPEARANCES

FOR THE DEFENDANTS/COUNTER-PLAINTIFFS:

GERALD J. SCHIRATO
Attorney at Law
K & L Gates
535 Smithfield Street
Pittsburgh, Pennsylvania 15222

ALSO PRESENT:

MATT POPLIN, Videographer

REPORTED BY: JANA NEIGHBORS, RPR

Page 4

INDEX

|   | | Page |
|---|---|---|
| EXAMINATION BY MR. SCHIRATO | | 6 |

EXHIBITS

| | | | Page |
|---|---|---|---|
| 1 | Subpoena. | | 9 |
| 2 | Film/Documentary Development Contract, February 22, 2005; UCI 000468-000475. | | 45 |
| 3 | Listing of BuzzMEDIA Productions Team. | | 47 |
| 4 | Hard drive containing videos produced by Andrew Wright to WWE. [Retained by Counsel.] | | 56 |
| 5 | Email from Andrew Wright to Jim Ross, May 20, 2005; W0001155-0001156. | | 165 |
| 6 | Email from Chris Lewis to Jim Ross, May 20, 2005. | | 168 |
| 7 | Affidavit of Chris Lewis, October 27, 2005; UCI 000476. | | 111 |
| 8 | Complaint, Ultimate Creations v. Andrew Wright. | | 174 |

Page 157

1  and your representations of Warrior that basically told
2  you Warrior was difficult to work with. We talked about
3  the Jakks people, for example, and the NAXCOM people.
4  Are there any other instances that you can recall
5  discussing with any other individuals, in a business
6  sense, that Warrior was difficult to work with?
7      A.   Yes. Yes. In my opinion, the key thing
8  that prohibited Warrior from having a comeback either
9  with New Japan Pro Wrestling or Total Nonstop Action
10 Wrestling was the fact that -- well, I remember Dave
11 Marquez with New Japan and Jerry Jarrett with TNA said
12 that the reputation that Warrior has for being
13 extraordinarily difficult to work with and things of
14 that nature is the prime reason that we can't offer him
15 the kind of money that he wants to come back.
16          Jerry Jarrett in particular said it's not
17 that I don't understand that Warrior has a huge amount
18 of Q value and would have even more so if he came back.
19 It's --
20     Q.   Can I stop you there real quick?
21     A.   Absolutely.
22     Q.   Now, the jury may not understand -- and you
23 used the word "Q value" a lot today, and I think I have
24 a good understanding of what that is, but could you
25 explain to the jury what you mean when you say Q value?



Page 158

1  And, again, I apologize for getting you off your train
2  of thought, but --
3      A.   Q value would be kind of just star power.
4  That would be, you know, kind of maybe industry -- or
5  entertainment-industry lingo for star power. How much
6  of a draw that someone would be in terms of generating
7  excitement, raising television ratings, raising
8  pay-per-view buy rates, and be giving a boost in
9  merchandising sales, that would be your Q value, how
10 much you as a character bring to an organization, how
11 much they're likely to benefit from you.
12     Q.   Okay. And now get back to where you were
13 talking about. You were talking about Jerry Jarrett and
14 his interactions with Warrior coming back to TNA, if
15 you'd just continue. And if you need the court reporter
16 to let you know where you left off, we can do that, too.
17     A.   No. Jerry said it's not that we don't know
18 Warrior has Q value, probably more Q value than anyone
19 on the roster at that point in time, but the truth is --
20 and I remember he said very specifically, made this
21 point very specifically, we can't afford to pay him the
22 kind -- he said that it's not that we can't afford to
23 pay him the money he wants. It's that we can't afford
24 to pay him the kind of money he wants and risk that
25 he'll hold us up for more money at Slammiversary.

Page 159

1           I remember Jerry used Slammiversary --
2  which is kind of TNA's version of WrestleMania. It's
3  their annual big wrestling event. He said we could not
4  take the risk that Warrior would show up the night
5  before Slammiversary and try to hold us up the way he
6  did Vince in order to get more money and tank the show.
7  We can't take that kind of financial risk.
8           He said so we can pay him a decent amount
9  of money to come on board, and after three or six months
10 of producing and showing that, you know, he's not going
11 to hold us up, he's not going to be a terrible pain to
12 work with, then we can come back and renegotiate a
13 long-term contract that would pay him more along the
14 lines of what he expects.
15     Q.   So Jerry Jarrett, who, for the jury, we've
16 seen him today in some video, he's a fellow wrestling
17 promoter, was throughout history, he's a pretty well
18 respected promoter and obviously works with Total
19 Nonstop Action, TNA, which you've discussed a few times
20 today already, Jerry Jarrett expressed to you that he
21 was concerned that he would be held up for money, much
22 like Vince McMahon was. So, actually, Jerry Jarrett
23 confirmed the hold-up story that Warrior had -- I just
24 lost my train of thought. I apologize. Strike that
25 from the record.

Page 160

1           So, basically, Jerry Jarrett, who is a
2  fellow promoter in the business, confirmed the hold up
3  of Vince McMahon's story and was also concerned that
4  Warrior had not changed, and that given the same
5  circumstances, he may find himself in the position where
6  Warrior was refusing to go onstage or unwilling to go
7  out and perform a show unless he got more money?
8      A.   Well, let me be clear. Jerry didn't
9  represent that he knew for a fact that the hold-up story
10 was true.
11     Q.   Okay.
12     A.   But he did say -- he believed it to be
13 true.
14     Q.   And these -- strike that from the record.
15 It's been a long day.
16          Your interactions with Jerry Jarrett
17 regarding Warrior's participation in Total Nonstop
18 Action Wrestling occurred prior to WWE's release of the
19 "Self-Destruction" DVD. Correct?
20     A.   Yes. Yes.
21     Q.   So any belief that Jerry Jarrett had that
22 Warrior had held Vince McMahon up for money would have
23 been prior to the release of the "Self-Destruction" DVD?
24     A.   Yes, it would have been.
25     Q.   Did Warrior ever discuss with you his

Page 181

```
1   rule, most people do decide to waive. So --
2        THE WITNESS: I'll waive.
3        MR. SCHIRATO: Okay. Thank you very much.
4        FURTHER THIS DEPONENT SAITH NOT.
5   (The deposition concluded at 3:57 p.m.)
```

Page 182

```
1                    CERTIFICATE
2
3   STATE OF TENNESSEE
4   COUNTY OF KNOX
5        I, Jana Neighbors, Registered Professional
6   Reporter and Notary Public, do hereby certify that I
7   reported in machine shorthand the deposition of DAVID
8   CHRISTOPHER LEWIS, called as a witness at the instance
9   of the Defendants; that the said witness was duly sworn
10  by me; that the reading and subscribing of the
11  deposition by the witness was waived; that the foregoing
12  pages were transcribed by me and constitute a true and
13  accurate record of the deposition of said witness.
14       I further certify that I am not an attorney or
15  counsel of any of the parties, nor an employee or
16  relative of any attorney or counsel connected with the
17  action, nor financially interested in the action.
18       Witness my hand and seal this the 3rd day of
19  May, 2008.
20
21            _____
              Jana Neighbors
22            Registered Professional Reporter
              and Notary Public
23            My Commission Expires:
              August 11, 2009
24
25
```