# EXHIBIT 29

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

CV06-00535-PHX-ROX
- - - - - - - - - - - - - - - - -X
Ultimate Creations, Inc., and     :
Arizona corporation, Warrior and  :
Dana Warrior, husband and wife,   :
            Plaintiffs            :
                                  :
VS                                :
                                  :
Vincent K. McMahon and Linda      :
McMahon, husband and wife; Titan  :
Sports, Inc., a Connecticut       :
corporation, World Wrestling      :
Entertainment, a Connecticut      :
corporation,                      :
            Defendants            :
- - - - - - - - - - - - - - - - -X

          Videotaped deposition of VINCENT
K. McMAHON taken at the offices of
Rosenblum Newfield LLC, One Landmark
Square, Stamford, Connecticut 06901,
before Clifford Edwards, LSR, Connecticut
License No. SHR.407, a Professional
Shorthand Reporter and Notary Public, in
and for the State of Connecticut on April
23, 2009, at 9:17 a.m.

## 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3  DANIEL D. MAYNARD, ESQ.
   MAYNARD CRONIN ERICKSON CURRAN & SPARKS, P.L.C.
4  1800 Great American Tower
   3200 Central Avenue
5  Phoenix, Arizona 85012
6
7  ON BEHALF OF THE DEFENDANTS:
8  JERRY S. McDEVITT, ESQ.
   MATTHEW H. SEPP, ESQ.  (not present)
9  KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
   The Henry Oliver Building
10 535 Smithfield Street
   Pittsburgh, PA 15222
11
12
13 ALSO PRESENT:
       DOMINIC BOUCHER, VIDEOGRAPHER
14     WARRIOR

## 3

1   VIDEOTAPED DEPOSITION OF VINCENT K. MCMAHON
2      APRIL 24, 2009
3
4      THE VIDEOGRAPHER: We are now on
5   record. This is the deposition of Vincent
6   McMahon taken on behalf of the plaintiff
7   in the case of the Ultimate
8   Warrior -- the Ultimate Creations,
9   Inc. et al. versus Vincent K.
10  McMahon, et al., Case No.
11  CV06-535-PHX-ROX, filed in the United
12  States District Court for the District of
13  Arizona.
14     Today's date is April 24th,
15  2009. The time on video record is 9:18
16  a.m. This deposition is being held at One
17  Landmark Square, Stamford,
18  Connecticut.
19     My name is Dominick Boucher
20  representing Esquire Deposition
21  Services.
22     Will counsel introduce yourself for
23  the record.
24     MR. MAYNARD: Dan Maynard on behalf
25  of Warrior.

## 4

1      MR. McDEVITT: Jerry McDevitt for the
2   defendants.
3
4         VINCENT K. MCMAHON
5   residing at 14 Hurlingham Lane, Greenwich,
6   Connecticut, [sic] having first been duly sworn,
7   deposed and testified as follows:
8
9         DIRECT EXAMINATION
10
11  BY MR. MAYNARD:
12    Q  Mr. McMahon, what is your current position
13  with WWE?
14    A  Chairman.
15    Q  Any other positions?
16    A  No.
17    Q  What's your educational background?
18    A  Graduate of East Carolina University.
19    Q  What year?
20    A  I'm not real good --
21       THE VIDEOGRAPHER: Can you --
22       THE WITNESS: What?
23       All right.
24    A  I'm not sure.
25  BY MR. MAYNARD:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 13

1  A  Yes.
2  Q  So I don't have to keep changing letters
3  and names.
4  A  Thank you.
5  Q  Okay.
6      MR. McDEVITT: Unless you won't get
7      in trouble where the tree huggers in
8      England.
9      MR. MAYNARD: It's probably my
10     daughter.
11 BY MR. MAYNARD:
12 Q  All right. And, again, I don't mean to
13 repeat myself, but you did not read your deposition
14 that you had taken before?
15 A  No, again.
16 Q  Okay. Prior to looking at portions of the
17 Warrior DVD yesterday, had you ever seen the Warrior
18 DVD?
19 A  No, I hadn't.
20 Q  You've never -- had you reviewed any
21 portions of it?
22 A  No.
23 Q  Let me ask you a few questions: I'm going
24 to focus on 2005 and the corporate structure of WWE
25 at the time.

### 14

1      In 2005, were you the chairman of the
2  board?
3  A  I've always been the chairman of the
4  board.
5  Q  Okay. And your wife was the CEO?
6  A  Yes.
7  Q  And was she also the president?
8  A  I don't think we had a president.
9  Q  Okay.
10 A  She may have been then.
11     I don't know. I'm not real big on
12 titles.
13 Q  Okay. Who was responsible for
14 deciding -- strike that.
15     In 2005, approximately how many DVDs or
16 home videos did WWE produce?
17 A  I don't know.
18     But including pay-per-views, which we
19 always do a DVD off of a pay-per-view 2005, my guess
20 would be we probably did 13 or maybe 14
21 pay-per-views.
22     I don't know whether or not we did 10
23 others I'd say. So 25 would be my guess.
24 Q  Okay.
25 A  In that neighborhood, you know. I don't

### 15

1  know.
2  Q  I don't want to misstate the
3  testimony, and I'm sure your lawyer won't let
4  me.
5      But if I understood from Mr. Dunn
6  yesterday, he said you did do DVDs on all
7  pay-per-views. And there were approximately
8  14, he thought.
9  A  Okay, 14.
10 Q  Okay. And that they attempted to do
11 approximately the same number of subject related
12 DVDs a year.
13     Does that comport with your
14 recollection?
15 A  I'll take his word for it.
16 Q  Who would have been responsible in 2005
17 for the DVDs that were put out by WWE?
18 A  Responsible for the ones put out by
19 DVD?
20 Q  Yes.
21 A  Well, the person in charge of that and all
22 other consumer products is a lady by the name of
23 Donna Goldsmith.
24 Q  Okay. And she was in charge back in
25 2005?

### 16

1  A  Yes.
2  Q  Okay. Who made the decision -- strike
3  that.
4      Of the 14 non-pay-per-view DVDs, if I
5  understood Mr. Dunn correctly, it was divided
6  roughly into half of them were subject related to
7  something other than wrestling characters.
8      I think he said there might be one for a
9  hall of fame, something of that nature.
10     Is that your recollection?
11 A  I have -- wouldn't have any idea how many
12 specific DVDs were non-wrestling related or
13 something.
14     I wouldn't know.
15 Q  Who is the one that was responsible back
16 in 2005 for deciding what wrestlers there would be a
17 DVD about?
18 A  Again, Donna Goldsmith and her consumer
19 products division.
20     They determine, you know, not only the
21 pay-per-views, but they determine what -- what
22 concepts and what performers in some way that they
23 would like to present.
24 Q  What role, if any, did you play in
25 that?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

## 17

1  A   An overseeing role, you know, not
2  a -- not much of a supervisory role but, just more
3  of an overseeing role.
4      Q   Would Ms. Goldsmith -- was there a group
5  that consists of Ms. Goldsmith and you and Mr. Dunn
6  that would meet periodically --
7      A   Yes.
8      Q   -- to discuss those things?
9      A   Yes.
10     Q   Okay.
11     A   And a fellow by the name of Dean
12 Miller.
13         Dean is the resident wrestling
14 expert, so to speak, you know, in the consumer
15 products division.  So I think Donna took a lot of
16 lead from Dean Miller.
17     Q   Do you recall there being discussions
18 about making a Warrior DVD?
19     A   Not specifically, but generally speaking.
20 You know, I mean we've had DVDs on a lot of our
21 personalities in the past and a lot of our
22 characters.  And this was one of them.
23     Q   Do you know who came up with the idea to
24 do a Warrior DVD?
25     A   Not specifically.  Probably Dean.

## 18

1      Q   Do you recall them bringing the idea to
2  you?
3      A   I recall a meeting, which we do have twice
4  a year, or whatever where they lay out various
5  subjects that they would like to cover.  And some
6  are good, and some are not so good.
7      Q   And they bring these ideas to you and talk
8  about them and discuss them and decide which ones to
9  go forward on?
10     A   I -- I sit on more of a less of a
11 committee along with Kevin Dunn, and we will listen
12 to what they suggest.
13     Q   And do you recall that at some point in
14 2005 or thereabouts that they suggested doing a
15 Warrior DVD?
16     A   Yes.
17     Q   Do you recall how that came about?  I
18 mean, Warrior had been gone from WWE for a number of
19 years at that time.
20     A   Uh-huh.
21     Q   Why at that particular point in time was
22 it decided to do a DVD on him?
23     A   I have no idea.
24     Q   What was your contribution to those
25 discussions concerning doing a Warrior DVD?

## 19

1      A   Just saying it sounds like a good
2  idea, along with, again, all the other ones that are
3  good, bad, whatever.
4          I mean, they have some input on it.  But
5  when it was suggested to do an Ultimate Warrior
6  DVD, I okayed it.
7      Q   And did you suggest that it should be a
8  controversial DVD?
9      A   No, there was no need.
10     Q   Why was that?
11     A   Because the character was very
12 controversial.
13     Q   The character, Ultimate Warrior, was very
14 controversial?
15     A   Yes.
16     Q   What about the man, Jim Hellwig, who is
17 now known as Warrior?
18     A   What about him?
19     Q   Did you consider him to be
20 controversial?
21     A   No.
22     Q   When you had discussions about doing the
23 Warrior DVD --
24     A   Uh-huh.
25     Q   -- were there discussions about whether it

## 20

1  was to be about the man, Jim Hellwig?
2          Or was it to be about the character?
3      A   Well, it's about the character.
4      Q   The emphasis -- strike that.
5          In the majority of WWE's DVDs that deal
6  with wrestling characters, is it generally about the
7  character or is it about the man who plays the
8  character?
9      A   I think you'd have to go on a title by
10 title basis.  Generally speaking, everyone who is on
11 television is a character.
12     Q   Okay.  But there's always the man behind
13 the character.
14         Correct?
15     A   There's always someone playing the
16 character, yes.
17     Q   Right.  And were there discussions in the
18 conception stage of the Warrior DVD about focusing
19 on the man, Jim Hellwig, or Warrior?
20     A   I wouldn't know, not from my standpoint.
21     Q   You didn't participate in any of that
22 nature?
23     A   No.
24     Q   Okay.  What was your role in the Warrior
25 DVD, other than them bringing it to you at the very



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

## 21

1  beginning and getting your approval?
2      A   My participation, as I recall, in that was
3  the selection of the title of the DVD. There were a
4  number of titles presented. And I thought the one
5  that I came up with, which is not the way I always
6  think, but the one I came up with was the best one.
7      Q   How did you come up with that title?
8      A   In my opinion, it described the character
9  and what happened to the character.
10     Q   Did it describe the man?
11     A   No.
12     Q   Was it intended to say to the consumer
13 that it described the man?
14     A   No.
15         Again, I think I just said that we deal in
16 characters. Generally speaking, if you are on
17 television, you are not that individual.
18         I don't -- I think Jim Hellwig would say
19 that he, as a human being, is not that character in
20 the ring. There's a distinction. I play a
21 character as well on television.
22     Q   In the -- you looked at your -- you looked
23 at the portions that they picked to put on the DVD
24 of your interviews yesterday.
25         Correct?

## 22

1      A   If what I saw was my participation, yes.
2  I don't know if I saw everything that I said. I
3  don't know.
4      Q   Okay. That's fair enough. We'll probably
5  be looking at portions of what you said and may not
6  be looking at all of it again today.
7      A   Okay.
8      Q   But at least in what you did view, isn't
9  it true that much of it wasn't about the character
10 but was about the individual man, Jim Hellwig?
11     A   There's always a man behind the
12 character. Pardon me.
13         Our audience knows of the Ultimate Warrior
14 as a character.
15     Q   That wasn't my question.
16         My question was, in your responses to
17 questions in the portions of your interviews that
18 ended up in the Warrior DVD --
19     A   Right.
20     Q   -- aren't they primarily focused on Jim
21 Hellwig, the man, not the Ultimate Warrior
22 character?
23         MR. McDEVITT: Objection.
24         Asked and answered.
25         You can answer again.

## 23

1  BY MR. MAYNARD:
2      Q   Unless he instructs you not to
3  answer, you can answer.
4      A   Oh, okay.
5          Again, we present characters. Our
6  audience is interested in characters.
7          So they could a lot of times care less
8  about the human being behind them. We are
9  performers. We are actors.
10     Q   I'm not asking what your audience is
11 looking for.
12         I'm asking what you -- what you said in
13 your interview, was it about the character or about
14 the man?
15         MR. McDEVITT: That question now has
16 been asked twice and answered twice.
17         MR. MAYNARD: It's been asked three
18 times, but it hasn't been answered.
19         MR. McDEVITT: It hasn't been
20 answered the way you like to be answered
21 doesn't mean it hasn't been answered.
22         I'll allow him to answer it one more
23 times, then we'll move on.
24     A   I'm always referring to a character.
25 BY MR. MAYNARD:

## 24

1      Q   Okay. So that I'm clear, when we look at
2  the DVD, what you are talking about a
3  character, Ultimate Warrior.
4          You are not looking -- you're not talking
5  about Jim Hellwig?
6      A   Our audience only knows the Ultimate
7  Warrior, the character.
8          That's all they know. They don't know Jim
9  Hellwig.
10     Q   Isn't the point of these DVDs to get
11 behind the character and to introduce your audience
12 to the man behind the mask or behind the
13 character?
14     A   Absolutely not. No one -- I just
15 mentioned, no one really knows or cares about who we
16 are, personally.
17         They care about the character that they
18 know. That's what they care about.
19     Q   Okay. Well, we'll look at that in a
20 little bit.
21         Let's talk a little bit about your
22 relationship with Jim Hellwig.
23         When do you first recall meeting -- and
24 for the purposes of the deposition so I don't
25 get -- I try not to confuse things between Jim



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 65

1  him at all.
2      Don't recall any specific conversation
3  with Hogan, either. This doesn't necessarily
4  refresh my recollection at all. Again, I stated, if
5  you want to read it back, that I'm not surprised
6  that I had a conversation with Hogan.
7      Q   All right. During the time that -- strike
8  that.
9      At some point, you were interviewed for
10 this DVD.
11     Correct?
12     A   Yes.
13     Q   And where did that interview take
14 place?
15     A   At our studios.
16     Q   And do you recall who was there?
17     A   Laurie actually asked me the questions off
18 camera.
19     Q   She's off camera?
20     A   Laurie Calabrese.
21     Yeah.
22     Q   And had she given you a list of the
23 questions that she was going to ask you?
24     A   No, I don't do that. I just go in and
25 give my honest reaction. I don't want to know what

### 66

1  the questions are.
2      More times than not and just again I come
3  from the office building or off the road or
4  whatever, go sit in the studio. In cases like
5  this, whenever I do these things, bang it out and
6  then go on about my business.
7      Q   Had you been prepared with a fact sheet
8  that told you sort of a chronology of events with
9  Jim Hellwig?
10     A   No. I had no preparation at all.
11     Q   You had no preparation whatsoever?
12     A   None.
13     Q   Had you asked for any preparation?
14     A   No.
15     Q   Had you had conversations with anyone to
16 help you prepare for this interview?
17     A   No.
18     Normally, whoever is doing the
19 interview -- in this case it was Laurie. In some
20 other cases it's been Jen who's responsible
21 specifically for the production of these
22 things.
23     But they'll -- they'll say, Hey,
24 look, if you don't remember, I'll try and refresh
25 your memory. It was this date and so and so, that

### 67

1  kind of thing.
2      And that part, obviously, would not air on
3  the video. But they would be reminding me of these
4  things.
5      Q   That happened in this case?
6      A   I don't know if it did or not.
7      Q   Just don't recall?
8      A   No.
9      Q   Okay. Did -- do they ever prepare fact
10 sheets for you to review to help refresh you were
11 recollection before you do interviews?
12     A   They may. I've never seen one.
13     Q   Okay. It's not something that's actually
14 given to you --
15     A   No.
16     Q   -- and you used?
17     A   No.
18     Q   Do you ask anybody to go out and get
19 information for you in preparation for these
20 interviews?
21     A   No.
22     Q   Do you recall asking anyone to get
23 information for you in preparation for this
24 particular interview for the Warrior DVD?
25     A   No.

### 68

1      Q   Are you telling me you don't recall?
2      Or it didn't happen, you didn't ask
3  anyone?
4      A   I don't think I've ever prepared for any
5  of these.
6      Q   Okay.
7      A   And I've never been given a fact sheet for
8  any of them.
9      Q   After the interview is done, do you review
10 the interviews?
11     A   No. I've never seen the video until
12 yesterday and today. I've never seen my responses.
13     Q   So this is the second time then that
14 you've ever seen this video.
15     You saw it yesterday?
16     A   That's correct.
17     Q   Okay. But the video -- and I keep calling
18 it a video.
19     It's a DVD. It's the same with you. It
20 doesn't matter?
21     A   Yes.
22     Q   Okay. This was done in-house at WWE?
23     A   Yes, it is.
24     Q   And WWE is responsible for its
25 contents?



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 69

1   A   Yes.
2   Q   Okay. Do you know whether or not anybody
3   at WWE went back and looked at the documents that
4   were prepared in 1991, for instance, that you gave
5   Mr. Hellwig when he came out of the ring at
6   SummerSlam '91?
7   A   No.
8   Q   Did you ask them what they had done to
9   prepare for your interview?
10  A   No.
11  Q   Do you know whether or not WWE has any
12  individuals who were responsible for going back and
13  checking the facts behind what you say when you make
14  statements in these videos?
15  A   I don't know if that's Jen Good's
16  responsibility or not.
17      But it's her responsibility for the
18  production of these. I don't know if she does that
19  or not.
20  Q   Did you ever go back the anybody and
21  say, Jeez, I misspoke.
22      I really didn't terminate him. What I
23  really did was suspend him?
24  A   No.
25  Q   Okay. When -- and I don't want to

### 70

1   misstate it. But what I believe you said was "I
2   reluctantly agreed to his demand."
3       Do you recall that?
4   A   Yes.
5   Q   Okay. What were you referring to?
6   A   I was referring to his demands of
7   everything that he wanted. I had to get that match
8   in the ring.
9   Q   We can go back and look at it. But I
10  think you said demand in the singular.
11      Do you recall?
12  A   I don't recall.
13      I don't think it would matter, would
14  it?
15  Q   Well, was the demand -- is the demand that
16  you are referring to multiple that he wanted certain
17  things?
18      Or was the demand I need more money right
19  now?
20  A   I don't think it was I need more money
21  right now.
22      As if in that night you mean I need more
23  money right now?
24  Q   Yes.
25  A   No.

### 71

1       I think -- I thought I straightened you
2   out on that one.
3   Q   No, you haven't straightened me out.
4   A   All right.
5   Q   You've given me your testimony on it.
6   A   Oh, okay. I've given you my
7   testimony.
8       Then why are you asking me again if I've
9   given you my testimony?
10  Q   Because I'm not sure of what -- when you
11  said "demand," singular versus plural.
12      What you told me is that he made numerous
13  demands on you --
14  A   Okay.
15  Q   And that you found them
16  objectionable.
17      And in the DVD, it appears to me you said
18  he made a demand, which to me connotes one
19  thing, want more money.
20  A   Uh-huh.
21      MR. McDEVITT: That's you.
22      That's a statement. It's not a
23      question.
24  BY MR. MAYNARD:
25  Q   Do you agree with that if it's singular

### 72

1   that you said --
2       MR. McDEVITT: Why don't you play it
3       for him?
4       MR. MAYNARD: Sure.
5       Let's play it back.
6       (THEREUPON, THE DVD WAS PLAYED AND
7       VIEWED.)
8   BY MR. MAYNARD:
9   Q   The individual that's speaking now, who is
10  he?
11  A   Gene Okerlund.
12  Q   Okay. Did -- did you tell him at some
13  point that the Warrior hold you up for a half a
14  million dollars?
15  A   To my knowledge, I never had any
16  conversation with Gene Okerlund about this.
17  Q   Do you have any idea how he -- what his
18  basis is for making the statements that he just
19  made?
20      MR. McDEVITT: Object to form and
21      foundation.
22  A   Don't know.
23  BY MR. MAYNARD:
24  Q   Do you recall -- does this help refresh
25  your recollection that Warrior was holding you up



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent   K. McMahon                                              April 24, 2009

259

CERTIFICATE

1.   I hereby certify that I am a Notary Public,
2.   in and for the State of Connecticut, duly
3.   commissioned and qualified to administer oaths.
4.   I further certify that the deponent named in
5.   the foregoing deposition was by me duly sworn, and
6.   thereupon testified as appears in the foregoing
7.   deposition; that said deposition was taken by me
8.   stenographically in the presence of counsel and
9.   reduced to typewriting under my direction, and the
10.  foregoing is a true and accurate transcript of the
11.  testimony.
12.  I further certify that I am neither of
13.  counsel nor attorney to either of the parties to
14.  said suit, nor am I an employee of either party to
15.  said suit, nor of either counsel in said suit, nor
16.  am I interested in the outcome of said cause.
17.  Witness my hand and seal as Notary Public
18.  this  13th  day of   May                , 2009.

/s/ Clifford Edwards

Clifford Edwards

Notary Public

My commission expires:  9/30/2011



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com