# EXHIBIT 30

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

CV06-00535-PHX-ROX
- - - - - - - - - - - - - - - - -X
Ultimate Creations, Inc., and        :
Arizona corporation, Warrior and     :
Dana Warrior, husband and wife,      :
                Plaintiffs           :
                                     :
vs                                   :
                                     :
Vincent K. McMahon and Linda         :
McMahon, husband and wife; Titan     :
Sports, Inc., a Connecticut          :
corporation, World Wrestling         :
Entertainment, a Connecticut         :
corporation,                         :
                Defendants           :
- - - - - - - - - - - - - - - - -X

           Videotaped deposition of KEVIN
    DUNN taken at the offices of Rosenblum
    Newfield LLC, One Landmark Square,
    Stamford, Connecticut 06901, before
    Clifford Edwards, LSR, Connecticut License
    No. SHR.407, a Professional Shorthand
    Reporter and Notary Public, in and for the
    State of Connecticut on April 23, 2009, at
    9:11 a.m.

**2**

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3  DANIEL D. MAYNARD, ESQ.
   MAYNARD CRONIN ERICKSON CURRAN & SPARKS, P.L.C.
4  1800 Great American Tower
   3200 Central Avenue
5  Phoenix, Arizona 85012
6
7  ON BEHALF OF THE DEFENDANTS:
8  JERRY S. MCDEVITT, ESQ.
   MATTHEW H. SEPP, ESQ.  (not present)
9  KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
   The Henry Oliver Building
10 535 Smithfield Street
   Pittsburgh, PA 15222
11
12
13
14
15 ALSO PRESENT:
     DOMINIC BOUCHER, VIDEOGRAPHER
16   WARRIOR

**3**

1   VIDEOTAPED DEPOSITION OF KEVIN DUNN
2          APRIL 23, 2009
3
4        THE VIDEOGRAPHER: We are on
5   record. This is the deposition of Kevin
6   Dunn taken on behalf of the plaintiff in
7   the case of Ultimate Creations, et
8   al. versus Vincent K. McMahon, et al.
9        Case number is
10  CV060-00535-PHX-ROX, filed in the United
11  States District Court for the District of
12  Arizona.
13       Today's date is April 23rd,
14  2009. The time on video record is
15  9:11 a.m.
16       This deposition is being held at 1
17  Landmark Square, Stamford,
18  Connecticut. My name is Dominick Boucher
19  representing Esquire Deposition
20  Solutions.
21       Would counsel please introduce
22  yourselves for the record.
23       MR. MAYNARD: Dan Maynard on behalf
24  of the plaintiff.
25       MR. McDEVITT: Jerry McDevitt on

**4**

1   behalf of the defendants.
2            KEVIN DUNN
3   residing at 33 Wilton Acres, Wilton, Connecticut
4   06987, having first been duly sworn, deposed and
5   testified as follows:
6
7            DIRECT EXAMINATION
8
9   BY MR. MAYNARD:
10      Q   Mr. Dunn, you are aware that you are here
11  to be deposed because of a lawsuit that's been filed
12  by the plaintiff's lawyer in the District of
13  Arizona.
14      Is that correct?
15      A   Yes.
16      Q   Okay. Have you ever been deposed
17  before?
18      A   Yes.
19      Q   On how many occasions?
20      A   At least once.
21      Q   And when was that?
22      A   Some time ago, ten years maybe.
23      Q   Can you tell me what the circumstances
24  were around that?
25      A   We had a -- a dispute with an announcer



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 13

1  Q   Okay. Is it acceptable for this
2  deposition for us just to refer to WWE, and that
3  would encompass your time at both WWF and WWE?
4  A   Yes.
5  Q   Okay. Is your actual employer Titan
6  Sports?
7  A   Now?
8  Q   Yes.
9  A   No.
10 Q   Okay. How long were you employed by Titan
11 Sports?
12 A   I was employed with them until they
13 changed their name to World Wrestling Federation or
14 World Wrestling Entertainment.
15 Q   You just don't recall when that was.
16 A   No.
17 Q   Okay. Your employer changed its name.
18 Did your job responsibilities change when the name
19 change occurred?
20 A   Not necessarily.
21 Q   Okay. Sort of give me a brief history of
22 your tenure at Titan Sports, WWF, WWE? You start in
23 1983, and you're currently employed there.
24     Correct?
25 A   Started in 1983, currently employed there,

### 14

1  worked my way up being an associate producer, to a
2  producer, to senior producer, to a supervising
3  producer, to an executive producer, to what I am now
4  which is executive vice president television.
5  Q   Do you happen to recall when you became a
6  producer?
7  A   No.
8  Q   Did your job responsibilities change every
9  time your job title changed?
10 A   Most likely.
11 Q   Okay. When did you become an executive
12 producer?
13 A   I believe it was 1993.
14 Q   And what were your jobs as an executive
15 producer?
16 A   To supervisor the television studio, the
17 television production studio.
18 Q   Can you explain to me exactly what those
19 responsibilities were?
20 A   To be the head person in charge of all
21 technical television facilities and production
22 facilities.
23 Q   And were you responsible for the
24 videotaping of all WWE wrestling matches?
25 A   When I became executive producer?

### 15

1  Q   Yes, sir.
2  A   Yes.
3  Q   Were you responsible for the various
4  programming that WWE would put on, including
5  vignettes interviews and things of that nature?
6  A   Yes.
7  Q   Okay. When did WWE -- and again, I'm
8  going to use it generically to cover Titan
9  Sports, WWF and WWE.
10     Is that okay?
11 A   Yes.
12 Q   At some point, did WWE start making home
13 videos?
14 A   I'm sorry. Was there a question there?
15 Q   Did WWE start producing videos to be sold
16 to consumers?
17 A   Yes.
18 Q   When did that occur?
19 A   I don't know.
20 Q   What's your best recollection?
21 A   Mid '80s.
22 Q   Okay. When did you start having any
23 responsibility, if at all, for the production of
24 those home videos?
25 A   I'm not a hundred percent sure.

### 16

1  Certainly, when I was executive producer, that fell
2  under me at that point.
3  Q   So at least as early as 1993?
4  A   Yes.
5  Q   Okay. Who -- once you -- strike
6  that.
7      Once you became the executive producer and
8  had some responsibility for the home videos, who was
9  it that would make the decision as to what the
10 subjects were going to be for the home videos?
11 A   Back in 1993, I could not tell you.
12 Q   Okay. Was there a separate division of
13 WWE that did home videos versus the television's
14 productions?
15 A   No.
16 Q   They were done together.
17     Is that correct?
18 A   I wouldn't say they were done together.
19 It was certainly housed in the same building.
20 Q   Okay. I'm going to show you some exhibits
21 later on and primarily a number of e-mails.
22     Did you look at any of the e-mails that
23 were sent to you or that you sent out concerning
24 this "Self Destruction of Ultimate Warrior" video in
25 preparation for today.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 25

1    Q   Do you know if it would be in the
2    hundreds?
3    A   I don't.
4    Q   Okay. Do you know when WWE first started
5    making DVDs that focused on one particular character
6    or individual?
7    A   I don't.
8    Q   Do you know who the first one was that
9    they ever did a DVD on?
10   A   No.
11   Q   Okay. Can you tell me how many DVDs on
12   individual characters were made this past year in
13   2008?
14   A   No.
15   Q   Any idea?
16       Was it more than a dozen or less than a
17   dozen?
18   A   No idea.
19   Q   None. Okay.
20       And I take it you wouldn't know how many
21   were made in 2005?
22   A   No.
23       I could tell you we do 14 DVDs a year that
24   are -- that are subject driven outside of our
25   pay-per-views.

### 26

1        But I don't know how many deal with
2    individual characters.
3    Q   When you say "subject driven," what do you
4    mean by that?
5    A   They are DVDs that are driven out of our
6    library.
7    Q   In other words, you go back and you look
8    at a old footage that you have and decide that you
9    are going to create a DVD from the library,
10   television footage that you have?
11   A   Yes.
12   Q   Okay. And I take it you look at footage
13   that you are thinking about compiling that you hope
14   will sell to consumers?
15   A   Yes.
16   Q   Okay. Do you put out a DVD each year for
17   your pay-per-view subjects such as
18   WrestleMania?
19   A   We put a DVD out for every pay-per-view we
20   do.
21   Q   Okay. So how many pay-per-views does WWE
22   do a year?
23   A   Fourteen.
24   Q   So does that mean that WWE then puts out
25   28 DVDs a year?

### 27

1    A   I don't know if it's exactly 28.
2        It's -- it's around that area.
3    Q   You testified just a moment ago that you
4    routinely put out 14 DVDs that are subject
5    driven.
6        Is it fair to say it could be a little
7    less than that or a little more some years?
8        Or is that a number you try to achieve
9    each year?
10   A   It could be more or less than that.
11       It's around that number.
12   Q   Okay. And starting in what year did you
13   try to start putting out 14 subject driven DVDs a
14   year?
15   A   I don't know.
16   Q   Would it have been prior to 2005?
17   A   Yes.
18   Q   Okay. Has it remained fairly constant for
19   the last ten years, say?
20   A   I don't know.
21   Q   Is there anyone who's in a better position
22   to know than you would be?
23   A   Jennifer Good.
24   Q   How long has she been with the
25   company?

### 28

1    A   Fifteen years.
2    Q   Is it the group of Ms. Goldsmith,
3    Ms. Good, Mr. McMahon and you that decides what the
4    subjects will be on those 14 subject-driven
5    DVDs?
6    A   That has -- that has happened in the
7    past. Yes.
8    Q   Have there ever been times when
9    Mr. McMahon would say, I want a DVD on this
10   particular subject?
11   A   Yes.
12   Q   Okay. How often does that happen?
13   A   I don't know.
14   Q   In this particular case, dealing with the
15   Warrior DVD, do you know how it came to pass that
16   WWE decided to do a Warrior DVD?
17   A   I don't.
18   Q   Okay. You don't know whether or not the
19   four of you got together, Ms. Goldsmith, Ms. Good,
20   Mr. McMahon and you, or whether Mr. McMahon might
21   have made that decision on his own?
22   A   I don't know that.
23   Q   Okay. The subject-driven DVDs that are
24   done, do you recall whether or not a percentage of
25   those are based on an individual character?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

**29**

1   A   No.
2   Q   So there isn't a formula that says we are
3   going to try to do six character DVDs a year and
4   eight on some other subject?
5   A   There is not a formula.
6   Q   Okay. Of the subject-driven DVDs that you
7   are aware of concerning the character or the
8   individuals, do those DVDs generally deal with the
9   history of that individual in the wrestling
10  business?
11  A   That can happen.
12  Q   Is there another formula other than that?
13  A   I don't understand the question.
14  Q   Okay. Let's say, for instance, we take
15  The Rock, WWE has done a DVD on The Rock.
16      Correct?
17  A   Yes.
18  Q   That DVD basically looks at his
19  development as an individual who came into wrestling
20  and the characters that he wrestled under?
21  A   It could.
22  Q   Okay. It would look at potentially what
23  he did at WWE, and it might even look at what he was
24  doing before that?
25  A   It could.

**30**

1   Q   Okay. Who makes the decision what the
2   scope of the DVD is going to be?
3   A   The -- the producer in charge of the home
4   video department.
5   Q   And who is that?
6   A   Well, right now, it's Mike Calabrese.
7   Q   Who was it in 2005?
8   A   I believe it was Laurie Calabrese.
9   Q   Are they husband and wife?
10  A   Yes.
11  Q   Is -- what position is she in at this
12  point?
13  A   She's no longer with the company.
14  Q   Who makes the decision as to what people
15  will be interviewed for the various DVDs that WWE
16  makes?
17  A   The home -- the home video producer works
18  with Jennifer Good in making those decisions.
19  Q   And are the interviews routinely done at
20  WWE?
21  A   At -- what is "at WWE mean"?
22  Q   Well, at the studio WWE?
23  A   Not necessarily.
24  Q   Okay. Are the individuals who are
25  interviewed, are they routinely people who have been

**31**

1   employed by WWE?
2       MR. McDEVITT: Object to the form and
3       conclusion of employment.
4       You can answer.
5   A   Not necessarily.
6   BY MR. MAYNARD:
7   Q   Okay. There will be times during the day
8   when your counsel will object to the form of the
9   question. He's making a record. You can go ahead
10  and answer those questions unless he instructs you
11  not to answer.
12      For instance, if I were to ask you a
13  question about the conversations you had with him
14  and you were starting to answer. He'd instruct you
15  not to answer, and I'd suggest you follow his
16  instructions.
17      Do you understand that?
18  A   Yes.
19  Q   Okay. Have there ever been DVDs that WWE
20  has put out that portray the individual wrestler or
21  the character in a negative connotation?
22  A   I would --
23      MR. McDEVITT: I object to the form
24      of the question.
25      Go ahead, Kevin. You can

**32**

1       answer.
2   A   I assume so.
3   BY MR. MAYNARD:
4   Q   Are you aware of any as we sit here?
5   A   Not necessarily.
6   Q   Do you believe that the Warrior video
7   portrays Warrior in a negative way?
8   A   I don't know.
9   Q   Are you aware, as we sit here, of any
10  videos put out by WWE that portrays an individual in
11  a negative way?
12  A   I --
13      MR. McDEVITT: Again, I have to
14      object to the form of that. I think
15      that's so ambiguous I don't know how
16      someone would answer that.
17      But go ahead, Kevin, if you can.
18  A   Not that I know of.
19  BY MR. MAYNARD:
20  Q   Okay. Is it fair to say that generally
21  the videos that are put out by WWE concerning
22  wrestlers are positive about the wrestler's
23  career?
24  A   I'm not -- I'm not sure.
25  Q   Are you aware of any videos, for



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 37

1  years?
2  A  It's been at least five.
3     I'm not sure past that.
4  Q  And Laurie Calabrese, how long -- strike
5  that.
6     In 2005, what was her position with
7  WWE?
8  A  I don't know exact what her position
9  was. I believe in 2005, she was in charge of
10 producing home videos.
11    I don't know exactly what the title would
12 be.
13 Q  Do you know how long she was with WWE?
14 A  Somewhere between five and ten years.
15 Q  When was it that she left?
16 A  I believe it was 2006.
17 Q  Who is Steve Cooney?
18 A  Steve Cooney is a home video producer.
19 Q  Was he a home video producer back in 2005?
20 A  Yes.
21 Q  How long had he been with WWE?
22 A  Somewhere between five and ten years.
23 Q  Did he report to you?
24 A  No.
25 Q  Who did he report to?

### 38

1  A  Laurie Calabrese.
2  Q  Did Laurie Calabrese report to you?
3  A  No.
4  Q  I'm going to get this name wrong, but it's
5  Kieran Bent?
6  A  Yes.
7  Q  Who is that?
8  A  He's an assistant producer in home video.
9  Q  Who did he report to?
10 A  I believe Laurie Calabrese.
11 Q  Does he continue to be with the business
12 today?
13 A  Yes.
14 Q  What's his position today?
15 A  I don't know.
16 Q  Does he report to you at all?
17 A  No.
18 Q  Do you work with him at all?
19 A  No.
20 Q  Dan Pucherelli?
21 A  Yes.
22 Q  What was his position in 2005?
23 A  I don't know.
24 Q  Is he with WWE today?
25 A  Yes.

### 39

1  Q  What is his position today?
2  A  I don't know.
3  Q  Do you know how long he's been with
4  WWE?
5  A  I would guess five years.
6     MR. MAYNARD: I'm going to mark
7  some.
8     (THEREUPON, PLAINTIFF'S EXHIBIT
9     NO. 1, E-MAIL FROM DONNA GOLDSMITH TO
10    JENNIFER GOOD, WAS MARKED FOR
11    IDENTIFICATION.)
12 BY MR. MAYNARD:
13 Q  I'm going to show you what's been marked
14 as Exhibit No. 1.
15    MR. McDEVITT: Do you have
16 copies, Dan?
17    MR. MAYNARD: Yeah. Yeah, I do.
18    MR. McDEVITT: Have you been marking
19 each exhibit in each deposition just
20 one?
21    Or are you not going --
22    MR. MAYNARD: Yeah. We're not -- you
23 guys started -- we are not doing
24 sequential.
25    MR. McDEVITT: All right. So this

### 40

1  is, basically, Dunn Exhibit 1.
2     MR. MAYNARD: Basically, Dunn
3  Exhibit 1.
4     MR. McDEVITT: All right.
5  BY MR. MAYNARD:
6  Q  All right. Mr. Dunn, I'm showing you what
7  I've had marked as Exhibit No. 1 which appears to be
8  a e-mail or a memo from Donna Goldsmith to Jennifer
9  Good.
10    It doesn't appear that you are copied on
11 it.
12    Have you ever seen this document
13 before?
14 A  No.
15 Q  The subject of it is notes from V.K.M.
16 meeting.
17    Is that Vincent K. McMahon?
18 A  Yes.
19 Q  Back in 2005, would Mr. McMahon have had
20 meetings with Ms. Goldsmith to discuss DVD projects?
21 A  Yes.
22 Q  Were they held on any routine basis, such
23 as once a week, once a month?
24 A  I don't know.
25 Q  Okay. Is there a reason you would not



Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 45

1 the document meant that he didn't
2 write.
3     MR. MAYNARD: I didn't ask him what
4 the author meant.
5     MR. McDEVITT: I think you did.
6     MR. MAYNARD: No, I didn't.
7     MR. McDEVITT: I think you did.
8     MR. MAYNARD: If you want it, we'll
9 read the question back.
10    I asked him what his understanding
11 was. And he can either tell me or he
12 can't.
13    MR. McDEVITT: You are asking his
14 understanding of what somebody else
15 wrote.
16    MR. MAYNARD: That's right.
17    MR. McDEVITT: That he didn't
18 write --
19    MR. MAYNARD: I understand.
20    MR. McDEVITT: -- or receive.
21    MR. MAYNARD: I understand.
22    MR. McDEVITT: There's no foundation
23 for that question.
24    But if you can answer it, Kevin, go
25 ahead.

### 46

1     MR. MAYNARD: I would appreciate
2 it, though, if you quit doing speaking
3 objections.
4     MR. McDEVITT: I'm not doing speaking
5 objections.
6     These are self-evident
7 objections, and any lawyer would
8 know.
9 BY MR. MAYNARD:
10 Q  Go ahead.
11    Do you have an understanding of what is
12 meant by "why did he self destruct"?
13    MR. McDEVITT: Same objection.
14 A  My understanding would be to put -- to
15 explain why he self destructed in the video.
16 BY MR. MAYNARD:
17 Q  Do you have any understanding having
18 worked on this Warrior DVD that he, Warrior, self
19 destructed?
20    MR. McDEVITT: Again, object for
21 foundation.
22    You haven't established that he
23 worked on the Warrior video.
24 BY MR. MAYNARD:
25 Q  Can go ahead and answer.

### 47

1 A  I didn't work on the Warrior video.
2 Q  You didn't have anything to do with the
3 Warrior video?
4 A  I had very little to do with the Warrior
5 video.
6 Q  Who were the primary people that were
7 responsible for the Warrior video?
8 A  Laurie Calabrese and her team, whoever
9 worked on it --
10 Q  Okay.
11 A  -- Jennifer Good.
12 Q  You were aware the video was being
13 made, were you not?
14 A  Yes.
15 Q  You were aware that at some point that the
16 title became "The Self Destruction of the Ultimate
17 Warrior"?
18 A  Yes.
19 Q  Okay. Do you know who picked that title?
20 A  Vince McMahon.
21 Q  Did you have discussions with Mr. McMahon
22 about the title?
23 A  I don't have a direct recollection of it,
24 but I believe I did.
25 Q  Okay. I understand you don't have a

### 48

1 direct recollection. But what is it that you can
2 recall, if anything?
3 A  Well, I can recall that Vince was very
4 much involved in making titles for home videos
5 because they were good marketing.
6    So I have a recollection of discussing at
7 one point with him. But I don't have a direct
8 recollection of this happened so that,
9 therefore, I did this.
10    But I believe that was I was involved in
11 that process. But I would be involved in a lot of
12 the process in making a lot of this -- the titles
13 for DVDs.
14 Q  Did you know Jim Hellwig?
15 A  Yes.
16 Q  And when did you meet Mr. Hellwig?
17 A  I don't know.
18 Q  You recall him wrestling under the name
19 the Ultimate Warrior?
20 A  Yes.
21 Q  Do you recall there being a point in time
22 when he was suspended from wrestling by Mr. McMahon?
23 A  I don't know about suspended. I know
24 there was a point in time where he stopped working
25 for us.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 49

1  Q  Okay. And do you recall that he came back
2  then at some later date?
3  A  Yes.
4  Q  Do you recall that he then was either
5  suspended or terminated or stopped working for WWE?
6  A  Yes.
7  Q  And do you recall that he came back a
8  third time?
9  A  No.
10 Q  Okay. You just recall it occurring twice?
11 A  I would call it occurring several times.
12 I don't know if it was the third time or not.
13 Q  Okay.
14        (THEREUPON, PLAINTIFF'S EXHIBIT
15        NO. 2, E-MAIL FROM LAURIE CALABRESE
16        TO JENNIFER GOOD, WAS MARKED FOR
17        IDENTIFICATION.)
18 BY MR. MAYNARD:
19 Q  I'm going to show you what I've
20 had -- oh, shoot put it on the wrong one.
21      Let me show you what I've had marked as
22 Exhibit No. 2 to your deposition.
23      Okay. Exhibit No. 2, the first page of it
24 appears to be an e-mail from Laurie Calabrese to
25 Jennifer Good with copies to a number of

### 50

1  people. And the subject is "Ultimate Warrior."
2        Have you ever seen this document
3  before?
4  A  No.
5  Q  Okay. The second page -- and it would
6  appear that the following four pages appear to be an
7  outline.
8        Have you ever seen those four pages
9  before?
10 A  No.
11 Q  Can you tell me, when WWE was doing a DVD
12 on a wrestler back in 2005, was it typical to
13 prepare an outline?
14 A  I would assume so.
15 Q  Okay. Did you ever participate in those
16 outline preparations?
17 A  No.
18 Q  Do you have any understanding of how the
19 outlines were made?
20 A  No.
21 Q  Did you participate in determining who
22 would be interviewed for the DVD?
23 A  No.
24 Q  Did you ever participate in who would be
25 interviewed for various DVDs for WWE?

### 51

1  A  No.
2  Q  Okay. In 2005, would that have been
3  either Jennifer Good or Laurie Calabrese?
4  A  I think it would have been both.
5  Q  Okay. Exhibit No. 2, does this appear to
6  be a typical type of e-mail and attachment that
7  would have occurred in the production stages of a
8  WWE DVD?
9  A  Yes.
10 Q  When a DVD on a particular wrestler was
11 being made, was there ever a separate file set up on
12 that at WWE?
13 A  I don't know.
14 Q  Do you know whether or not -- strike
15 that.
16      Exhibit No. 2 -- and I understand you are
17 not the author. But it's written by Laurie
18 Calabrese.
19      Do you recall whether she was around in
20 1991 at WWE?
21 A  Highly unlikely.
22 Q  Do you have any understanding of how she
23 would go about finding out who should be interviewed
24 for a DVD in a time period when she wasn't
25 there?

### 52

1  A  Do I have an understanding of that?
2        No.
3  Q  Yes.
4        I mean, would she sit down with you?
5        Or would she sit down Mr. McMahon and
6  say, Okay, we are going to do this DVD.
7        Who do I interview?
8        MR. McDEVITT: Lack of
9        foundation.
10       If you can answer, Kevin, go
11       ahead.
12 A  I -- I don't know how she would
13 necessarily do it.
14 BY MR. MAYNARD:
15 Q  The DVDs on the various histories of a
16 wrestler that have been done by WWE, when you do an
17 interview or an interview is done of other
18 wrestlers, do they script the wrestlers?
19 A  No.
20 Q  Do they give them copies of the questions
21 they are going to be asked?
22 A  I don't know.
23 Q  Who would know?
24 A  Any producer who have done these
25 interviews over the years.



Toll Free: 800.211.3376
Facsimile: 954.331.4418

ESQUIRE
an Alexander Gallo Company

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 125

1  A  I said, You guys should look at the DVD
2  and find the controversial parts of this that would
3  make it interesting and make sure it's part of your
4  promo.
5  Q  When do you recall having these
6  conversations with Mr. Gaborik?
7  A  Some time leading up to the DVD coming
8  out.
9  Q  Would it have been after the title had
10 been picked?
11 A  Yes.
12 Q  Okay. Had -- what role, if any, did you
13 play in selecting what was portrayed in the
14 DVD, the Warrior DVD?
15 A  Zero.
16 Q  Before it was a finished product, did you
17 review the DVD?
18 A  No.
19 Q  What is the typical process back in 2005
20 that WWE went through in finalizing DVDs before they
21 were sent to market?
22 A  The producer meets with their supervising
23 producer, which in this case is Jennifer Good. They
24 discuss what the project is. They execute the
25 project.

### 126

1  The producers do, in this case Laurie
2  Calabrese. And then Jennifer reviews the DVD, gives
3  notes, those DVDs are -- revisions are made. She
4  reviews it again, and it's finalized.
5  Q  Okay. So in this case, Jennifer Calabrese
6  would have been the one who is producing it --
7  A  Laurie Calabrese.
8  Q  Laurie Calabrese, and Jennifer Good was
9  her boss?
10 A  Yes.
11 Q  And so she would have -- Calabrese would
12 have put it together and, then, sent it to Laurie
13 Good for approval?
14 A  Jennifer Good.
15 Q  Jennifer Good.
16 A  Yes.
17 Q  Okay. Would Jennifer Good then have to
18 seek approval from anyone else before it was
19 marketed?
20 A  No.
21 Q  Were there any steps taken to make sure
22 that the things said in the DVD were accurate?
23 A  I don't know of that for a fact, no.
24 Q  Is there a process by which WWE does any
25 fact checking on its DVDs before it sends them out

### 127

1  to marketing?
2  A  That's certainly Jennifer Good's
3  responsibility.
4  Q  Do you have any understanding of how she
5  would have satisfied that responsibility?
6  A  I know she has a relationship with legal,
7  and legal has often looked at these DVDs. And she's
8  had conversations with them.
9  Q  Do you know whether or not she had
10 conversations with legal in this case before the DVD
11 went out to marketing.
12 A  I believe she did.
13 Q  Without telling me the substance or your
14 conversation, what's your basis for telling me
15 that?
16    I haven't seen any e-mails.
17 A  Right.
18    My basis -- recollection is Jennifer told
19 me she was going to have this reviewed by
20 legal.
21 Q  And when you say "reviewed by legal," is
22 it your understanding that it would have been done
23 in-house?
24 A  Yes.
25 Q  And how many in-house lawyers did WWE have

### 128

1  back in 2005?
2  A  I don't know.
3  Q  How many in-house lawyers does it have
4  now?
5  A  I don't know.
6  Q  How many are you aware of now?
7  A  One, two, three -- I'm aware of three
8  now.
9  Q  And you just don't recall how many there
10 were in 2005?
11 A  No.
12 Q  Looking at Exhibit 21 -- I know you've
13 told me this, and I apologize.
14    But what was Kieran Bent's role?
15 A  He's assistant producer.
16 Q  Okay. Is he still employed --
17 A  Yes.
18 Q  -- at WWE?
19 A  Yes.
20 Q  Okay. Have you seen Exhibit 21
21 before?
22 A  No.
23 Q  Did you ever have any conversations with
24 Kieran Bent about the title to the Warrior DVD?
25 A  No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### 145

1  A  "Run-down" is generally some sort of
2  script that's either done before or after a
3  videotape that explains what's to be on it or
4  what's -- what is on it.
5  Q  Okay. Is it -- is a run-down an ongoing
6  document that changes?
7  A  Yes.
8  Q  In other words, do you start with a
9  run-down at the very beginning of the taping
10 process.
11      And as the taping goes on, does it
12 change?
13 A  Yes.
14 Q  Okay. And is there -- strike that.
15     In 2005, was there a typical number of
16 run-downs that would be done on a particular video
17 or DVD?
18 A  I don't know.
19 Q  Did you ever see run-downs on DVDs?
20 A  No.
21 Q  What was the purpose of the run-down?
22     MR. McDEVITT: Are you talking in
23     general or on DVDs or --
24 BY MR. MAYNARD:
25 Q  Strike that.

### 146

1      What was the purpose of the run-down for
2  these WWE DVDs?
3  A  I don't know.
4      I've never seen one.
5  Q  You just heard the phrase used?
6  A  Well, I use them -- I produce live TV
7  shows.
8      We use them in live TV shows. I don't
9  know how it pertains to DVD.
10 Q  You use the phrase "run-down" in live
11 TV. Okay.
12     MR. MAYNARD: Jerry, why don't we
13     take five minutes.
14     I may be done.
15     MR. McDEVITT: Okay.
16     THE VIDEOGRAPHER: Going off the
17     record. The time is 12:25.
18     (THEREUPON, THERE WAS A RECESS
19     TAKEN.)
20     THE VIDEOGRAPHER: We are back on
21     record. The time is 12:45.
22     You may continue.
23 BY MR. MAYNARD:
24 Q  Okay. All right. The Warrior video or
25 DVD, have you ever seen it?

### 147

1  A  No.
2  Q  Did you ever watch any of it?
3  A  No.
4  Q  I've got the -- I believe this is the
5  intro section that's up on the screen over here to
6  your right where it says "The Self Destruction of
7  the Ultimate Warrior."
8      It says "play, chapters, extras."
9      Do you see that?
10 A  Yeah.
11 Q  Have you ever seen that before?
12 A  No.
13 Q  Do you know who created the visual effect
14 for the self-destruction, and then it looks like
15 lines going out from it?
16 A  No.
17 Q  Would it have been somebody at WWE?
18 A  I'm assuming that's true. Yes.
19 Q  Does it --
20 A  We do everything in-house.
21 Q  Yeah. I was just going to ask that.
22     Is it fair to say that everything with the
23 production of the Warrior DVD would have been done
24 in-house at WWE?
25 A  Yes.

### 148

1  Q  Okay. And is all of the marketing on the
2  Warrior DVD done in-house at WWE?
3  A  I don't know.
4  Q  Are you aware of any marketing that is not
5  done in-house?
6  A  I'm aware that retailers market product
7  for us.
8  Q  Okay. The Warrior DVD comes in a
9  particular box.
10     Would that have been designed by people at
11 WWE?
12 A  Yes.
13 Q  The graphics, photographs and all of that
14 would be --
15 A  Yes.
16 Q  -- from folks at WWE?
17 A  Yes.
18 Q  Is that correct?
19 A  Yes.
20 Q  Okay. Do you happen to know whether or
21 not the portion that I have on the screen right now
22 at the very beginning where it has the play and the
23 chapters and the extras, is that meant to depict a
24 broken or shattered window?
25     MR. McDEVITT: Again, objection.



Toll Free: 800.211.3376
Facsimile: 954.331.4418

ESQUIRE
an Alexander Gallo Company

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

                                    167
                               C E R T I F I C A T E

        I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

        I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

        I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

        Witness my hand and seal as Notary Public this __15th__ day of __May__, 2009.


                        /s/ Clifford Edwards
                             Clifford Edwards
                             Notary Public

My commission expires: 9/30/2011



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418
Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

# EXHIBIT 31

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ARIZONA
 2
    ULTIMATE CREATIONS, INC., an Arizona
 3  Corporation; WARRIOR and DANA WARRIOR,
    Husband and wife,
 4
                    Plaintiffs,    Case No. CV06-0535-PHX-ROS
 5
            vs.
 6
    VINCENT K. McMAHON and LINDA
 7  McMAHON, husband and wife; TITAN SPORTS,
    INC., a Connecticut corporation; WORLD
 8  WRESTLING ENTERTAINMENT, INC., a
    Connecticut corporation,
 9
                    Defendants.
10
    VINCENT K. McMAHON and LINDA
11  McMAHON, husband and wife; TITAN SPORTS,
    INC., a Connecticut corporation;
12  WORLD WRESTLING ENTERTAINMENT;
    INC., a Connecticut corporation,
13
                    Counterclaim-Plaintiffs,
14
            vs.
15
    WARRIOR,
16
                    Counterclaim-Defendant.
17
                VIDEO DEPOSITION OF DANA WARRIOR
18                      April 17, 2009
                         9:36 a.m.
19                   55 Old Santa Fe Trail
                     Santa Fe, New Mexico
20
               PURSUANT TO THE NEW MEXICO RULES OF CIVIL
21  PROCEDURE THIS DEPOSITION WAS:
22  TAKEN BY:   MR. CURTIS B. KRASIK
                ATTORNEY FOR THE DEFENDANTS
23
    REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
24               TRATTEL COURT REPORTING & VIDEOGRAPHY
                 P.O. Box 36297
25               Albuquerque, New Mexico  87176-6297
```

Ultimate Creations v. McMahon et al                                           206CV 535
Dana Warrior                                                                  April 17, 2009

### Page 26

1    A. All the way through. It's just -- it was
2  produced and put out there to malign him and to take a
3  character that was beloved and always a good guy and bring
4  it down.
5    Q. So if I understand, you're saying that you're
6  basing your belief on what you saw in the DVD.
7    A. I think that anybody would see on the DVD.
8    Q. Well, did anyone else tell you that?
9    A. I did have somebody tell me that.
10   Q. Who is that?
11   A. A family -- an acquaintance family was telling me
12 that they wanted to know more about my husband, and they
13 had ordered the DVD, and when they sat down as a family to
14 watch it, they had to shut it off because they said this
15 wasn't what we were imagining.
16   Q. And this is a family that you're acquaintances
17 with here in Santa Fe?
18   A. It is.
19   Q. Do you know if they are coming into court to
20 testify on your husband's behalf in this lawsuit?
21   A. I do not.
22   Q. Other than that conversation, is there any other
23 basis for your belief that your husband's reputation was
24 injured because of the DVD?
25   A. I think the fact that it was mass marketed, it

### Page 27

1  was a hit piece, and there is no way to surmise anything
2  other than it was aimed at ruining his reputation.
3    Q. Okay. Again, all of those bases for your belief
4  are -- came from what you saw in the DVD; right?
5    A. Yes, sir.
6    Q. No one else told you that?
7         MR. MAYNARD: Objection to the form.
8    A. No.
9    Q. Ma'am, when you say the DVD was intended to
10 malign your husband, was a hit piece, and was aimed at
11 ruining his reputation, do you have any evidence that that
12 was WWE's intent in producing that DVD?
13   A. The product, sir.
14   Q. Do you have any evidence that that was their
15 intent behind the product that you saw?
16   A. The title in itself.
17   Q. Okay.
18   A. Destruction has a meaning.
19   Q. Anything else?
20   A. I think that's enough.
21   Q. Okay. But you don't -- no one in your
22 conversations with WWE where they indicated to you or your
23 husband or anybody else were intending to put out this DVD
24 to malign him, use as a hit piece and aimed at ruining his
25 reputation?

### Page 28

1    A. I had no conversation with WWE.
2    Q. Do you have an understanding of whether anyone
3  said that to your husband?
4    A. I -- I do not.
5    Q. Are you aware if your husband lost any business
6  opportunities as a result of the DVD?
7    A. I -- I would not be aware of that.
8    Q. Can you name one person who was deterred from
9  doing business with him as a result of the DVD?
10   A. I can't name faces, people.
11   Q. Is there any -- any possibility out there, any
12 business prospect that you're aware of that was lost, even
13 if you don't know the person's name, that was lost as a
14 result of the DVD?
15   A. I don't -- I can't pinpoint a certain person.
16   Q. Can you name any person who was deterred from
17 associating with your husband as a result of the DVD?
18   A. I don't think it's my job to name a person that
19 was deterred from associating with my husband. I couldn't
20 know that. I couldn't -- I couldn't know that.
21   Q. Well, if there was a person, you could know that.
22 I need you to answer my question, ma'am.
23   A. Please ask me again.
24       MR. KRASIK: Could you read back the
25 question, please.

### Page 29

1        (The previous question was read.)
2    A. I do not have that information.
3    Q. What do you contend your husband's reputation is
4  now after the DVD?
5    A. In what circle?
6    Q. However you choose to define it.
7    A. I don't think I have data to answer that
8  question.
9    Q. Okay. But if you don't know what your husband's
10 reputation is now, how do you know that it was harmed as a
11 result of the DVD?
12   A. Well, it certainly wasn't uplifted by the content
13 of the DVD.
14   Q. And how do you know that?
15   A. Because of the product that was put out there,
16 because of the DVD itself.
17   Q. From your own perception of the product?
18   A. From my perception of the product.
19   Q. Okay.
20   A. Since there is not a question pending, may I
21 stretch my legs for a moment?
22       MR. KRASIK: Sure. We can go off the
23 record.
24       VIDEOGRAPHER: Going off the record at
25 10:10.

Ultimate Creations v. McMahon et al
Dana Warrior

206CV 535
April 17, 2009

Page 38

1  stress, attorneys' fees incurred, costs incurred in
2  litigation. Damages have not yet been calculated.
3  Plaintiffs will supplement this response.
4      I can represent to you there has been no
5  supplementation since this -- since then to this response.
6  What knowledge and information, ma'am, do you have
7  regarding damages in this case?
8      A. The damage to his reputation.
9      Q. And what information do you have in that
10 connection?
11     A. The product that was put out there.
12     Q. Okay. Do you know if your husband is going to
13 ask for money from the jury in this case?
14     A. I don't -- I don't know.
15     Q. You don't know?
16     A. I don't know.
17     Q. Do you know how much money he is going to ask the
18 jury for?
19     A. I do not.
20     Q. If I told you five to $7 million, does that sound
21 high to you?
22     A. I have no opinion.
23     Q. Have you ever discussed with your husband outside
24 the presence of your lawyer how much money in damages he is
25 seeking in this case?

Page 39

1      A. No.
2      Q. Okay. Now, a moment ago, you said you have
3  information concerning your belief that his reputation has
4  been harmed based on the DVD; is that right?
5      A. I did.
6      Q. Okay. And that's, again, based on your
7  perception of the DVD?
8      A. A reasonable person's perception to the DVD.
9      Q. A reasonable person's perception. Have any
10 reasonable persons told you that's their perception of the
11 DVD?
12         MR. MAYNARD: Objection to form. Other than
13 what she's already testified about?
14     Q. Well, other than the acquaintance family in Santa
15 Fe, have any -- and I don't know if they're reasonable
16 people or not. I'll assume they are. Have any other
17 reasonable people told you that their -- that the DVD hurt
18 his reputation?
19     A. I don't think any other conclusion could be
20 reached by reasonable people.
21         MR. KRASIK: Could you please read back my
22 question.
23         (The previous question was read.)
24     Q. I need you to answer my question, ma'am. Have
25 any other reasonable people told you that the DVD hurt your

Page 40

1  husband's reputation?
2      A. Told me directly?
3      Q. Yes.
4      A. No.
5      Q. Okay. You are guessing what a reasonable person
6  would say, aren't you?
7          MR. MAYNARD: Objection to the form. Go
8  ahead and answer.
9      A. I'm not in agreement with the word "guessing."
10     Q. What word would you use?
11     A. I'm able to surmise after watching the DVD that a
12 reasonable person would have an affected opinion of my
13 husband's reputation.
14     Q. Would it be fair to say you're predicting what a
15 reasonable person would do or think?
16     A. Well, predicting would sort of cast in the future
17 as though it had not already been dis' -- distributed.
18     Q. I mean predicting in the sense that you don't
19 know, so you're predicting what someone else would say.
20     A. It's my belief.
21     Q. Okay. Other than that aspect of damages, this
22 response says you have knowledge and information concerning
23 value of intellectual property. Do you have any knowledge
24 and information concerning damages with respect to the
25 value of intellectual property?

Page 41

1      A. No, I do not.
2      Q. Okay. Do you have any knowledge or information
3  concerning emotional stress?
4      A. Well, in living with him, yes.
5      Q. Okay. What knowledge or information do you have
6  regarding emotional stress?
7      A. Just the way I saw it affect him after he watched
8  it, and that carried on for several months afterwards.
9      Q. He didn't like it, did he?
10     A. Well, no, of course not.
11     Q. Okay. Well, how did --
12     A. It was very hurtful.
13     Q. How did it affect him, to your perception?
14     A. Just as my husband and the father of my kids.
15 These people had gone out there to memorialize something
16 for -- that will never go away, and I think he just didn't
17 understand why they would do such a thing, and it was
18 really hurtful to all of us.
19     Q. Did this emotional stress manifest itself in any
20 tangible way?
21     A. Yes.
22     Q. How did it do that?
23     A. He wasn't -- he was withdrawn from my family, and
24 I could just tell he was really hurt and saddened by it.
25 It really hurt him. For everything that has gone back and

11 (Pages 38 to 41)