1   Daniel D. Maynard, No. 009211
    Michael D. Curran, No. 012677
2   **MAYNARD CRONIN ERICKSON**
    **CURRAN & SPARKS, P.L.C.**
3   3200 North Central Avenue, Ste. 1800
    Phoenix, Arizona 85012
4   (602) 279-8500
    dmaynard@mmcec.com
5
    Attorneys for Plaintiffs
6

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ULTIMATE CREATIONS, INC., an Arizona corporation; WARRIOR and DANA WARRIOR, husband and wife,<br><br>Plaintiff,<br><br>v.<br><br>VINCENT K. McMAHON and LINDA McMAHON, husband and wife; TITAN SPORTS, INC., a Connecticut corporation; WORLD WRESTLING ENTERTAINMENT, INC., a Connecticut corporation,<br><br>Defendants. | No. CV06-00535-PHX-ROS<br><br>**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' LOCAL RULE CIV. 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**AND**<br><br>**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

        Plaintiff, Warrior, by and through undersigned counsel and pursuant to Fed.R.Civ.P.

56 and L.R. Civ. 56.1, disputes the following paragraphs from Defendants' Local Rule Civ.

56.1 Statement of Material Facts in Support of Defendants Motion for Summary Judgment

("DSOF").

### DISPUTED FACTS

        6.      Plaintiff objects on the grounds that this is not a complete statement and takes

the comment out of context.  (*See* Defendants' Exhibit 4 and PSOF ¶14)

        7.      Plaintiff objects on the grounds that it is not complete.  The remaining portion

of the letter states:

1

> I regret the turmoil you've put yourself through and your agonizing over what you feel is fair compensation. And even though we have a difference of opinion over some of these matters, I am resolved to work with you in the same honest and equitable way that I always have. Furthermore, I would like to express to you my deepest appreciate and admiration for you as a performer, as a member of the WWF family, as a man and as my friend.

*See* Defendants' Exhibit 5.

10.     Plaintiff objects on the grounds that paragraph 10 is not a statement of fact but rather is a statement of opinion. Only Mr. McMahon can express what his understanding was. Warrior can testify as to what Mr. McMahon said, did or what he wrote but not as to how Mr. McMahon interpreted something.

14.     Plaintiff objects on the grounds of hearsay and lack of foundation.

15.     Plaintiff objects on the grounds of hearsay and lack of foundation.

16.     Plaintiff objects on the grounds of hearsay and lack of foundation.

17.     Plaintiff objects on the grounds of hearsay and lack of foundation.

18.     Plaintiff objects on the grounds that this mischaracterizes the testimony of Terry Bollea, a/k/a Hulk Hogan; he was not testifying as to Warrior's reputation but as to rumors he heard. *See* Defendants' Exhibit 14, Terry Bollea Dep., 4/18/09, p. 37.

19.     Plaintiff objects on the grounds of lack of foundation and hearsay. Again, Steve Borden was stating on a videotape, not under oath during a deposition, rumors he heard.

20.     Plaintiff objects on the ground of hearsay; what Chris Lewis heard from others is inadmissible hearsay.

23.     Plaintiff objects on the grounds that Mauro DiPasquale, M.D. stated that he was not aware of what policy was in effect at the time Warrior entered a booking contract on April 2, 1992 and it is not certain whether the Policy dated May 1, 1992 was ever in ever in effect much less as of November 1992, and there is no evidence that it applied to Warrior who entered into a new Booking Contract with WWE on April 2, 1992. (*See* PSOF 31)

24.     Plaintiff objects on the grounds that this mischaracterizes Warrior's testimony. The policy as defined in paragraph 22 would be the Policy that was in effect on April 2, 1992. The policy that was mentioned in paragraph 24 was from a later date. (*See* PSOF 31, 32, 33)

25.     Plaintiff objects on the grounds that this statement is misleading and does not accurately reflect the Policy that was in effect at the time that Warrior entered into a new contract with WWE. (*See* PSOF 33, 34)

33.     Plaintiff objects on the grounds of lack of foundation and hearsay.

36.     Plaintiff objects because Defendants states that Warrior admits that he was requested to pay for his father's funeral by his father's fifth wife and was not questioned about his siblings.

37.     Plaintiff objects on the grounds that this misstates Warrior's testimony, he did not say he did not consider his relationship with is father a private matter.  He said:

> A.  Be -- just because I didn't have a relationship with him and then that I'm coming to find out that -- you know, the man who was responsible for bringing me into the world doesn't mean I don't care about him.
>
> I mean, I think the two don't even -- I think I was trying to explain the best I could in my deposition what I was thinking at the time.
>
> Thinking about my own relationship with my family and with my father that I didn't have, and wanting to have kids myself one day and everything else.
>
> So it's not that I did not care about him.  And I never said to Vince that I did not care about him.

(*See* Defendants' Exhibit 1, p. 284)

39.     Plaintiff objects on the ground the statement is hearsay.

40.     Plaintiff objects to the use of the word "excuse."

52.     Plaintiff objects on the grounds that even though it accurately states Mr. Dunn's testimony, it was incomplete testimony and he testified to a number of things he did including being over the producers; working to prepare Mr. McMahon for his interview, calling Warrior

about being in the DVD and he was constantly consulted and kept informed about the status of the DVD. (*See* PSOF 85-87, 89-90, 96) Plaintiff objects to this statement because although Mr. McMahon testified he had no involvement in the production of the DVD but that was incomplete and inaccurate testimony and he testified that he participated in the subjects of the WWE DVDs, whether to interview Warrior for the DVD, he was interviewed for the DVD and he came up with the title of the DVD. (*See* PSOF 87, 90, 96)

55.    Plaintiff objects on the grounds that this statement is incomplete. The documents disclosed that numerous staff members or employees at WWE were consulted to put together a fact sheet to prepare Mr. McMahon for his interview. (*See* PSOF 90)

57.    Plaintiff objects on the grounds that this is inaccurate and incomplete. (*See* PSOF 81, 85)

59.    Plaintiff objects because it mischaracterizes Warrior's testimony. He testified that there were no wrestling opportunities currently before him but he is not retired and he would be open if a wrestling opportunity came up for him. (Defendants' Exhibit 1, 325-326).

61.    Plaintiff objects because it misstates his testimony; what he actually stated was he was not <u>aware</u> of any business opportunities that he lost due to the DVD. (Defendant Exhibit 1, pp. 395, 422)

62.    Plaintiff objects because it misstates his testimony or is not complete. He testified that his reputation was injured.

> Q. Sir, do you contend that your reputation was injured because of the DVD?
>
> A. Yes.
>
> Q. And what's your basis for that?
>
> A. That it's filled with lies and mischaracterizations and things that aren't true about me as a person or my career, as I performed the Ultimate Warrior.
>
> Q. But how do you know that that hurt your reputation?

1   A.  It would hurt anybody's reputation.   Any human being's reputation.

2   Q.  Is there anything else?

3   A.  No, that's it.

4   Q.  Okay.  Your belief that what was said on the DVD would hurt anybody's reputation?

5

6   A.  If a DVD was put together about somebody else in that way about a career that they had, and the whole thing was filled with lies, then it would, I think, hurt their reputation.

7

8   (Defendants' Exhibit 1, 394-395)

9   65.   Plaintiff objects on the grounds that it misstates his testimony.

10   Q.  Okay.  Do you believe that you have been damaged?

11   A.  Yes.

12   Q.  Okay.  Is it your intention to ask the jury for a certain amount of money to compensate you for the damages that you've suffered?

13

14   A.  Yes.

15   Q.  Okay.  What do you believe is a fair amount that you should ask the jury for?

16

17   A.  To attach a figure to it or a figure that has crossed my mind, I would say five to seven million dollars.

18   Q.  And where do you come by that number?

19   A.  I think about the effect of the DVD and what effect it's had on my reputation, what effect it has on my reputation to my own children in the future, when the day will come that it will be out there and somebody will come up to them and say, "You know, have you ever seen this DVD that was put out on your dad when he was a wrestler and what it's all about?"

20

21

22   The likelihood that people who watch the DVD, they're going to think that I am the irrational, the over the top, the extreme, irresponsible, unreliable, uncreative, deceptive, conniving person that is put forward in the DVD; that to me when I watch it, when -- to me, when I watch it, I think anybody that watches that, stops and figures out, even if they didn't' follow wrestling, and doesn't -- never knew Ultimate Warrior, they don't know me, they stop and they come to a conclusion that this guy was not a stable individual.

23

24

25

26

He's not a human being that could be trusted in any type of role or any type of -- it's like there's no way I can contribute in a positive way to any project or to anything that I may want to do.

And it's out there. It's out there in the marketplace now. And the people that are affected by that portrayal in there, the false portrayal of who I am, what Ultimate Warrior meant to wrestling, what success that character had overall, yes, there are mentions of that in the DVD.

But there are -- for every mention about Ultimate Warrior being a huge star or being a charismatic or being that, there are ten or 12 lies about me as a person and about what Ultimate Warrior meant to the wrestling industry.

And I just, to me, the damages that I've suffered is, is that that's irreparable. There's no way to go back and fix that. And there's a value to that that's -- I -- an incalculable value that I can't even put on how that's affecting my life.

Every time I reach out to somebody in the future to talk about doing business or to establish a relationship with them, there's the potential that people have seen that, or they've seen that and they've come to a conclusion, without giving themselves an opportunity to find out the real me or find out what the real truth is.

And I would say the greatest damage is, is that - - my kids. You know, a lot of guys who are in the business, they lost sight of who they were outside the wrestling ring, and they ended up really self-destructing. And I have a positive and I have a productive and I have a healthy and I have a happy life.

And we don't sit around in my household. My girls have never really maybe more than once watched me do Ultimate Warrior on TV. Just one time maybe, in a tape. I remember in putting a collage tape together that I would show at my college speaking engagements so people would just have an idea of who I was or what I did.

So they don't run around doing Ultimate Warrior. We don't play Ultimate Warrior games, and daddy isn't Ultimate Warrior. But they know me.

And when they watch a video like that, or their friends bring it to them later on when they're old enough to understand, they're going to sit there and they're going to question or they're going to be peppered by other people who grew up with parents, and their parents or their mom or their dad or their dad gets in trouble, commits a crime, and all of a sudden, in the eyes of everybody else, becomes something that's bad, that's not safe.

1  And that's what the DVD does.  It creates that portrayal, that what
   I did in there in that wrestling career, the guy behind the whole
2  thing, was basically just a failure at everything he did or
   everything he tried to do here, and we just couldn't tolerate his
3  inhumane behavior anymore.

4  And to me, there's a damage to that.  And it's hard to attach a
   value to it.  But to, you know, to have to attach a value to it, I
5  would say five to seven million dollars.

6  (Defendants' Exhibit 1, 512-515) Warrior testified at length about what his damages were.

7        66.    Plaintiff objects to the use of the word invented.

8  **PLAINTIFFS SEPARATE STATEMENT OF FACTS ("PSOF")**

9  Plaintiff submits the following Separate Statement of Facts in Opposition to Defendants

10  Motion for Summary Judgment.

11  **I.**    **Background**

12      **A.**    **Events Leading to 1991 Suspension of Warrior by WWE.**

13      1.    Warrior, a professional wrestling icon has asserted claims against WWE as well

14  as WWE's chairman, Vincent McMahon ("McMahon") and CEO Linda McMahon for

15  defamation and false light invasion of privacy arising from the production and sale of a DVD

16  entitled, "The Self-Destruction of the Ultimate Warrior" in 2005.  (Doc. 75, Ex. 1)

17      2.    Jim Hellwig, now known as Warrior, signed a contract to wrestle for WWE in

18  1987 (*see* Exhibit 1 - McMahon Depo., pp. 26-27 and Defendants' Ex. 3).

19      3.    Warrior developed faster as a wrestling celebrity at WWE than most talent and

20  he developed a close relationship with Vince McMahon, the Chairman of the Board of WWE.

21  (*see* Exhibit 1 - McMahon Depo, p. 28)

22      4.    McMahon, a mentor to Warrior, moved Warrior up to the top of the WWE world

23  as they developed a close bond, became friends and business associates.  McMahon intended

24  for Warrior to be the next WWE superstar.  (*see* Exhibit 1 - McMahon Depo, pp. 30-32)

25      5.    Warrior stayed at McMahon's home in Greenwich, Connecticut; and McMahon

26  did not routinely have WWE talent stay at his home. (*see* Exhibit 1 - McMahon Depo, pp. 33-

1 | 34)

2 |      6.     Warrior developed a close relationship with McMahon's son, Shane, who was

3 | a teenager in 1989, and Shane visited Warrior at his home in Texas and had a closer

4 | relationship with Warrior than other WWE talent. (*see* Exhibit 1 - McMahon Depo, pp. 35-36

5 | and Defendants' Ex. 1, pp. 505-506)

6 |      7.     In 1990, Warrior defeated Hulk Hogan (a/k/a Terry Bollea) to become WWE's

7 | top wrestling entertainer. (*see* Exhibit 1 - McMahon Depo, pp. 31, 42-43)

8 |      8.     Hogan was supposed to retire but the day after WrestleMania, Hogan decided he

9 | was not ready to step aside. (*see* Exhibit 1 - McMahon Depo, pp. 42-43)

10 |      9.     Warrior was wrestling under the same contract he entered into in 1987 but he was

11 | making significantly more money. (*see* Exhibit 1 - McMahon Depo, p. 44)

12 |      10.     McMahon encouraged the WWE talent to have an open dialogue with him about

13 | additional benefits; *i.e.*, first class travel, limos or more money; however, McMahon came to

14 | resent Warrior's requests because he viewed them more as a demand. (*see* Exhibit 1 -

15 | McMahon Depo, pp. 46-48)

16 |      11.     Prior to SummerSlam 91, Warrior asked McMahon to be treated the same as

17 | Hogan. (*see* Exhibit 1 - McMahon Depo, p. 48)

18 |      12.     McMahon believed some of Warrior's requests were reasonable, but some were

19 | not and he told Warrior. (*see* Exhibit 1 - McMahon Depo, p. 49)

20 |      13.     McMahon had a long close relationship with Hogan and McMahon believes

21 | Hogan was jealous of Warrior and McMahon shared with Hogan his concerns about Warrior's

22 | requests (*see* Exhibit 1 - McMahon Depo, p. 55)

23 |      14.     On or about June 10, 1991 Warrior sent a letter to McMahon, requesting that

24 | McMahon reconsider Warrior's compensation and the amount of time off so it was the same

25 | as Hogan's. The letter concludes with a statement that "Whatever your decision I can and will

26 | live with it. Till then I remain home with one who cares." (*see* Defendant's Exhibit 4 and

Exhibit 1 - McMahon Dep. 78-80)

15.     Warrior was requesting McMahon to reconsider his compensation and time off to treat him the same as Hogan.  Because of all of the traveling he normally did, he was at home and McMahon could reach him at home while he waited to hear what McMahon had to say.  (Defendants' Exhibit 1, pp. 173-174)

16.     Three days later, on July 13, 1991, McMahon sent Warrior a letter stating that he agreed to Warrior's request and stated:

> I regret the turmoil you've put yourself through and your agonizing over what you feel is fair compensation.  And even though we have a difference of opinion over some of these matters, I am resolved to work with you in the same honest and equitable way that I always have.  Furthermore, I would like to express to you my deepest appreciate and admiration for you as a performer, as a member of the WWF family, as a man and as my friend.

(*see* Exhibit 1 - McMahon Dep., p. 97-98 and Defendants' Exhibit 5)

17.     Prior to sending his letter on July 13, 1991, McMahon believes he spoke to Warrior about Warrior's July 10, 1991 letter.  (*see* Exhibit 1 - McMahon Depo, p. 88)

18.     McMahon was upset by Warrior's July 10, 1991 letter because WWE could not have two performers making Hogan's compensation because it would be a financial disaster for WWE for any event both performers appeared in.  (*see* Exhibit 1 - McMahon Depo, pp. 88-89)

19.     McMahon testified that his intent in writing the July 13, 1991 letter was to temporarily acquiesce to Warrior's request to be treated the same as Hogan.  (*see* Exhibit 1 - McMahon Depo, p. 94)

20.     McMahon's letter of July 13, 1991 was intended to convey to Warrior that he would be paid the same as Hogan.  (*see* Exhibit 1 - McMahon Depo, p. 109)

21.     Warrior denies that he ever threatened to no-show any WWE wrestling events in 1991 if his financial demands/requests were not met.  (*see* Defendants' Ex. 1, p. 169) His

1    letter of July 10, 1991 was meant to convey to McMahon that Warrior had been on the road

2    for three months but was at home and that was where McMahon could communicate with him.

3    (Defendants' Ex. 1, pp. 173-178).

4        22.    Warrior was at home because he was not scheduled to work between July 10 and

5    July 14, 1991. (Defendants' Ex. 1, pp. 179-180)

6        23.    On the day of Summer Slam 1991, Warrior was not aware of any problems and

7    he never indicated that he was not going to perform unless he was paid more money.  It was

8    not until he left the ring that he learned that McMahon was suspending him.  (Defendants'

9    Exhibit 1, p. 159-160)

10       24.    Warrior was not fired by WWE after SummerSlam 1991, he was suspended.

11   (Defendant's Ex. 1, pp. 158-160)

12       25.    WWE did not pay Warrior the same as it paid Hogan as McMahon had agreed

13   in his July 13, 1991 letter and as he claims in the DVD.  Hogan was paid $90,000 and Warrior

14   $75,000.  (*see* Exhibit 1 - McMahon Depo, pp. 111-112 and Defendants' Exhibit 6, p. 2)

15       26.    In October 1991, Warrior sent a letter of resignation to McMahon and McMahon

16   refused to accept it since Warrior was under contract until September 27, 1992. (*see* Exhibit

17   1 - McMahon Depo, pp. 114-117).

18   **B.**    **Warrior's Second Stint with WWE**

19       27.    McMahon approached Warrior about returning to WWE in early 1992 and

20   apologized to Warrior and paid Warrior over $100,000 due to an outstanding financial issue

21   between them over a previous WrestleMania payoff. (Defendants' Ex. 1, pp. 164-166)

22       28.    Warrior entered into a second agreement with WWE in April 1992. (Defendants'

23   Ex. 1, pp. 207-208 and Defendants' Exhibit 17)

24       29.    WWE hired Dr. DiPasquale to monitor and implement its drug testing policy in

25   1992 (*see* Exhibit 1 - McMahon Depo., pp. 122-123, 132)

26       30.    Dr. DiPasquale testified that WWE had a drug testing policy in effect when he

1   was hired.  (*see* Exhibit 20 - Dr. DiPasquale Depo., p. 6)

2      31.   Mauro DiPasquale, M.D. stated that he was not aware of what policy was in

3   effect at the time Warrior entered a booking contract on April 2, 1992 and the Policy dated

4   May 1, 1992 is only a draft and it is not certain whether it was ever in effect much less as of

5   November 1992, and there is no evidence that it applied to Warrior who entered into a new

6   Booking Contract with WWE on April 2, 1992. (*see* Exhibit 20 - Dr. DiPasquale Depo., pp.

7   6, 135)

8      32.   Dr. DiPasquale testified that although WWE produced a revised draft of the

9   WWE Drug Testing Policy dated May 1, 1992 (which would have banned human growth

10  hormone ("HGH") for the first time), Dr. DiPasquale testified that his revisions could not have

11  been completed by May 1, 1992. (*see* Exhibit 20 - Dr. DiPasquale Depo., p. 135)

12     33.   WWE had a two-part Drug Testing and Rehabilitation Policy dated March 16,

13  1992 that did not ban the use of HGH nor did it provide for immediate termination of talent

14  who committed a violation respecting steroids as a substance that was banned under that

15  policy. (*see* Exhibit 20 - Dr. DiPasquale Depo., p. 22 and  Exhibit 2)

16     34.   The WWE March 16, 1992 drug policy contained the following language:

17         11.  Discipline for Violation of Law

18         Any WWF (WWE) talent who is convicted or who admits to a
           violation of law relating to use, possession, purchase, sale or
19         distribution of steroids or related substances will be subject to the
           following disciplinary action:
20
               (i) First offense – suspended without pay for six
21             weeks.

22             (ii) Second offense – termination of contract with
               WWF.
23  (Exhibit 2)

24     35.   The WWE May 1, 1992 policy purportedly contained the following language:

25         12.  Discipline for Violation of Law

26         Any WWE talent who is convicted or who admits to a violation of

1    law relating to use, possession, purchase, sale, or distribution of
     drugs or abuse (including steroids and growth hormone) will be in
2    breach of contract and immediately dismissed.

3    (*see* Exhibit 20 - Dr. DiPasquale Depo., p. 22-23 and Exhibit 3)

4          36.    Dr. DiPasquale did not know whether Warrior or other talent actually received

5    a copy of his new policy. (*see* Exhibit 20 - DiPasquale Depo., pp. 27-28).

6          37.    Dr. DiPasquale does not recall notifying any WWE talent that changes had been

7    made to paragraphs 11 and 12 of the March 16 and May 1 policies -- the very same paragraphs

8    that WWE now contends were violated by Warrior. (*see* Exhibit 20 - Dr. DiPasquale Depo.,

9    pp. 24-29)

10         38.    McMahon did not know if Warrior had received a copy of the drug policy, yet

11   that did not prevent him from terminating Warrior later that year. (*see* Exhibit 1 - McMahon

12   Depo., pp. 147-148 and Exhibit 19 - McMahon Depo. 2/19/99, pp. 380-381).

13         39.    Nor was Linda McMahon sure if Warrior had received a copy of any drug policy.

14   (*see* Exhibit 21 - Linda McMahon Depo, p. 227).

15         40.    Defendants' present counsel participated in development of the new drug policy

16   in 1992 and in the decision to terminate Warrior's contract (*see* Exhibit 19 - McMahon Depo.

17   2/19/99, pp. 323, 328).

18         41.    Conspicuously absent from McMahon's "internal investigation" in November

19   1992 was a call to the WWE's Drug Policy Advisor, Dr. DiPasquale, the person to whom

20   WWE had charged with administration of the drug policy. (*see* Exhibit 1 - McMahon Depo.,

21   pp. 132-145 and Exhibit 19 - McMahon Depo. 2/19/99, p. 324).

22         42.    Section 3 of the drug policy purportedly in effect in May and November 1992

23   reads as follows:

24       3. Administration of the policy.

25   The administration of this policy is directed by Mauro G.
     DiPasquale, M.D., the Drug Program Advisor (DPA) for the
26   WWF. Dr. DiPasquale is available to consult with the talent with

12

1   respect to drug education and clinical monitoring, which includes
    medical evaluations, treatment, counseling and testing.

2

3   (Exhibit 3, p.5)

4       43.    During his deposition, Dr. DiPasquale admitted that he was not involved in any

5   way in the decision to terminate Warrior in November 1992. (*see* Exhibit 20 - DiPasquale

6   Depo., p. 106).

7       44.    Warrior's attempt to acquire growth hormone did not violate the Drug Policy

8   which purportedly applied to his contract. (Defendants' Exhibit 1, p. 207)

9       45.    Without medical or legal training, McMahon, without consulting WWE's Drug

10  Advisor, decided that Warrior's attempt to acquire human growth hormone from the United

11  Kingdom was a violation of U.S. law and, in turn, a violation of the WWE's drug policy which

12  *was not even in effect* at the time Warrior signed his contract with the WWE (*see* Exhibit 19 -

13  McMahon Depo. 2/19/99, pp. 282, 295, 296, 344-349).

14      46.    McMahon did *not* consult with Dr. DiPasquale about Warrior's termination. (*see*

15  Exhibit 1 - McMahon Depo., p. 132 and Exhibit 20 - Dr. DiPasquale's Depo., pp. 106-107).

16      47.    Warrior never received a copy of the drug policy he purportedly had violated.

17  (Defendants' Exhibit 1, p. 224)

18      48.    McMahon admitted during his deposition that he was not familiar with the

19  "technical terms" contained in his company's drug policy. (*see* Exhibit 19 - McMahon Depo.

20  2/19/99,pp. 268, 272).

21      49.    The March 1992 drug policy under which Warrior entered the WWE provided

22  for suspension, at most, not termination. (*see* Exhibit 1 - McMahon Depo., p. 122 and Exhibit

23  2).

24      50.    During his deposition, Dr. DiPasquale admitted that WWE did not declare

25  Warrior's 1992 drug tests to have positively identified use of testosterone or

26  methyltestosterone. (*see* Exhibit 20 - DiPasquale Depo., pp. 42-45).

51.     Dr. DiPasquale stated during his deposition that Warrior's testosterone levels were not abnormal and his high testosterone/epitestosterone ratios likely were due to an enzyme deficiency. (*see* Exhibit 20 - DiPasquale Depo., pp. 42-43, 65-70).

52.     Section 13.3 of the 1992 Booking Contract contains an express "no-oral-modification" clause as follows:

> 13.3 This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

(Defendants' Exhibit 17).

53.     Warrior did not receive a copy of the May 1992 drug policy or any other drug policy in 1992. (Defendants' Exhibit 1, p. 224)

54.     On November 18, 1993, McMahon was indicted by the United State Attorney's Office for having violated section 333(e) of the United States Food & Drug Act, 21 U.S.C. § 333(e), the very same statute that Titan now claims was violated by Warrior. (*see* Exhibit 1 - McMahon Depo., p. 146 and Exhibit 19 - McMahon Depo. 2/19/99, p. 313).

55.     During his deposition, McMahon admitted that he and his company were subpoenaed by the United States government on the very same day that the parties entered into the Second Booking Contract. (*see* Exhibit 1 - McMahon Depo. 2/19/99, p. 277).

56.     A later draft of a Titan drug policy showing an *effective date of March 23, 1993*, described the same penalty for a first offense (*six weeks suspension without pay*) as the March 16, 1992 policy. (Exhibits 4 and 2)

57.     A draft drug policy appearing later yet, dated April 13, 1993, shows that Titan had adopted a "two-part" policy covering steroids and drugs of abuse. (Exhibit 5)

58.     The "two-part" format in the March 1993 and April 1993 is very similar to the format of the March 1992 policy. (Exhibits 4, 5, and 2)

59.     The format of the May 1992 policy is entirely different from both of these policies. (Exhibit 3)

14

60.     As Dr. DiPasquale explained during his deposition, and as section 812(c) of the United States Drug Abuse Prevention and Control Act, 21 U.S.C. § 812(c), confirms, somatropin is not a "controlled substance." (*see* Exhibit 20 - DiPasquale Depo., pp. 92-93).

61.     When the United States Custom Service seized a package of somatropin that Warrior ultimately intended to receive, it effectuated its seizure only under authority of 21 U.S.C. § 952, 19 U.S.C. § 159A, and 18 U.S.C. §545. (Exhibit 6)

62.     But section 952 of Title 21 prohibit importation of "controlled substances." Section 952 provides in pertinent part:

> (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of title II, or any narcotic drug in **schedule III, IV, or V** of title II . . . .

63.     Customs was mistaken about what it had seized.  The printout obtained by WWE's counsel from U.S. Customs officials in Boston reveals that U.S. Customs had mistakenly classified somatropin as "steroids." (Exhibit 6)

64.     In July 1992, anabolic steroids were a controlled substance, and growth hormone was not a controlled substance. (*see* Exhibit 20 - DiPasquale Depo., pp. 89-90).

65.     The other two statues relied upon by U.S. Customs in effectuating its seizure, namely 19 U.S.C. § 1595a and 18 U.S.C. § 545, have nothing to do with enforcement of United States drug laws.  19 U.S.C. § 1595a(c) was later amended on December 8, 1993, to provide U.S. Customs Service with seizure authority over "controlled substances." (Exhibits 7 and 8)

66.     18 U.S.C. § 545 deals with importation of goods based upon false, forged, or fraudulent documentation. (Exhibit 8)

67.     WWE's May 1992 drug policy only prohibited violations of law respecting "use, possession, purchase, sale, or distribution of drugs of abuse." (Exhibit 2)

68.     McMahon even admitted during his deposition that Warrior may have told him

1    that the growth hormone was intended only for Warrior's personal use (*see* Exhibit 19 -

2    McMahon Depo. 2/19/99, pp. 341-349).

3         69.    Despite McMahon's "internal investigation" during the weekend of November

4    7, 1992, McMahon also admitted that it was not important to him "whether [Warrior] intended

5    it for person use or he intended to distribute it" (*see* Exhibit 19 - McMahon Depo. 2/19/99, p.

6    343).

7         70.    McMahon admitted in deposition testimony that he had an utter lack of

8    knowledge of his own drug policy, United States laws, and pharmacology. (*see* Exhibit 19 -

9    McMahon Depo. 2/19/99, pp. 268, 272, 337-39, 343-71).

10        71.    Warrior attempted to purchase some human growth hormone but it was not a

11   violation of the WWE policy at the time. (*see* Exhibit 1 - McMahon Depo., p. 122; Exhibit 2

12   and Defendants' Exhibit 1, pp. 222-224, 227)

13   **C.    Warrior's Third Return to WWE in 1996.**

14        72.    In early 1996, McMahon approached Warrior about returning to WWE and

15   Warrior negotiated a new contract for the third time with WWE. (*see* Exhibit 1 - McMahon

16   Depo., pp. 149-153 and Exhibit 9).

17        73.    Under the agreement WWE was to provide certain cross-selling assistance to

18   Warrior for a number of projects including promoting the Warrior comic book (Exhibit 9).

19        74.    In 1996, Warrior performed at all scheduled events before attending a licensing

20   convention in New York City and saw that WWE was using certain of Warrior's trademarks

21   without his authorization. (*see* Exhibit 19 - McMahon Depo. 2/19/99, pp. 253-254 and Exhibit

22   1 - McMahon Depo. pp. 159-162 and Defendants' Exhibit 1, pp. 295).

23        75.    Warrior called McMahon and confronted him about this problem to see if they

24   could work out a resolution. (*see* Exhibit 1 - McMahon Depo., p. 161 and Defendants' Exhibit

25   1, pp.295-298).

26        76.    Over the same weekend, Warrior learned that his father who he had been

1   estranged from for years was dying and ultimately over that weekend, Warrior's father passed

2   away. (*see* Exhibit 1 - McMahon Depo., pp. 162-163 and Defendants' Exhibit 1, pp. 268,

3   279).

4       77.    Due to the confluence of these two events, WWE breaching its agreement with

5   Warrior and his father dying, even though they did not have the best relationship in the world

6   they would never be able to rekindle their relationship, Warrior missed three matches.

7   (Defendants' Exhibit 1, pp. 254, 279, 287, 292, 311)

8       78.    Warrior advised WWE prior to missing the matches that he would not be

9   performing. (Defendants' Exhibit 1, pp. 293-296)

10       79.    Wrestlers often missed scheduled events due to injury or illnesses or deaths in

11   their family. (*see* Exhibit 19 - McMahon Depo. 2/18/99, p. 186 and Defendants' Exhibit 1, p.

12   314)

13   **D.**    **WWE's Making of the DVD Titled: Self-Destruction of the Ultimate**
         **Warrior and Actual Malice**

14

15       80.    McMahon, Kevin Dunn and WWE decided in March 2005 to do a DVD on

    Warrior. (*see* Exhibit 22 - Dunn Depo., p. 23)

16

17       81.    Kevin Dunn is the current executive vice president of television for WWE but

    has been responsible for all home DVD's since 1993. (*see* Exhibit 22 - Dunn Depo., pp. 13-

18   16).

19

20       82.    Most of WWE's DVDs dealt with the WWE wrestling character; however, it was

    determined that this DVD would deal more with the person. (*see* Exhibit 22 - Dunn Depo, pp.

21   55-57, 155)

22       83.    From the beginning, this DVD was going to be a controversial. (*see* Exhibit 22 -

23   Dunn Depo p. 42 and  Exhibit 10)

24       84.    WWE wanted the DVD to be controversial and to determine "why did he self-

25   destruct?" (*see* Exhibit 22 - Dunn Depo., pp. 42-46 and Exhibit 10)

26

85. As early as March 2005, Kevin Dunn was involved in the production of the DVD video and the actual producer reached out to him and asked him such questions as "what were the beefs that Warrior had with WWE?" (*see* Exhibit 22 - Dunn Depo., p. 57 and Exhibit 11)

86. WWE decided on May 6, 2005 to ask Warrior if he wanted to be involved in the WWE video and Kevin Dunn called Warrior. (*see* Exhibit 22 - Dunn Depo., p. 67)

87. As of May 11, 2005, the decision to go forward with the DVD was up to Kevin Dunn and Vince McMahon. (*see* Exhibit 22 - Dunn Depo., p. 73)

88. The producer of the DVD, Donna Goldsmith, thought the WWE had a poor relationship with Warrior. (*see* Exhibit 22 - Dunn Depo., p. 73 and Exhibit 12)

89. Kevin Dunn got in contact with Warrior about participating in the DVD. (*see* Exhibit 22 - Dunn Depo., pp. 83-84)

90. WWE producers prepared a fact sheet and got comments from a number of WWE employees to help Vince McMahon prepare for his interview on the DVD deposition. (*see* Exhibit 13) Dunn was to talk with Pat Patterson, who apparently hated Warrior, to help prepare McMahon. (*see* Exhibit 22 - Dunn Depo., pp. 93-103)

91. WWE considered numerous titles for the DVD from the Ultimate Legend; the Ultimate Saga to the Ultimate Warrior; the Man Behind the Paint; to the Self-Destruction of the Ultimate Warrior. (*see* Exhibit 22 - Dunn Depo., pp. 107-114 and Exhibit 14)

92. The intent of this DVD was to look at the man behind the wrestling character; this is the way that WWE intended to promote the DVD. (*see* Exhibit 22 - Dunn Depo., pp. 111, 116)

93. Dunn is not aware of any WWE DVDs that have ever portrayed talent in a negative connotation. (*see* Exhibit 22 - Dunn Depo., pp. 31-32)

94. Dunn is not aware of other WWE DVDs that use the rise and fall of a character in the title or use the phrase "self-destruction" in the title. (*see* Exhibit 22 - Dunn Depo., p. 116)

18

95.   Dunn does not think the phrase "self-destruct" is positive because no one wants to "self-destruct." (*see* Exhibit 22 - Dunn Depo., pp. 121-123)

96.   McMahon came up with the title "The Self-Destruction of the Ultimate Warrior" and conveyed that to Kevin Dunn who then conveyed it to the producer Jennifer Good. (*see* Exhibit 22 - Dunn Depo., pp. 116-120; McMahon Depo., p. 199; Ex. 15)

97.   Dunn though the title was good for marketing because it is controversial. (*see* Exhibit 22 - Dunn Depo., pp. 119-121)

98.   WWE employees involved in producing the Warrior DVD, including an assistant producer, Kieran Bent, were taken back by the title "the Self-Destruction of the Ultimate Warrior" and wrote in e-mails "oh my goodness are you serious?  Wow, no holding back on this project huh?" "We have to live up to the title." (*see* Exhibit 22 - Dunn Depo., p. 38 and Exhibit 16)

99.   After the title was determined there was discussion between the producers about whether or not there were other ways to add more controversy to the DVD. (*see* Exhibit 17)

100.   The producer questioned whether or not they should "put up a written disclaimer at the top saying that the views expressed in this production are not those of WWE but are the opinions of those interviewed. There is a lot of bashing what do you think?" (*see* Exhibit 18)

101.   The DVD came out without the disclaimer and WWE and McMahon were aware that the DVD was going to be controversial because it contained bashing of Warrior. (*see* Exhibit 1 - McMahon Depo., pp. 197-199 and Exhibits 10 and 18)

102.   WWE designed the cover of the Warrior DVD. (*see* Exhibit 22 - Dunn Depo., pp. 147-148)

103.   The cover of the DVD utilizing what appears to be broken glass and the whole theme of the DVD is that Warrior was self-destructive (*see* Exhibit 24).

104.   The DVD contains the following statements:

Statement K–Vince McMahon: "Ultimate Warrior basically came

to me and figuratively put a gun to my head and said, 'hey, I'm not going to go out and perform unless you pay me x number of dollars.' And I forget what it was. And...that is so unprofessional. You just don't do that." *See* Doc. 75, Exhibit 1, DVD at 55:53--56:09; 58:46-58:51.

Statement L–Gene Okerland: "The guy comes up to you and tries to hold you up for a half million bucks or maybe more...saying I'm not going to go on unless I get the money up front." *See* Doc. 75, Exhibit 1, DVD at 58:40–58:45.

Statement M–Vince McMahon: "I did live up to my word and paid him whatever it was that I agreed to pay him when obviously I didn't have to, you know, but nonetheless that's me...I could not wait to fire him." *See* Doc. 75, Exhibit 1, DVD at 58:27–58:22;58:54–59:03.

Statement N–Vince McMahon: "It was a very unprofessional thing to do and I think subsequently I forgave him and he came back to work." *See* Doc. 75, Exhibit 1, DVD at 1:00:42–1:00:47.

Statement O–Vince McMahon: "We had established a very stringent drug policy and there was a violation." *See* Doc. 75, Exhibit 1, DVD at 1:07:21–1:07:29

Statement S–Jim Ross: "He missed several dates, just refused to show up." *See* Doc. 75, Exhibit 1, DVD at 1:16:17–1:16:20.

Statement T–Vince McMahon: "Jim missed several dates, just refused to show up." *See* Doc. 75, Exhibit 1, DVD at 1:17:03–1:17:09.

Statement U–Vince McMahon: "You cannot refuse to show up and screw the audience." *See* Doc. 75, Exhibit 1, DVD at 1:17:13–1:17:20.

Statement V–Vince McMahon: "His father passed away and he used it as an excuse; he had not seen his father in 10 years and could care less about him." *See* Doc. 75, Exhibit 1, DVD at 1:17:27–1:17:45.

Statement W–Jim Ross: "He was unreliable." Vince McMahon: "He was terminated for good." *See* Doc. 75, Exhibit 1, DVD at 1:17:48–1:18:22.

Statement Y–Jim Ross: "You can't hold people up for money. You can't not keep your commitments." *See* Doc. 75, Exhibit 1, DVD at 1:32:27–1:32:31.

105.   The DVD incorrectly claims that in 1991 on the day of Summer Slam Warrior

1  went to WWE and/or McMahon and advised him that he was not going to wrestle that day

2  unless he was paid $550,000.  (Defendants' Exhibit 1, pp. 174, 193)

3      106.   Bollea testified that after reviewing the tape, he believed the DVD stated that

4  Warrior refused to wrestle on the day of the match.  (*see* Exhibit 23 - Bollea Depo., pp. 37-38)

5      107.   Bollea could not explain why in 2005 when he did his video interview that

6  appears on the DVD that he could recall the July 1991 incident but at his deposition in 2009

7  he could not recall the incident nor could he recall doing the interview for the DVD.  (*see*

8  Exhibit 23 - Bollea Depo., pp. 40-44)

9      108.   In the DVD, Bollea states that he was told by McMahon on that day that Warrior

10  was literally holding up McMahon and/or WWE and refusing to wrestle unless he was paid

11  additional sums of money.  (*see* Exhibit 23 - Bollea Depo., pp. 38-43)

12      109.   McMahon states in the DVD that Warrior was terminated for good thus implying

13  that WWE and McMahon had enough and he would not hire Warrior again.  (*see* Exhibit 1 -

14  McMahon Depo., pp. 238-239).

15      110.   McMahon denied having further negotiations with Warrior about returning to

16  wrestle; however, on December 17, 1997, McMahon sent an offer to Warrior to come back and

17  wrestle for WWE for five years and the contract was more lucrative than the one that he claims

18  on the DVD was the last straw.  (*see* Exhibit 1 - McMahon Depo., pp. 240-241 and Ex. 35 to

19  McMahon Depo)

20      **E.    Damage to Warrior's Reputation**

21      111.   Warrior was considered to be an icon in wrestling history.  He was the first

22  person to ever defeat Hulk Hogan.  He was one of the premiere wrestlers in the early 90s for

23  WWE. (*see* Exhibit 19 - McMahon Depo. 2/19/99, pp. 326, 362; Exhibit 1 - McMahon Depo.,

24  pp. 42-43; Exhibit 23 - Bollea Depo., pp. 8, 21, and Defendants' Exhibit 1, p. 191)

25      112.   When Warrior came to visit Bollea at his home Bollea's children were excited

26  that he was there.  (*see* Exhibit 23 - Bollea Depo., pp. 24-25)

21

1    113.   Warrior was paid $80,000.00 plus expenses to wrestle in Spain in 2008.

2    (Defendants' Exhibit 1, pp. 13, 41, 47-48)

3    114.   He continues in part to make his living by selling action figures of himself,

4    attending autograph signings and relying upon his fame as a professional wrestler.

5    Defendants' Exhibit 1, pp. 11, 12, 16-21, 30-48, 126-127)

6    115.   Neither McMahon nor Dunn knew what was done to check any facts on the

7    DVD. (*see* Exhibit 1 - McMahon Depo. p. 69 and Exhibit 22 - Dunn Depo., pp. 126-127, 151-

8    152).

9    116.   Warrior never said he could care less about his father.  (Defendants' Exhibit 1,

10   pp. 280, 284).

11   117.   Warrior had a close relationship with McMahon and considered him like a father

12   figure.  (Defendants' Exhibit 1, pp. 504, 506).

13   118.   Warrior was hurt by his father's actions and realized that with his father's death,

14   he could never regain what they had lost.  (Defendants' Exhibit 1, p. 287).

15   RESPECTFULLY SUBMITTED this 15th day of June, 2009.

16                         **MAYNARD CRONIN ERICKSON
                           CURRAN & SPARKS, P.L.C.**

17

18                         By  /s/ Daniel D. Maynard
                              Daniel D. Maynard
19                            3200 N. Central Ave., Ste. 1800
                              Phoenix, AZ  85012
20                            Attorneys for Plaintiffs

21

22

23   **ORIGINAL** of the foregoing filed this 15th day of June, 2009 via ECF with:

24   Clerk of the Court
     United States District Court
25   401 W. Washington
     Phoenix, AZ 85003
26

22

1  copy mailed (along w/a copy of the NEF) and electronically mailed this same day to:

2  Hon. Roslyn O. Silver
   United States District Court
3  401 W. Washington
   Phoenix, Arizona 85003-2120
4  silver_chambers@azd.uscourts.gov

5  copy electronically mailed this same day to:

6  John T. Gilbert, Esq. – jtgilbert@aol.com
   Steven G. Ford, Esq. – sford@alvarez-gilbert.com
7  Jerry S. McDevitt, Esq. -- jmcdevitt@klng.com
   Curtis B. Krasik, Esq. – ckrasik@klng.com
8  Amy L. Barrette, Esq. – abarrette@klng.com

9
   By _____/s/Stacey Tanner_____
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26