# EXHIBIT 1

**Certified Copy**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Ultimate Creations, Inc., and
Arizona corporation, Warrior and
Dana Warrior, husband and wife,

        Plaintiffs

VS                                CV06-00535-PHX-ROX

Vincent K. McMahon and Linda
McMahon, husband and wife; Titan
Sports, Inc., a Connecticut
corporation, World Wrestling
Entertainment, a Connecticut
corporation,

        Defendants
~~~~~~~~~~~~~~~~~~~~~~~~~~

**VIDEOTAPED DEPOSITION OF**

**VINCENT K. MCMAHON**

April 23, 2009
9:17 a.m.

Rosenblum Newfield LLC
One Landmark Square
Stamford, Connecticut 06901

Clifford Edwards, LSR



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

26

1        A     No, I don't.

2        Q     Okay.  At some point, though, WWE hired

3     Jim Hellwig.

4              Correct?

5                   MR. McDEVITT:  Again, object to the

6              form of the question.

7                   Hiring him implies something.

8     BY MR. MAYNARD:

9        Q     Okay.  I don't want to --

10                  MR. McDEVITT:  I don't want to get

11             involved --

12       A     Yeah.

13                  MR. McDEVITT:  Maybe you can

14             rephrase.

15    BY MR. MAYNARD:

16       Q     At some time WWE enters into a

17    relationship with Jim Hellwig, contractural

18    relationship with Jim Hellwig and starts wrestling

19    for WWE?

20       A     Yes.

21       Q     Okay.  And there was a contract that was

22    signed between WWE or its predecessors --

23       A     Uh-huh.

24       Q     -- and Mr. Hellwig?

25       A     Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                              April 24, 2009

```
                          27
 1        Q    At that particular time, back in
 2    1980 -- and I believe it was '87.
 3            Does that comport with your
 4    recollection?
 5        A    I would imagine it's somewhere in
 6    there.  Yes.
 7        Q    Okay.  Did WWE have different grades of
 8    wrestlers, such as an A team, a B team, a C
 9    team?
10        A    We don't do A, B, and C teams.
11        Q    You didn't do that back in '87?
12        A    Not that I recall.  I mean, I -- we had
13    three different shows probably running then.
14            You know, and if you were in Madison
15    Square Garden, that would be one caliber.  If you
16    were at a local high school or something, that would
17    be another.
18            Is that your --
19        Q    Yes.
20        A    -- question?
21        Q    Yeah.
22            Weren't there certain levels of wrestlers
23    however you differentiate it between them, and they
24    were based upon the, you know, draw that they would
25    do.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                              April 24, 2009

28

1          Some would wrestle at Madison Square

2    Garden.  Some might wrestle at a college

3    auditorium.  Some wrestle in an armory or a High

4    School, different levels.  Is that --

5          A    Yes.

6               However, a top guy could be

7    wrestling, you know, in an armory.

8          Q    Okay.

9          A    You need someone to draw the money.

10         Q    Okay. '

11         A    And likewise, a middle of the road or a

12   young guy could be performing in the Garden.

13         Q    One of the things that you did with Jim

14   Hellwig was try to develop him as a wrestler.

15              Correct?

16         A    That's when we -- the normal process would

17   be.

18         Q    And is it fair to say that that process

19   moved faster than with most talent?

20         A    Yes.

21         Q    And did you, over the course of the next

22   couple of years, develop a close relationship with

23   Mr. Hellwig?

24         A    Yes.

25         Q    How would you describe that


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

<div align="center">30</div>

1    Q    Yeah.

2         He's wrestling in different venues around

3    the United States from WWE?

4    A    Yes.

5    Q    Okay.  Did you travel then?

6         I'm trying to determine what the

7    relationship -- how you -- did you see him on a

8    day-to-day basis?

9    A    Oh, no.

10   Q    He's a young wrestler.

11        You are the head of the company.

12        Correct?

13        In 1987?

14   A    Yes.

15   Q    Okay.  Over some period, you have to start

16   watching him perform and wrestle.

17        Correct?

18   A    Yes.

19   Q    Okay.  Are you the one who ultimately made

20   decisions to move him or his character up the totem

21   pole at WWE?

22   A    Ultimately, yes.

23   Q    Ultimately, it was your decision to

24   make?

25   A    Sure.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                        April 24, 2009

31

1      Q      Okay.  Between 1987 and then in
2  WrestleMania 6 in 1990, the Ultimate Warrior defeats
3  Hulk Hogan.
4             Correct?
5      A      In WrestleMania 6?
6      Q      Yes.
7      A      If that's the one we had in Toronto, the
8  answer is yes.
9      Q      Okay.  Between that period of time, it's
10  fair to say that you took a fairly young wrestler
11  who you really didn't know and put him at
12  the -- the top of the WWE wrestling world?
13     A      Yes.
14     Q      Okay.  Tell me how the relationship
15  between you, Vince McMahon, and Jim Hellwig
16  developed during those three years?
17     A      How it developed?
18     Q      Yeah.
19     A      We became friends and business
20  associates.
21     Q      Okay.  Were you -- were you good
22  friends?
23     A      I'd like to think so.
24     Q      Were you -- did you consider yourself to
25  be a mentor to Jim?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

32

1        A     In a professional sense?

2        Q     Yes.

3        A     Yes.

4        Q     Did you have personal conversations with

5    him?

6        A     About the business?

7        Q     Sure.

8        A     Yes.

9        Q     Did you have personal conversations with

10   him about his personal life?

11       A     Not much.

12             You know, he's very guarded that way, and

13   so am I.  But, you know, we developed a bond.

14       Q     Okay.  Can you give me some idea -- and

15   I'm focusing on WrestleMania in 1990 as the point

16   when he defeats Hulk Hogan.

17       A     Right.

18       Q     Did you have a close relationship, close

19   working relationship, with him at that point?

20       A     Yes.

21       Q     Was it your intent that he was going to be

22   the next superstar of WWE?

23       A     Yes.

24       Q     Okay.  How long before WrestleMania 6 do

25   you believe that you had developed this close



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

33

1    working relationship with him?

2         A    Like any relationship, you know, it

3    builds.

4         Q    Would it have been a year?  I mean, in the

5    first year that he was wrestling for WWE, did you

6    see him often?

7         A    No.

8         Q    Was there -- at some point, were you

9    recognized that he had some talent that you wanted

10   to advance at WWE?

11        A    Yes.

12        Q    Any particular event that occurred that

13   caused you to see that?

14        A    No.  Not that I recall.

15        Q    Okay.  Were there times when you invited

16   Jim to your home?

17        A    Could very -- could have been.

18        Q    Did he actually stay at your house?

19             You live in Greenwich, Connecticut?

20        A    Yeah.  Connecticut.  Right.

21        Q    Okay.

22        A    He may have.  I don't recall.

23        Q    Do you routinely invite the wrestling

24   talent to stay at your home?

25        A    No, I don't.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                     April 24, 2009

34

1    Q    So that would have been an unusual
2  event?
3    A    Yes, it would have.
4    Q    Okay.  Do you recall whether you invited
5  him to stay at your home on more than one
6  occasion?
7    A    No, I don't.
8    Q    Do you recall -- strike that.
9         How many children do you have?
10   A    I have two.
11   Q    And what are their names?
12   A    Shane and Stephanie, son Shane and
13  daughter Stephanie.
14   Q    And how old is Shane?
15   A    Shane currently is -- God, I can't believe
16  it.
17   Q    Now, I'm testing you.
18   A    Yeah.  I know.  He's 39.
19         MR. McDEVITT:  Is he really?
20         THE WITNESS:  Yeah.  I know.  It's
21      unbelievable.
22         It's like I can't be that old,
23      really.
24         MR. McDEVITT:  I hear you.
25  BY MR. MAYNARD:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent   K. McMahon                                        April 24, 2009

35

1        Q      Okay.  So back in 1989, you would have

2   been 19 years old?

3        A      Right.

4        Q      Okay.  Were there times that you are aware

5   of when Shane would -- strike that.

6               Are you aware that Jim Hellwig lived in

7   Texas back in the late '80s, early '90s?

8        A      He probably did.

9               I'm not -- I don't recall.

10        Q      Were there times when Shane went and

11   visited Jim at his home in Texas?

12        A      I don't -- I don't know.

13        Q      You don't have any recollection of

14   that?

15        A      No, I don't.

16        Q      Would it surprise you if he did?

17        A      I don't think it would have surprised

18   me.

19        Q      Okay.  Are you aware of your son, when he

20   was a teenager, visiting and staying at the home of

21   other talent that worked for WWE?

22        A      No.

23        Q      Did it come to your attention that Shane

24   and Jim developed a close relationship?

25        A      Yeah.  They liked each over a lot.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                April 24, 2009

36

1       Q     How did you see that relationship
2  manifesting itself?
3       A     I don't know what you mean.
4       Q     Well, I mean, did they -- did they call on
5  the phone?
6             Did they get together?
7             Did Shane actually go to Jim's house in
8  Texas to visit him?
9       A     I think I just answered the portion as to
10 whether or not he went to visit.  I don't know.
11            I don't remember that, and I also said it
12 wasn't -- you said wouldn't surprise me.  It
13 wouldn't surprise me.
14      Q     Okay.  Well, you said they liked each
15 other a lot.
16      A     Right.
17      Q     What did you see that made you come to
18 that conclusion?
19      A     Interaction on television.
20      Q     What kind of interaction?
21      A     Clowning around, kidding each other.
22      Q     Was it your belief at the time that Shane
23 had a closer relationship with Jim than he did with
24 other talent?
25      A     That's probably fair to say.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

42

1     Q    He still had the 1987 contract or whenever

2     that first contract had been signed.

3          Correct?

4     A    I guess maybe I would ask you what you

5     meant by status.  In terms of status I thought you

6     were referring to the perception of where he is in

7     relation to like a Hogan or things like that.

8     Q    Right.

9     A    Is that what you are referring to?

10    Q    Well, I'll get to it.

11    A    All right.

12    Q    I wasn't quite --

13    A    Sorry.

14    Q    No.  No.

15         I want us to be on the same wavelength.

16    And if we are not, it's probably more my fault in

17    the question.

18         When you say his status didn't

19    change, what did you understand "status" to

20    mean?

21    A    What was supposed to happen was that Hogan

22    was supposed to almost retire at that time, and

23    that's not what happened.

24    Q    Why is that?

25    A    It was Hogan's suggestion he continue on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                            April 24, 2009

43

```
 1    working.   Whereas, he indicated to me prior to the

 2    one-on-one match at WrestleMania that he was ready

 3    to step aside in fewer dates and what have you.

 4              And shortly after the match --

 5    actually, it was probably the next day's

 6    television, Hogan said, Oh, hang on a second.  I'm

 7    not ready to, you know, step aside.

 8         Q    Okay.  It's -- it's fair to say that in

 9    these matches that it's predetermined who's going to

10    win the match?

11         A    Sure.

12         Q    So Ultimate Warrior knew when he walked

13    into the ring he was going to win.

14              Correct?

15         A    Yes.

16         Q    And, in fact, to some degree, he and Hogan

17    had probably choreographed some aspects of

18    the -- the match?

19         A    Sure.

20         Q    Okay.  And it was your understanding that

21    Hogan was going to retire or semi-retire but then

22    decided that he didn't want to?

23         A    At a later date.

24         Q    Some time after that match?

25         A    Yes.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                      April 24, 2009

                                    44

1        Q     Okay.  At that -- the day of WrestleMania
2    6 when the Ultimate Warrior wins, at that point he
3    is at the top of the heap for WWE?
4        A     Yes.
5        Q     Okay.  At some point, did you start
6    treating Jim Hellwig differently in that when he
7    first starts in '87 he's on the road and he's making
8    how much money a week or a month or a show?
9        A     You are asking me that?
10       Q     Yeah.  I mean, he's not making very much
11   money when he first starts.
12             Correct?
13       A     Not compared to what he was making later
14   on in his career.
15       Q     Right.
16             By the time he wins WrestleMania 6, he's
17   making significantly more money?
18       A     Yes.
19       Q     Still under the same contract that he had
20   been under before?
21       A     I believe so.
22       Q     Were there perks that were given to him
23   that were not mentioned in the contract once he had
24   started rising up the chain?
25       A     There -- through the course of the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

46

1        A     He probably got royalties all along on

2     merchandise sales.

3              I don't know why he would not have.

4        Q     Okay.  He -- when he first started he

5     probably wasn't given the same travel allowance as

6     he got as of 1990.

7              Is that fair?

8        A     Travel allowances?

9        Q     Well, for instance, how did he travel?

10    Did he travel first class airfare?

11       A     Generally speaking, again, the way things

12    like this work is when you are introduced in the

13    business, generally speaking, you are working

14    preliminary matches.  Then you'll work middle of the

15    road more or less matches.  And then hopefully, if

16    you are a performer, you get to the top.  And you

17    work in main events.  And if you are on top as a

18    main-eventer and you've been there for a while and

19    you earned the right, then you, you know, obtain

20    things like first class travel.

21       Q     But those are things that you make the

22    decision when they are going to get first class

23    travel?

24       A     Yes.

25       Q     Correct.  So when he starts off in his



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

47

1    contract, he doesn't get first class travel.

2              But by the time he becomes a

3    main-eventer, you have decided that he's entitled to

4    first class travel?

5         A    Yes.

6         Q    Okay.  You would in -- and first class

7    travel would not only be first class on

8    airlines, but it might also be a driver.

9              Correct?

10        A    It may have been.

11             That's -- it'd be -- it could have

12   happened with Jim.  You know, I don't recall about

13   having a driver.

14        Q    Do you remember there being limo service

15   or a driver --

16        A    Oh, is that what you mean?

17             Yes.  I recall -- definitely recall the

18   limo service.

19        Q    Okay.  And limo service would not have

20   been provided to him when he first came in

21   under --

22        A    No.  Definitely not.  No.

23        Q    But as he moved up, he got more and more

24   perks that he had not gotten under the original

25   contract?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

48

1       A    That's correct.

2       Q    And to get those perks, did he come and

3    ask you about them?

4       A    Yes.  One of the biggest differences

5    between Jim and anyone else that I worked with it

6    was the way that he asked.  It was more of a demand

7    than a request.

8       Q    Did you resent that?

9       A    Yes.

10      Q    Did you tell him you resented it?

11      A    I'm sure I did.

12      Q    Do you recall that you did?

13      A    No.  It's a general conversation, you

14   know.

15      Q    Didn't you expect your talent when they

16   wanted something to come to you and ask for it?

17      A    Absolutely.

18      Q    Okay.  And you encouraged them to do that

19   so it was an open dialogue between you?

20      A    Absolutely, yes.

21      Q    Okay.  Prior to SummerSlam of '91, had Jim

22   come to you asking you about other accommodations

23   that he wanted, such as he wanted to be treated the

24   same as Hogan?

25      A    Yes, definitely.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

                                    49

1        Q      And had he come to you on a number of
2    occasions to discuss that?
3        A      I'm sure he did.
4        Q      Okay.  And what was your position on
5    that?
6        A      My position on that was I think some of it
7    was valid and some of it wasn't.
8        Q      Okay.  I'm -- some of his demands were
9    valid and some of them were not?
10       A      Some of them, I felt were reasonable, and
11   some of them were not.
12       Q      Okay.  Can you recall for me what you
13   believed at the time was reasonable versus what was
14   not?
15       A      No, not specifically.  I mean, you just
16   recollected the fact that limo service was
17   provided.
18              But generally speaking, as I recall, the
19   demands just continued to grow and grow.  And it was
20   a source of frustration on my part.
21       Q      Did you -- did you tell Jim that?
22       A      Yes.
23       Q      Can you recall a specific incident where
24   you told him that, that you were becoming frustrated
25   with his demands?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

55

1    night after the event was over?

2        A    It's important to know in their -- Jim had

3    really ostracized himself from the rest of the

4    talent and was not, you know, a part of the

5    group.

6             He -- and certainly not in a traditional

7    sense and -- and/or a literal sense.  So he was

8    thought of as somewhat of an outsider.  And I think

9    there was also some professional jealousy, you

10   know, with Hogan being jealous of Warrior.

11            Not so sure -- well, pretty sure it was

12   the other way around, too.  And Hogan was someone

13   that was at that time a confidant.  I'd had a long

14   relationship with Hogan.  So it's something I would

15   have shared with him.

16       Q    Do you remember if you shared that you

17   were going to suspend the Warrior or Jim Hellwig

18   with anyone else, other than Hogan?

19       A    Again, I don't even recall the

20   conversation with Hogan.  It's likely I had

21   one.

22            But I don't recall any conversations with

23   anyone else, which is not to say I didn't have

24   one.

25       Q    Okay.  Did you review your comments



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

69

1      A    Yes.

2      Q    Okay.  Do you know whether or not anybody

3  at WWE went back and looked at the documents that

4  were prepared in 1991, for instance, that you gave

5  Mr. Hellwig when he came out of the ring at

6  SummerSlam '91?

7      A    No.

8      Q    Did you ask them what they had done to

9  prepare for your interview?

10     A    No.

11     Q    Do you know whether or not WWE has any

12  individuals who were responsible for going back and

13  checking the facts behind what you say when you make

14  statements in these videos?

15     A    I don't know if that's Jen Good's

16  responsibility or not.

17          But it's her responsibility for the

18  production of these.  I don't know if she does that

19  or not.

20     Q    Did you ever go back the anybody and

21  say, Jeez, I misspoke.

22          I really didn't terminate him.  What I

23  really did was suspend him?

24     A    No.

25     Q    Okay.  When -- and I don't want to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

78

1    portions.

2         A    Okay.

3         Q    It will move along things faster, but I

4    want you to feel --

5         A    We'll try this.

6              But if I need to read it, I will.

7         Q    Okay.  Have you ever seen this document

8    before?

9         A    Yes.

10        Q    Okay.  Do you recall receiving this some

11   time on -- on or about July 10th of 1991?

12        A    I don't recall specifically.  No.

13             But I can see the date is on it.

14        Q    Do you have any reason to doubt the

15   authenticity of the date?

16        A    No.

17        Q    Do you recognize this as a letter that was

18   written to you?

19        A    Yes.

20        Q    And it was written to you by Jim

21   Hellwig?

22        A    Yes.

23        Q    Is that correct?

24        A    Yes.

25        Q    Do you recall where you were when you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

79

1    received it?

2         A    No.

3         Q    Do you recall what your reaction was when

4    you received this letter?

5         A    Not favorable.

6         Q    Okay.  Was this a letter that you had

7    received after you and Jim had had a number of

8    conversations about things that he wanted changed in

9    his working relationship with you?

10        A    In all likelihood.

11        Q    Okay.  Turn to the fifth page.

12        A    These pages are not numbered.

13             MR. McDEVITT:  Is that the last

14             page?

15   BY MR. MAYNARD:

16        Q    I'm sorry.

17             The last page of the document.

18        A    Okay.

19        Q    Okay.  It starts out, it says, "I want

20   $550,000 released from the movie -- from the monies

21   allotted me to purchase my home."

22             Do you see that?

23        A    Yes.

24        Q    And do you recall Jim asking you for

25   monies to be released so that he could purchase a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

                              80

1   home in Arizona?

2               MR. McDEVITT:   Object to the form and

3          foundation.

4        A    I loaned Jim money for his home to buy a

5   home as I recall.

6   BY MR. MAYNARD:

7        Q    Do you recall -- is this one of the

8   demands that you've been telling me about that he

9   made?

10       A    Is this one of them?

11       Q    Yes.

12              MR. McDEVITT:   I would suggest you

13         take time, Vince, and read that last

14         page.

15              THE WITNESS:   All right.   Thank you

16         very much.

17  BY MR. MAYNARD:

18       Q    When you've finished reading it,

19  Mr. McMahon, just let me know.

20       A    I've finished reading it.

21       Q    Do you recall this letter now?

22       A    Yes.

23       Q    Okay.  Tell me what you recall about

24  it.

25       A    Me, thinking that these demands are



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

88

1    recall -- I don't recall the conversation.  It's

2    been a long time ago.

3         Q    I understand.

4              If the -- your recollection is that it

5    would have been a negative reaction.

6              Would it have been your normal course to

7    have picked up the phone and told him, This upsets

8    me.  I don't like this?

9              What would have been your normal course of

10   conduct?

11        A    Sure.

12             My normal course of conduct would be to

13   discuss the demands.

14        Q    In fact, I think you told me earlier that

15   you generally encouraged your were talent to come to

16   you with demands or --

17        A    I never encouraged them to ever come to me

18   with a demand.

19        Q    Not a demand but to talk about what it was

20   they wanted?

21        A    I -- I want an open-door policy and a

22   really good dialogue with -- with our

23   performers.

24        Q    And why was it that you found this

25   particular way of sending you a communication as to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

89

1    what he wanted offensive?

2         A    Offensive?

3         Q    Yes.

4         A    (A) I can't have two Hulk Hogans, you

5    know, appearing at the same time.  That would be a

6    financial disaster for that event.

7              But again, notwithstanding the onerous

8    aspects of everything he's asking for here, the

9    biggest problem I have is that if he didn't get

10   it, he was going to take his ball and go home.

11        Q    Okay.  At this particular time, back in

12   July of 1991, do you recall how often you had Jim

13   Hellwig working?

14             Would he work --

15        A    Number of dates he appeared?

16        Q    Yes.

17        A    No, I don't.

18        Q    Was he working 14 days a month?

19             Was it 20 days a month?

20        A    Sorry.

21        Q    Do you have any recollection?

22        A    I don't.  No, I'm sorry.

23        Q    Okay.  Do you recall what the schedules

24   would have been like back then, when the working

25   would have occurred?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

94

1    Q    Okay.   Was it your intent from writing

2    this letter to convey that everything was fine

3    between you and Mr. Hellwig?

4    A    No.

5    Q    What was your intent in writing the

6    letter?

7    A    My intent in writing the letter was to

8    acquiesce to his demands temporarily.

9    Q    Do you recall whether or not you had a

10   conversation with him between receiving the letter

11   of July 10th and the sending of this letter of

12   July 13th?

13   A    Again, I think I testified I don't recall

14   a conversation.

15        In all likelihood, I would have had

16   one.  But I don't recall a conversation.

17   Q    I just didn't know whether this letter

18   would help refresh your recollection or not?

19   A    No, it hasn't.

20   Q    It hasn't.  Okay.

21        Do you recall -- would you have dictated

22   this letter to someone to type for you?

23        Do you know how it was prepared?

24   A    Probably.

25   Q    Okay.  You would not have had legal



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

97

```
 1          And I can't define it.  I admire him.  I
 2   think he's a good guy, you know, I mean in terms of
 3   a personal relationship.  So I meant what I said
 4   here.
 5      Q    Okay.  And I guess my only point is:  As
 6   of July 13th of '91, when you wrote this, I really
 7   am sort of baffled as to how he was supposed to read
 8   this letter and understand that you were upset with
 9   him --
10               MR. McDEVITT:  Is that a
11          question --
12   BY MR. MAYNARD:
13      Q    -- how you --
14               MR. McDEVITT:  -- or a
15          statement?
16   BY MR. MAYNARD:
17      Q    -- how you meant to convey that in this
18   letter.
19               MR. McDEVITT:  What's the
20          question?
21   BY MR. MAYNARD:
22      Q    How he meant to convey, or did you mean to
23   convey that you were upset with Jim Hellwig in July
24   13th of 1991 in this letter, Exhibit No. 2?
25      A    I would imagine --
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent   K. McMahon                      April 24, 2009

98

1          MR. McDEVITT:  I think you've asked

2          him the question, and he's answered

3          those.

4          But if you want to answer again,

5          Vince, go ahead.

6     A     Read back what I said.

7  BY MR. MAYNARD:

8     Q     Did you intend to convey that you were

9  upset by writing this letter?

10    A     This was -- as I've stated before, this

11  was my attempt at getting the match in the

12  ring.  I had advertised him for SummerSlam.

13        So by the writing of this letter,

14  hopefully, it assured, you know, that he was going

15  to show up for SummerSlam and not hurt the WWE, the

16  promotion or anyone else that was, you know, around

17  it by a no-show.

18        A no-show is the worst thing in the

19  world, you know, in our business.  You advertise

20  something, and you don't deliver it.  That's --

21  that's a no-no.

22        You know, and you don't -- you don't

23  say, you know, in terms of request, in this case

24  demands.

25        You know, you don't constantly



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                April 24, 2009

109

```
 1             MR. MAYNARD:  Are you instructing him
 2        not to --
 3             MR. McDEVITT:  I may let him answer
 4        that one question.
 5             MR. MAYNARD:  Okay.
 6             MR. McDEVITT:  But we may get there
 7        really quick.
 8             MR. MAYNARD:  Okay.
 9    A    What was the question?
10        You guys have been arguing here.
11 BY MR. MAYNARD:
12    Q    The question was whether it was your
13 intent to convey to Jim Hellwig that he would be
14 paid at the same rate as the highest rate
15 entertainment that you had, which at the time would
16 have been Hulk Hogan?
17    A    Yes.
18    Q    Okay.  And did you do that?
19    A    I don't think we got there.
20    Q    Okay.
21             THE VIDEOGRAPHER:  Excuse me.  We are
22        out of tape.
23             MR. MAYNARD:  Okay.  Let's go off the
24        record.
25             THE VIDEOGRAPHER:  This is the end of
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                          April 24, 2009

111

           MR. MAYNARD:  Which is where we got

           it.


BY MR. MAYNARD:

     Q     Can you identify what Exhibit No. 5

is?

     A     This is a pay sheet dated August 26,

'91.

     Q     Would this have been the pay sheet that

was done for SummerSlam '91?

     A     In all likelihood.  Yes.

     Q     Okay.  Would you turn to the second

page, please?

           And does this show the pay rate for the

individual talent on that particular event.

     A     It shows the pay.

     Q     Shows the pay for that -- that event.

           Correct?

     A     Yes.

     Q     And according to this sheet, Warrior got

$75,000?

     A     Yes.

     Q     And Hulk got $90,000?

     A     75,000.

     Q     Isn't there a bonus?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K.  McMahon                                   April 24, 2009

112

1        A    Yes, there is.

2        Q    What would the bonus be?

3        A    I don't recollect at this -- this

4    time.

5        Q    So the pay that he would have -- that Hulk

6    would have received would have been 90,000?

7        A    No.

8             75,000 is what this says.

9        Q    Okay.  Did you routinely give

10   bonuses?

11       A    Yes.

12       Q    Okay.  Is there a criteria for it?

13       A    It could be any number of things.  It

14   could be, generally speaking, something that was a

15   little bit out of the ordinary, an accumulation of a

16   number of things.

17            But I don't recall what the bonus was

18   for.

19       Q    But for this particular event, the amount

20   of money that would have been paid to Warrior was

21   75,000.

22            And the amount of money paid to Hulk was

23   $90,000, whether you call it a bonus or a pay?

24       A    Well, call it what you will.

25            What I see here is both were paid



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

                              114

1    done.  I mean --

2         A    Yes.

3         Q    If you send out a memo with your name on

4    it, saying this is what's going to be done, it would

5    have been done?

6         A    Yes.  Generally.  Sure.

7         Q    Okay.

8                   (THEREUPON, PLAINTIFF'S EXHIBIT

9                   NO. 7, CERTIFIED LETTER DATED

10                  10/25/91, WAS MARKED FOR

11                  IDENTIFICATION.)

12   BY MR. MAYNARD:

13        Q    Let me show you what's been marked as

14   Exhibit No. 7.

15        A    Read it.

16        Q    Okay.  Mr. McMahon, is that your signature

17   at the bottom?

18        A    It looks like it, yes.

19        Q    And did you send this letter out certified

20   mail on or about October 25th, 1991?

21        A    It says "certified" at the top of it.

22             That's what happened, but let's assume

23   that it was.

24        Q    Do you recall having this letter prepared

25   for your signature?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                          April 24, 2009

                              115

1        A    No.

2             I don't recall having it prepared

3    for --

4        Q    You don't have any reason to doubt

5    it, though?

6        A    No, I don't.  Absolutely not.

7        Q    You believe you sent this out on

8    October 25th, 1991?

9        A    Yes.

10       Q    The letter in the first paragraph

11   references that you received an undated letter on

12   October 11th of '91.

13            And then, when I look at the third

14   paragraph, it says, "Therefore, in plain

15   English, so there will be no misunderstanding under

16   the terms of the agreement, your resignation is only

17   effective as of the end of the term, September 27th

18   of 1992."

19            Do you see that?

20       A    Yes.

21       Q    Does that refresh your recollection that

22   the letter you would have received from Jim Hellwig

23   was that he was resigning?

24                 MR. McDEVITT:   I object to the

25                 form.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                        April 24, 2009

116

 1           He hasn't claimed he lacked the

 2      recollection about what the letter

 3      says, and you haven't shown him what the

 4      letter says.

 5           You have the letter, both of

 6      them.

 7           MR. MAYNARD:  I don't have it.

 8           MR. McDEVITT:  Well, how would you

 9      expect him to -- that's just shark

10      practicing.  Come on.

11           MR. MAYNARD:  It's not --

12           MR. McDEVITT:  Yes, it is.

13           You are asking him about a letter

14      that was written 18 years ago without

15      showing it to him and asking him whether

16      he recalls what it says.  Come on.

17   BY MR. MAYNARD:

18      Q    Looking at the third paragraph --

19      A    Uh-huh.

20      Q    -- do you have a recollection of what you

21   were intending to convey there?

22           MR. McDEVITT:  Object.

23           The document speaks for itself.

24      A    I can read it --

25   BY MR. MAYNARD:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K.  McMahon                            April 24, 2009

117

1        Q    Okay.

2        A    -- for you.

3        Q    At some point, did you have any

4    conversations or communications with Jim Hellwig

5    where he was suggesting that he was resigning?

6        A    This is what this letter make reference

7    to.

8             I don't recall any specific conversations

9    about that.  Again, it's been a long time ago.

10       Q    Okay.  In the last -- in the fifth

11   paragraph you said, "I would be willing to enter

12   into a termination agreement with you whereby we

13   will agree to terminate you, providing we reach a

14   mutually satisfactory solution and you comply until

15   that time with the above provisions.  If you care to

16   further discuss, you may all my office."

17            Did you ever enter into such a termination

18   agreement with Mr. Hellwig?

19       A    I don't remember.

20       Q    Do you recall the next time that you had

21   any communications with Mr. Hellwig?

22       A    No, I don't.

23       Q    Okay.  Do you recall at some point

24   Mr. Hellwig came back to work for WWE?

25       A    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                              April 24, 2009

                              122

1    rehabilitation policy, part one, steroid and related

2    substance policy and part two drugs of abuse."

3            And when I turn to the second page at the

4    top, it appears to be March 16 of 1992.

5            Do you see that?

6       A    Yes, I do.

7       Q    Okay.  Was this the drug policy that was

8    in effect as of the time that Jim Hellwig signed the

9    booking contract which was Exhibit 8?

10      A    Yes.

11      Q    Okay.  And this was the one that would

12   have governed him.

13           Is that correct?

14      A    That's correct.

15           MR. McDEVITT:  Objection to the

16           form.

17           Calls for a legal conclusion.

18   BY MR. MAYNARD:

19      Q    Okay.  Now, at some point, did WWE hire a

20   Canadian doctor by the name of Dr. Di Pasquale?

21      A    Yes.

22           He over -- was the overseer of this

23   policy.

24      Q    What was his role at WWE?

25      A    To oversee the policy.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

123

1          Q     Was he the person that implemented

2     it?

3                When you say "oversee," what do you mean

4     by that?

5          A     He was our drug program advisor.  He

6     would -- he would review the results of

7     testing.

8                It might even state what he does in

9     here.  I don't know.

10         Q     Were you the one who hired him?

11         A     I don't recall.

12         Q     Do you recall why he was hired?

13         A     Why he was hired?

14               He was hired to oversee this.

15         Q     Was he going to revise the program at

16    all, if you know?

17         A     Revise this program?

18         Q     Yes, sir.

19         A     From --

20         Q     From a prior policy?

21               Was he going to develop a new

22    program?

23               Was it going to be the same?

24               Do you have any recollection?

25                    MR. McDEVITT:  Object to the lack of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

132

1      It depends what you ask.

2   BY MR. MAYNARD:

3        Q      Okay.  Do you recall now that Dr. Di

4   Pasquale was in charge -- overall in charge of this

5   drug testing in 1992?

6        A      Yes.

7               I stated that now for the third time.

8        Q      If he had found that someone had violated

9   the drug policy, was he supposed to inform you?

10       A      I answered that earlier, too.  Yes.

11       Q      And did -- are you aware that he testified

12  in his deposition that he never found that Jim

13  Hellwig violated the drug testing policy?

14              MR. McDEVITT:   Object to form and

15              foundation.

16       A      No.

17              I'm not aware of that.

18  BY MR. MAYNARD:

19       Q      Okay.  Did you ever have any conversations

20  with Dr. Di Pasquale as to whether or not Jim

21  Hellwig had violated the drug testing policy at

22  WWE?

23       A      Not that I recall.

24       Q      Did Dr. --

25       A      He may have, but I don't recall.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

133

```
 1        Q     Did Dr. Di Pasquale ever tell you that Jim

 2   Hellwig should be fired because he violated the drug

 3   testing policy?

 4        A     I don't think so.

 5        Q     Okay.  Now, at some point in 1992, Jim

 6   Hellwig told you that he had attempted to buy or had

 7   bought some human growth hormone in England.

 8             Correct?

 9        A     Yes.

10        Q     Okay.  Tell me what you recall about

11   that.

12             MR. McDEVITT:  Object to the form and

13             the foundation of it.

14             But go ahead.

15             MR. MAYNARD:  Just what's the

16             objection?

17             MR. McDEVITT:  That isn't what Jim

18             Hellwig said.

19             And there's no foundation for

20             that.  And that's not what Jim Hellwig

21             did, either.

22             MR. MAYNARD:  He said "yes."

23        A     I said "yes" what?

24   BY MR. MAYNARD:

25        Q     You answered my question.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                April 24, 2009

134

1    A    Which was?

2              MR. McDEVITT:  Go ahead and answer

3         his question.

4    BY MR. MAYNARD:

5         Q    Tell me about the conversation you had

6    with Jim Hellwig.

7              MR. McDEVITT:  It wasn't buying in

8         England.

9    BY MR. MAYNARD:

10        Q    Tell me' about conversation you had with

11   Jim Hellwig.

12        A    Which conversation?

13        Q    Concerning Jim Hellwig purchasing human

14   growth hormone.

15        A    As I recall -- as I recall, I called Jim

16   up and had a problem of some kind and -- with him

17   and was about to go into it, and he cut me off.

18              He said, Yeah, yeah, I know.  It was about

19   the growth.

20              About the what?

21              You know, it was about the growth.  And he

22   then went on to tell me, as I recall, that he and

23   Davey Boy, you know, had done some sort of, you

24   know, buying of human growth hormone and obviously

25   brought it back from United Kingdom back to the



## ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                               April 24, 2009

<pre>
                           135
 1   United States.
 2        Q     Okay.  Do you recall anything else about
 3   that conversation?
 4        A     No, I don't.
 5              I don't know if I ever got around to why I
 6   was originally calling him or not.  I probably
 7   did.
 8        Q     Okay.  Did he tell you that he had
 9   attempted to buy human growth hormone in the United
10   Kingdom?
11        A     I think he told me he bought human growth
12   hormone and then brought it back to the states.
13        Q     Did he tell you how it was brought back to
14   the states?
15        A     No.  I don't recall that.
16        Q     Did he tell you he had purchased it for
17   his own purposes or his own consumption?
18        A     That's the only reason, to my
19   knowledge, Jim would ever do anything like that is
20   for his own -- Jim Hellwig is not a drug
21   dealer.
22        Q     All right.  So do you recall when that
23   conversation took place?
24        A     Some time prior to me firing Jim.
25              Specifically, I you know don't have a
</pre>



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

<center>136</center>

1  recollection of the actual date.

2       Q    Do you recall whether it would have been

3  months before you fired him or --

4       A    Oh, no.

5            It would have been pretty close

6  thereafter.

7       Q    What did you do after he told you that he

8  had attempted the buy human growth hormone?

9       A    I called up Davey Boy and got Davey Boy's

10  point of view as well.

11      Q    Did you call him up right away, within a

12  couple of days?

13      A    I'm sure I did.

14           I don't have an exact recollection.  But I

15  would imagine so.

16      Q    What do you recall Davey Boy told you?

17      A    Specifically, I don't recall, other than

18  the fact that he confirmed that he and Jim bought

19  human growth hormones and brought it back.

20      Q    Was it your understanding that Jim Hellwig

21  actually had the human growth hormone here in the

22  United States?

23      A    That's the way I recollect.

24      Q    And did Jim Hellwig -- do you have a

25  recollection of whether Jim Hellwig told you he was



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

137

1    using the human growth hormone?

2         A    No.   I don't have a recollection.

3         Q    Did you ever make any calls to Dr. Di

4    Pasquale about whether or not it was acceptable

5    under the drug policy for Jim Hellwig to have human

6    growth hormone in the United States?

7         A    I don't specifically remember that.

8    I -- from time to time, we amend these

9    policies.

10             As I recall, we had amended the policy and

11   included human growth hormone.

12        Q    Do you recall when that was done?

13        A    No.

14        Q    Do you recall whether it had been done

15   before or after you'd had your conversation with Jim

16   Hellwig?

17        A    Oh, as far as modifying the drug program?

18        Q    Yes.

19        A    The modification would have occurred prior

20   to Jim Hellwig and Davey Boy's infraction.

21        Q    Do you recall whether or not you had ever

22   given him a copy of the policy?

23        A    Him?

24        Q    Jim Hellwig.

25        A    I don't specifically recall.   Again, a lot



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                          April 24, 2009

138

1     of this is a long time ago..

2          Q    What steps, if any, did you take to

3     determine whether or not Jim Hellwig had violated

4     the drug policy?

5          A    I didn't take any steps.  He told me he

6     violated it.

7          Q    Jim says, I violated the WWE drug

8     policy?

9          A    Not in those terms, saying, I violated

10    it.

11             But he knew what it was..  He told me,

12    Oh, it's about the growth.  I mean, it's shock.

13         Q    Okay.  Did you -- do you have an

14    understanding that Jim Hellwig knew that he wasn't

15    supposed to bring human growth -- growth hormone

16    into the United States from the United Kingdom?

17                   MR. McDEVITT:  Object to the form and

18             foundation.

19         A    I would expect that, you know, all of our

20    talent would adhere to the policy.

21             Any violation of the policy is a violation

22    of policy..

23    BY MR. MAYNARD:

24         Q    Well -- and I'm not trying to argue with

25    you.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

139

```
1            Other than --
2       A    I think you are, but go ahead.
3       Q    Jim didn't tell you, I have violated the
4   drug policy, did he?
5       A    In those words, no.
6       Q    And did you call Dr. Di Pasquale and
7   say, Jeez, Jim Hellwig tells me he has how many
8   growth hormone.
9            He's having it shipped to him from England
10  or from the United Kingdom.
11           Does that violate our policy?
12              MR. McDEVITT:  Object to the form of
13              and foundation.
14      A    I don't recall, as I testified a few
15  minutes ago, having a conversation with Mauro Di
16  Pasquale, much less whatever the substance is.
17  BY MR. MAYNARD:
18      Q    But he was the one who was in charge of
19  your policy.
20           Correct?
21      A    I think I stated that before he was
22  overseeing our policy.
23      Q    If you thought somebody had violated your
24  policy, why wouldn't you call the person who was
25  responsible for the policy?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

140

1           MR. McDEVITT:  He hasn't said he
2       didn't.
3       A    I didn't say that I didn't.
4  BY MR. MAYNARD:
5       Q    You just don't recall whether you
6  did?
7           MR. McDEVITT:  How many times does he
8       have to say that?
9           MR. MAYNARD:  Until he gets it
10      through to me.
11      A    Beg your pardon?
12          MR. McDEVITT:  You are talking 18
13      years ago.
14          How many times does he have to tell
15      you he didn't remember doing that before
16      you accept that as his answer?
17  BY MR. MAYNARD:
18      Q    When did you terminate Jim Hellwig?
19      A    Shortly thereafter when he told me that he
20  had imported growth hormone.
21      Q    Did you contact anyone else -- or strike
22  that.
23          Can you recall contacting anybody to
24  discuss terminating Jim Hellwig when you found out
25  he had imported human growth hormone?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                April 24, 2009

141

1    A    Yes.

2    Q    Who?

3    A    My attorney, Jerry McDevitt.

4    Q    Anyone other than that?

5    A    I don't recall anyone other than

6    that.

7    Q    Okay.  At any time have you ever been told

8    that it was not against the law to import human

9    growth hormone back in the summer of 1992?

10   A    That it was not -- '

11        MR. McDEVITT:  I don't want

12        to -- hang on a minute.

13        Do not disclose anything we talked

14        about in our conversations about this

15        subject.

16        So if there's an answer you can give

17        that excludes our conversation, you can

18        answer his question.

19   A    No one told me that it was legal.

20        Are you -- is that what you are supposing

21   that someone told me that -- that it was legal?

22   BY MR. MAYNARD:

23   Q    Well, I don't want to get into what your

24   counselor --

25   A    As I explained earlier, from time to time



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

142

1    these programs are amended as time goes on.

2                Human growth hormone was put into

3    this, as I recall, as an amendment.

4                And I don't know that -- again, I don't

5    recall any conversations with Mauro because normally

6    Mauro would tell you if, in fact, you tested

7    positive for a certain drug.

8                Human growth hormone that the time -- and

9    maybe it's still to this day, I don't know -- is

10   very difficult to detect.  Nonetheless, it was a

11   part of the policy.

12               So, therefore, when Jim Hellwig told me

13   what he had done, that was a breach of the

14   policy.  Whether or not I had conversations with

15   Mauro or not, I don't recall.

16      Q    Okay.  Other than possibly talking to

17   Dr. Di Pasquale and talking to your attorney, did

18   you talk to anyone else about whether Jim Hellwig

19   importing human growth hormone for personal

20   consumption was a violation of the policy?

21      A    You just asked me that two minutes

22   ago.

23      Q    Anyone else other than those two?

24      A    You just asked me that.

25               I don't recall having a conversation with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                    April 24, 2009

143

1    anyone else.

2         Q    Okay.

3         A    And I don't even recall the conversation

4    with Mauro.

5         Q    At the time that you terminated

6    Mr. Hellwig in 1992, were you making any other

7    changes at WWE internally?

8         A    I have no idea what you mean by that.

9         Q    Okay.  With your talent were you changing

10   your -- your talent?

11             MR. McDEVITT:  Change --

12        A    I don't know what you mean.

13             MR. McDEVITT:  In what sense?

14             Can you be more specific?

15   BY MR. MAYNARD:

16        Q    Sure.

17             Back in '91, '92, a lot of your talents

18   were cartoonish in nature, very large, bulky,

19   muscled wrestlers.

20             Would you agree with that?

21        A    Cartoonish?

22             Again, I think I had, as I stated

23   earlier, about two cartoons.  One was Ultimate

24   Warrior and one was Hogan.

25        Q    Okay.  Did you -- did you ever have



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

144

1   discussions with Jim Hellwig where you told him that

2   you were going to take the WWE in a different

3   direction from the cartoonish talent?

4       A    No, I don't.

5       Q    Were you concerned because of your

6   own -- strike that.

7            Had you been indicted at the time that Jim

8   Hellwig was terminated?

9       A    I don't recall the sequencing.

10           I could have been.  I don't recall.

11           MR. McDEVITT:  He knows the answer to

12           that.  He knows you weren't.

13           So I don't know why he'd ask the

14           question.

15           MR. MAYNARD:  No, I don't.

16           MR. McDEVITT:  Yeah.  You do.

17           Absolutely, you do.

18           It's a matter of public record.

19           MR. MAYNARD:  Could be a lot of

20           things.

21           I'm sure your birthday is, too, but I

22           don't know when you were born.

23           MR. McDEVITT:  Matter of public

24           record.

25   BY MR. MAYNARD:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

                                145

1        Q     Do you recall whether or not you were

2   under, at least, scrutiny?

3        A     You asked me that once before, and I

4   stated yes.

5              But in terms of the sequencing in all of

6   this I -- I can't remember.

7        Q     Okay.

8        A     You asked me if I was indicted.

9              You know I said yes.

10       Q     Okay.  Did you do any sort of an internal

11  investigation when Jim told you that he had imported

12  human growth hormone?

13             MR. McDEVITT:  You mean, other than

14             what he's just described for you?

15             MR. MAYNARD:  Yes.

16       A     Not that I recall.

17  BY MR. MAYNARD:

18       Q     Did you terminate Davey Boy Smith?

19       A     Yes.

20       Q     Did you bring him back to the company to

21  work?

22       A     At some time --

23       Q     Yes.

24       A     -- subsequent, I think so.

25       Q     Was Davey Boy Smith terminated, or was he



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                           April 24, 2009

146

1    just suspended?

2        A    My recollection is they both were

3    terminated.

4        Q    So the record is clear, I have a document

5    that does show that you were indicted on

6    November 18th of 1993.

7             And I didn't have any idea what the date

8    was.

9             MR. McDEVITT:  As I said, you have a

10           document that shows when he was

11           indicted --

12           MR. MAYNARD:  Doesn't mean I

13           know.

14           MR. McDEVITT:  If you read the

15           documents, you know.

16           And you also have your client's grand

17           jury testimony.

18           MR. MAYNARD:  There's a lot of

19           documents.

20           MR. McDEVITT:  You are a criminal

21           lawyer, and you know the grand jury

22           testimony precedes indictment and you know

23           the grand jury testimony followed this

24           whole episode.

25           So don't sit there and tell me you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

147

1              don't know.
2                     MR. MAYNARD:   I didn't --
3                     MR. McDEVITT:   You have all the
4              information there available to know.
5                     MR. MAYNARD:   I had the information
6              available.
7                     I didn't know when I asked.
8                     (THEREUPON, PLAINTIFF'S EXHIBIT
9                     NO. 10, DRUG POLICY IN 1992, WAS
10                    MARKED FOR IDENTIFICATION.)
11     BY MR. MAYNARD:
12         Q     Let me show you what I've had marked as
13     10.
14              Have you ever seen this document
15     before?
16         A     I would imagine I have.  Yes.
17         Q     Okay.
18         A     I don't know if I would have ever read the
19     entire thing.
20         Q     Okay.  Did you play any role in the
21     preparation of the document?
22         A     Not that I recall.
23         Q     As we sit here today, do you know who
24     would have prepared it?
25         A     Probably Mauro Di Pasquale.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

148

1      Q     And do you know whether or not a copy of

2   this document was ever given to Jim Hellwig?

3      A     Do I recall?

4      Q     Yes.

5      A     No.

6      Q     Do you have any recollection of how copies

7   of the drug policy that WWF had back in 1992 was

8   conveyed to the talent?

9      A     Specifically, no.

10     Q     Okay.  Would that have been something that

11  would have been in the realm for Dr. Di Pasquale to

12  do?

13     A     In terms of sending it out?

14     Q     Yeah.  I'm trying to figure out how

15  the -- how the talent in 1992 would have known what

16  the drug policy was?

17     A     Probably through talent relations out of

18  our headquarters, not Mauro.

19           In terms of this, this would be something

20  that was sent from our company to talent, I

21  believe.

22     Q     Okay.  But you can't tell me exactly how

23  it was done or if it was even done?

24           You don't have a recollection?

25     A     I don't have a recollection.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

149

1    Q    Okay.  Jim Hellwig comes back to work for

2  WWE in 1996.

3         Do you recall that?

4    A    This is the third contract now?

5    Q    Yes.

6    A    I'm recalling that he came back to

7  work.  Yes.  Not specifically the date.

8         I'm sure the contract will refresh my

9  memory or certify it with a date.

10              (THEREUPON, PLAINTIFF'S EXHIBIT

11              NO. 11, BOOKING CONTRACT, WAS MARKED

12              FOR IDENTIFICATION.)

13  BY MR. MAYNARD:

14    Q    I'll show you what I've had marked as

15  Exhibit 11.  And just so it's clear, there is a

16  rider that is attached to it.  Okay.

17         You are not going to read the whole

18  thing?

19    A    Please, we'll be here forever if I have to

20  do that.

21    Q    All right.  Do you recognize this

22  document, Exhibit No. 11?

23    A    I recognize it as a booking contract.

24  Yes.

25    Q    The date on the front says February 18th



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

150

1   of 1996.

2          And it's between Titan, and this time it's

3   Warrior because Jim Hellwig has now changed his name

4   to officially be known as Warrior.

5          Correct?

6      A   Yes.

7      Q   Okay.  Can you tell me how this contract

8   came about?

9                  MR. MAYNARD:  I'm sorry?

10                 MR. McDEVITT:  Object to the

11                 form.

12                 At least, what I've been given is not

13                 a signed copy of a contract.

14                 WARRIOR:  Yeah.  This is a

15                 draft.

16                 MR. McDEVITT:  Which you have given

17                 and the rider refers to the letter

18                 agreement.

19                 MR. MAYNARD:  Oh, I'm sorry.

20                 WARRIOR:  Four pages --

21                 MR. McDEVITT:  So I don't know what

22                 you are -- I believe that is the

23                 contract.

24                 MR. MAYNARD:  You are right.  Let's

25                 do this -- all right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                April 24, 2009

151

```
 1    BY MR. MAYNARD:
 2         Q     Let me have your copy back.
 3         A     Sure.
 4         Q     Just a second.
 5               MR. MAYNARD:  Jerry, I'm going to
 6               take the last page off and make it a
 7               separate exhibit.
 8               (THEREUPON, PLAINTIFF'S EXHIBIT
 9               NO. 12, CONTRACT RIDER, WAS MARKED
10               FOR IDENTIFICATION.)
11               MR. McDEVITT:  The rider?
12               MR. MAYNARD:  Yeah.
13               MR. McDEVITT:  That's Exhibit 12
14          now?
15               MR. MAYNARD:  Yeah.
16    BY MR. MAYNARD:
17         Q     All right.  Let's take a look at
18    Exhibit 12.
19               Have you seen that document before?
20         A     Well, I don't recall.
21               I mean, this -- I --
22         Q     Is that your wife's signature?
23         A     Yes.
24         Q     Okay.  Do you recall that when Warrior
25    came back in 1996, there was a four-page letter
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

152

1    agreement?

2                    MR. McDEVITT:   Object to the form and

3              foundation.

4         A    I'll take your word for it if there

5    was.

6    BY MR. MAYNARD:

7         Q    Okay.  Were you responsible for

8    negotiating with Jim Hellwig in 1996?

9                    Or was that something your wife was

10   responsible for doing?

11        A    I think partially my wife.

12        Q    What do you recall about those

13   negotiations?

14                    MR. McDEVITT:   Object to the

15             form.

16                    You haven't established he was in

17             them.

18   BY MR. MAYNARD:

19        Q    Did you participate in the

20   negotiations?

21        A    Probably did.

22        Q    Do you remember flying out to

23   Scottsdale, Arizona, and meeting with Jim?

24        A    I -- if I -- if that was the time that I

25   went through his gym and all that sort of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                   April 24, 2009

153

1   stuff. Yes.

2        Q     I wasn't there. So I'm not sure.

3              Did you go through his gym at some

4   point?

5        A     Yes, I did.

6        Q     Did you have discussions with him about

7   coming back to work?

8        A     I'm sure I did. He came back to

9   work.

10       Q     Okay. Did -- tell me what

11  discussions, if any, you had with him if any about

12  him coming back to work in 1996?

13       A     God, I don't recall.

14             Again, this is a long time ago.

15       Q     Did -- do you recall there being any

16  discussions that Jim was not willing to come back on

17  a typical contract, that he wanted a long-form

18  contract?

19             MR. McDEVITT:  Object to the form and

20             foundation on that.

21             Are you drawing a distinction between

22             typical and long form?

23  BY MR. MAYNARD:

24       Q     Well, let me divide it out.

25             MR. McDEVITT:  Object.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

159

1    Jim came back to work in 1996 about whether or not

2    he was being a main event?

3        A    No.  I don't recall anything

4    specific.

5        Q    Do you ever recall him complaining to you

6    or stating to you, You are not living up to this

7    term of my contract.

8             I'm not being the main event?

9        A    No, I don't.

10       Q    Were there any discussions about Jim going

11   on a world tour as -- as a wrestler?

12       A    With WWE?

13       Q    Yes, sir.

14       A    On a world tour?

15       Q    Yes.

16       A    I don't have any recollection of that,

17   either.  I mean, he was in a world tour.

18       Q    Do you recall Jim ever complaining that he

19   felt you had not lived up to the agreement with him?

20       A    No.  I don't have any recollection of

21   that.  Again, we are talking a long time ago here.

22       Q    In 1996, in June of '96, was there a

23   particular show where WWE would go to in New York

24   and do marketing?

25       A    And do marketing?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

160

1      Q     Yeah, where they put on -- where there
2    were booths, and they would advertise,
3    promote -- promote product?
4                 MR. McDEVITT:  Talking about the toy
5           fair?
6                 WARRIOR:  Licensing show.
7    BY MR. MAYNARD:
8      Q     Licensing show?
9      A     Oh, okay.  Toy fair, probably.
10     Q     Did WWE routinely go to that show?
11     A     I know we went to toy fair every year
12   or -- whether or not we had a booth, I don't
13   recall, at toy fair.
14     Q     What -- what did you understand the
15   purpose of that show was?
16     A     Toy fair is to look for business, cement
17   current business relationships and do like everybody
18   else is doing, just you are there for good
19   business.
20     Q     Did you have any discussions with anyone
21   at WWE about using the phrase "Always Believe" at
22   that licensing or toy fair in 1996 in New York?
23     A     No.  As I recall, what happened on that
24   was we had someone who subsequently was a
25   thief, which we didn't know it at the time.  His



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

```
 1   name was Jim Bell.  He was in charge of
 2   licensing.
 3            As I recall, Jim Bell had some sort of the
 4   "Always Believe" insignia or call it what you will
 5   at the booth.  And that's the first I heard of
 6   it, as I recall.  And then Jim went ballistic when
 7   he went -- went there and subsequently decided,
 8   again, to take his ball and go home.
 9       Q    Okay.  I don't want to get confused
10   because you've given me Jim Bell, and you said
11   Jim.
12            And the second Jim who went
13   ballistic, would have been Jim Hellwig?
14       A    I'm sorry.  Thank you very much.
15   Sorry.
16            It was Jim Hellwig.
17       Q    How did you come to the understanding that
18   Mr. Hellwig got upset about the licensing?
19       A    He called me up and let me know.
20       Q    What was your response?
21       A    What was my response?
22       Q    Yeah.
23       A    My response to that was, you know, don't
24   go home.
25            We can work all this stuff out.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

162

1      Q    Do you recall anything else about that

2   particular weekend or that -- those conversations

3   that occurred surrounding that toy show or licensing

4   show?

5      A    Any other set of circumstances?

6      Q    Yes.

7      A    No.

8           Other than the fact that Jim did go

9   home, and he missed dates.  That's what I recall

10   about it.

11      Q    Do you recall whether or not Jim

12   complained that the licensing show was sort of the

13   straw that broke the camel's back for him because he

14   felt that WWE had not lived up to its commitments to

15   him?

16      A    I don't recall that.

17           I know is that he went ballistic when he

18   saw "Always Believe."  He went home.

19      Q    Do you recall that his father passed

20   away?

21      A    I do.

22           It was around the same time.

23      Q    Okay.  And do you recall that he was aware

24   that his father had gotten ill -- that he learned

25   his father was ill before his father passed



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

164

1  you?

2      A    No.

3      Q    Okay.

4      A    He -- you know, other than the fact that

5  he wanted to be compensated in some fashion for us

6  using "Always Believe."

7          I mean that was very clear.

8      Q    Did he seem upset that his dad had

9  died?

10     A    No.

11     Q    What did he say in that regards that led

12  you to believe that he didn't seem upset?

13     A    There was no conversation, you know, about

14  it other than "my dad had died."

15     Q    Did you ask him anything else about

16  it?

17     A    No.

18     Q    Why not?

19     A    Wasn't my business.

20          About his dad dying?

21     Q    Yes.

22     A    I don't recall having much of a

23  conversation at all about him as it relates to his

24  dad.

25          Subsequent to that, however, Jim did not



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

197

NO. 21, NOTES FROM VKM MEETING, WAS

MARKED FOR IDENTIFICATION.)


BY MR. MAYNARD:

    Q    I'm going to show you what I've had marked
as Exhibit 21.

    A    Sure.

    Q    Have you seen Exhibit 21 before?

    A    No.

    There's like a big black square -- two big
black squares here.

    Q    Those are redacted portions --

    A    Okay.

    Q    -- from your counsel.

    I assumed that there was something in
there that didn't have anything to do with this
case.

    A    Okay.

    Q    But if you'll look, the date is March 4th,
2005.  The subject line says, "Notes from VKM
meeting."

    A    Right.

    Q    You are VKM.

    Correct?

    A    That's correct.



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

198

1      Q     Okay.  These notes appear to have been

2   made by Donna Goldsmith.

3      A     Uh-huh.

4      Q     What do you recall Ms. Goldsmith's

5   position was with the company in March 2005?

6      A     I think I said earlier today that she's in

7   charge of consumer products.

8      Q     Does this refresh your recollection that

9   some time either on March 4th or prior to March 4th

10   of 2005 that she had a meeting with you to discuss

11   making a video about the Ultimate Warrior?

12      A     No.

13          Testified earlier that once or twice a

14   year, we will get together I'll be a part of a

15   committee that listens to ideas that -- about talent

16   and how you want to -- in addition to

17   pay-per-views, you want the do personality profiles

18   of the -- you know, of the character, any number of

19   individuals.

20          And Warrior was brought up as one of

21   them, and I okayed it.

22      Q     You'll note under the bullet point that we

23   can see, it says, "Ultimate Warrior, make this

24   controversial."

25      A     Right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                          April 24, 2009

199

1     Q     Were you -- did you tell her to make the

2  DVD controversial?

3     A     No.

4        The character himself was very

5  controversial and always has been.  And, you

6  know, I came up with the title, as I stated

7  earlier, in terms of the "Self Destruction of the

8  Ultimate Warrior" from a business standpoint.

9        That's exactly what he did.  He self

10  destructed.  So that's way I came up with that

11  title.

12        Why did he self destruct?

13        Well, I guess, we are going to find out

14  and we do find out, you know, in the video and we

15  found out because of my testimony today, you

16  know, of all of the many things of him self

17  destructing.

18        They are all accurate.  They are all

19  true.  They all happened.

20     Q     What do you mean by "self destruct"?

21     A     Well, anyone -- let's start from the

22  top.

23        Anyone who -- there's a difference between

24  a request and a demand, anyone who has no diplomacy

25  or very little of it and comes at you, as Jim



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent K. McMahon                                    April 24, 2009

238

1    didn't care much for his dad.  It's an accurate

2    statement.

3         Q    Do you think it's an accurate

4    statement?

5         A    I wouldn't have said it otherwise.

6              (THEREUPON, THE DVD WAS PLAYED AND

7              VIEWED.)

8    BY MR. MAYNARD:

9         Q    What did you mean when you said, "He was

10   terminated for good"?

11        A    I wasn't doing business with him.

12        Q    Did you mean to imply that was the last

13   time you had attempted to do business him?

14        A    I --

15             MR. McDEVITT:  I object to that, all

16             these questions, what he meant to

17             imply.

18             If anything, he made a

19             statement.  That's what the question

20             is, whether it's truthful or not.

21   BY MR. MAYNARD:

22        Q    You can answer my question.

23        A    What's the question again?

24        Q    Did you mean to imply -- convey to the

25   audience that this was the last time you attempted



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K.  McMahon                                April 24, 2009

239

1    to do business with Jim?

2        A    I meant to imply -- you know, convey to

3    audience that our relationship was over.

4        Q    Was your relationship over with at that

5    point?

6        A    Again, I'm not good on chronology.  It may

7    not have been.

8            But when the tape was produced, surely it

9    was over.

10       Q '  After 1996, which is the time period that

11   you are talking about in this tape, July, summer of

12   '96, did you ever reach out to Jim Hellwig again

13   about coming back to WWE?

14       A    I don't recall.

15       Q    You don't recall contacting him about

16   coming to work for WWE again?

17       A    I have no recollection of it.

18            (THEREUPON, PLAINTIFF'S EXHIBIT

19            NO. 35, LETTER DATED 12/17/97, WAS

20            MARKED FOR IDENTIFICATION.)

21   BY MR. MAYNARD:

22       Q    Let me show you what I've had marked as

23   Exhibit 35.

24       A    Obviously, I did propose to do business

25   with Jim afterwards.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

240

1           Again, I'm fuzzy on dates on this
2    stuff.
3           Q    Okay.  The time period that we've been
4    looking at on the DVD was the summer or June and
5    July of 1996.
6           A    Okay.
7           Q    I've just handed you what I've had marked
8    as Exhibit No. 35.
9                Have you seen this document before?
10          A    Again, not that I recall.
11          Q    Is that your signature?
12          A    That's definitely my signature.
13          Q    This is a letter dated December 17th of
14    1997 written to Jim -- Mr. Jim Hellwig, Ultimate
15    Creations.
16               "Dear Jim:  I'm prepared to offer you the
17    following:  Term five years, minimum guarantee
18    compensation, $750,000, plus royalty, royalty
19    rate, royalties to be paid at 35 percent, basis on
20    merchandise everyone else is paid 25 percent plus
21    standard licensing rate, working days 14 per month
22    for everything."
23               How did this come about?
24          A    I don't know.  I guess I'm a glutton for
25    punishment here.  Here, I'm attempting to do



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                              April 24, 2009

241

1    business with him again.

2              So I would -- you know, again at

3    the -- when I did this video, as far as I knew, that

4    was going to be the last time I would ever do

5    business with Jim.  Here in December, I'm proposing

6    doing business with him again of '97.

7        Q    But when you did the video, you stated

8    that that was the last time that you had done

9    anything with him was in '96.

10             Whereas, in fact, you really went back to

11   him about 18 months -- 17, 18 months later proposing

12   to do business with him again?

13             MR. McDEVITT:  That's an inaccurate

14             characterization of what he says on the

15             tape.

16   BY MR. MAYNARD:

17       Q    Correct?

18       A    I'd have to review exactly what I said on

19   the tape.

20             This doesn't have to do with anything I

21   said on the tape, does it?

22       Q    Let's go back again.

23       A    Yeah, sure.

24       Q    I am not good with this thing.

25             (THEREUPON, THE DVD WAS PLAYED AND



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Vincent  K. McMahon                                April 24, 2009

259

C E R T I F I C A T E

    I hereby certify that I am a Notary Public,

in and for the State of Connecticut, duly

commissioned and qualified to administer oaths.

    I further certify that the deponent named in

the foregoing deposition was by me duly sworn, and

thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me

stenographically in the presence of counsel and

reduced to typewriting under my direction, and the

foregoing is a true and accurate transcript of the

testimony.

    I further certify that I am neither of

counsel nor attorney to either of the parties to

said suit, nor am I an employee of either party to

said suit, nor of either counsel in said suit, nor

am I interested in the outcome of said cause.

    Witness my hand and seal as Notary Public

this ___13th___ day of ___May_____ , 2009.


/s/ Clifford Edwards

Clifford Edwards

Notary Public

My commission expires:  9/30/2011



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.211.3376
Facsimile: 954.331.4418

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

SENT BY:TITAN SPORTS, INC.    ;12-17-87 ; 2:27PM ;    V.K. MCMAHON – ;## ;    0024800024;# 17 1



**WORLD WRESTLING FEDERATION®**

VINCENT K. McMAHON
Chairman

December 17, 1997

Mr. Jim Hellwig
ULTIMATE CREATIONS
10320 N. Scottsdale Road
Scottsdale, AZ 85253

Dear Jim:

I am prepared to offer you the following:

TERM:    5 YEARS

MINIMUM GUARANTEE COMPENSATION:
SEVEN HUNDRED FIFTY THOUSAND DOLLARS
PLUS ROYALTIES

ROYALTY RATE:
ROYALTIES TO BE PAID ON A 35% BASIS ON
MERCHANDISE (EVERYONE ELSE IS PAID ON
25%) PLUS, STANDARD LICENSING RATE

WORKING DAYS:
14 PER MONTH FOR EVERYTHING

Jim, this deal is far more lucrative to you then our last agreement of 1996, and obviously, far more long term.

I look forward to building the resurgence of the Ultimate Warrior again.

Sincerely,

Vince

VKM/er

TITAN TOWER
1241 East Main Street
Post Office Box 3857
Stamford, CT 06902
Phone: 203 352 8602
Fax: 203 352 8730

® Registered Trademark of TitanSports, Inc.

PLAINTIFF'S
EXHIBIT
35

PENGAD 800-631-6989

WOO10781