# EXHIBIT 6



UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

**Date:**  May 30, 1999

**A. I HEREBY CERTIFY** that the annexed documents, listed or described below, are true copies of official records (or extracts therefrom) maintained in ___Treasury Enforcement Communications___ ___Systems (TECS)_____, and that I am the custodian thereof:

Customs Seizure Incident Report number 1992-SZ-0136185-01
Customs Fines and Penalties Case Document 1992-0401-000374-01
Customs Subject Records (2) for Wendell ROBINSON

_Ellen Mulvenna_
**Signature**

___Custodian of Records___
*Title*

**B. I HEREBY CERTIFY** that _____Ellen Mulvenna_____ who signed the foregoing certificate was at the time of signing ___Designated Custodian of Records___ and as such, was the legal custodian of the above listed documents, and that full faith and credit should be given to such certificate.

**IN TESTIMONY WHEREOF** I have hereunto set my hand, and caused the seal of the Department of the Treasury to be affixed this ___Thirtieth___ day of ___May___ one thousand nine hundred and ___Ninety Nine___

**By direction of the Secretary of the Treasury:**

_Mickey Boyle_                    T-JH 06778

**NOTICE OF CERTIFICATION**

TD F 10-  (     76)

★ U.S. GOVERNMENT PRINTING OFFICE: 1995-387-614/22143

REQUESTED BY:  MULVENNA, ELLEN

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>      PAGE   1
                                                     TIN00220

INCIDENT  NBR: 1992SZ013618501          FP&F CASE NBR: 1992040100037401
VIOLATOR NAME:
TOPIC: STEROID SEIZURE

           DATE   TIME              DATE   TIME                  DATE   TIME
SEARCH:       /             ARREST:      /          SEIZURE: 07101992/1530
===============================================================================
VIOLATOR DATA

===============================================================================
SUMMARY DATA

OI OFFICE CODE:   CASE #:
PROJECT CODES:
PRIOR INFO:  NONE X DEA   CUSTOMS   TECS   NCIC   OTHER

                        NAME-TITLE-AGENCY
DECLARATION TAKEN BY:
ARRESTING OFFICER:
SEIZING OFFICER:    PIRES/B-CUSTOMS INSPECTOR-C
SUPERVISOR:         DER/B-SEN CUSTOMS INSP-C
DISTRICT DIRECTOR:

TYPE OF INCIDENT: D  DRUGS              DISCOVERY DATE: 07101992
===============================================================================
LAW CHARGED             LAW CHARGED             LAW CHARGED
18USC545                21USC952                19USC1595A
===============================================================================
AGENCY PARTICIPATION

DISCOVERING:                 CSM
SEIZING:                     CSM
===============================================================================
CONVEYANCE DATA

CONVEYANCE TYPE: S MAIL
ITINERARY:  DATE 07101992  TIME      FROM GB UNITED KINGDOM
                                VIA
INBOUND/OUTBOUND:        MAIL SEARCHED: Y
MAIL DETENTION NUMBER:                   APO/FPO NUMBER:
AIR OR SURFACE: A                        TYPE OF MAIL:   P  PARCEL POST

SENDER - PERSON NAME: UNKNOWN
        FIRST NAME: UNKNOWN         MIDDLE NAME:
        STREET: UNKNOWN                       APT/SUITE:
        CITY: UNKNOWN          STATE:   CNTRY: GB ZIP:      0000

ADDRESSEE - PERSON NAME: ROBINSON
        FIRST NAME: WENDELL         MIDDLE NAME:
        STREET: 9 SEPTEMBER LANE                 APT/SUITE:
          OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

T-JH 06779

REQUESTED BY:  MULVENNA, ELLEN

OFFICIAL USE ONLY -- SEACATS INFORMATION -- OFFICIAL USE ONLY

<APPROVED>  SEACATS - INCIDENT REPORT <APPROVED>      PAGE   2
                                                     TIN00220

INCIDENT  NBR: 1992SZ013618501          FP&F CASE NBR: 1992040100037401
VIOLATOR NAME:.
TOPIC: STEROID SEIZURE

        CITY: BURLINTON             STATE: MA  CNTRY: US ZIP: 018030000
=============================================================================
SEIZURE DATA

REASON FOR EXAM:            TYPE OF EXAM:
SEIZURE REFERRED TO OI:     FILER CODE:
MANUFACTURER NAME/NBR:
SHIPPER NAME/NBR:
ABANDONED:    BLITZ:   DOG ALERT:    XRAY:
ENFORCEMENT AID USED:
ENTRY NUMBER:               ENTRY TYPE:
APPRAISING OFFICER:
MITIGATING OFFICER:
ON SITE MITIGATION:
 CITATION ASSOCIATED WITH PENALTY:
PENALTY: PENALTY ASSESSED          .00    MITIGATED AMT          .00
  AMT CLCTD        .00 DATE        RECEIPT#          PRMSRY AMT
PLACE OF DISCOVERY:             LOC: BOSTON
ACE OF SEIZURE:                LOC: BOSTON

 1 DESC OF SEIZED ITEM: STEROIDS (INJECTABLE)
    COMM/CD: STR       QTY:        12.00 UM: EA  WT DET:    FDIN:
    COUNTRY OF ORIGIN:     COUNTRY OF EXPORT: GB  COUNTRY OF DESTINATION:
    DEC VAL:      0      FOR VAL:            DOM VAL:
    DUTY:      0.00      LEGAL STAT: SZ PHYS STAT: DE CUST: OTH
    CONCEAL: I SEC:        ENTERED TARIFF #:
    T.E.S. CODE:    INV LIST:    CONCEAL COMM/CDE:

TOTALS:         DECLARED VALUE:        0    FOREIGN VALUE:         0
                DOMESTIC VALUE:        0       DUTY:         0.00
=============================================================================
CIRCUMSTANCES/REMARKS:
WHILE CONDUCTING AN EXAMINATION OF ENFORCEMENT OF MAIL,I SELECTED A SMALL
PACKAGE PULLED FROM THE BELT BY US CUSTOMS AIDE JOSEPH FISHER.  THE
PACKAGE WAS HEAVILY TAPED AND IDENTIFIED AS A TOY.  UPON OPENING THE PACKAGE
I DISCOVERED 12 COMBINATION PACKAGES OF INJECTABLE STEROID.  EACH BOX
CONTAINED (1) IU OF GENOTROPIN AND (1) 3ML VIAL OF SOMATROPIN, PRESCRIPTION
STEROIDS.  S/A STEVEN DOO OF OE WAS CONTACTED AND HANDLED PER SAC GUIDELINES
ACTING SCI BERNARD DER AUTHORIZED SEIZURE.


=============================================================================

T-JH 06780

REQUESTED BY:  MULVENNA, ELLEN

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

052999                    TECS II - LIST OF RELATED RECORDS              PAGE   1
                                                                         TN007060
                          3 RECORDS ARE RELATED TO BASE RECORD
1992SZ013618501      INCD C04 DER              B 071492


P9217986100C04       ROBINSON        WENDELL
       SM  MINOR VIOLATOR FROM S/A/S (CF-151)              PRIMARY VI

P9217986100C9X       ROBINSON        WENDELL        000000
       NN                                                 SRCE-SRCE

199204010037401      FPCS 02  TECII

```
16:35                    SEACATS SEIZURE CASE              05301999 T2M9C403
M8GP                                                               T2P9C405
CASE NO:   1992040100037401


STATUS: 7015 - SEIZURE CASE CLOSED - ADMINISTRATIVE FORFEI INPUT DTE: 09171992


VIOLTR NAME: ROBINSON              , WENDELL  VIOLTR ID:
VIOLATION DATE: 07101992    DISCOVERY DTE: 07101992
MITIGATED AMT:
VIOLATION        VIOLATION DESCRIPTN     VIOLATION         VIOLATION DESCRIPTN
21USC952         UNLAWFUL IMPORTATION O
19USC1595A       FORFEITURE AND PENALTI
18USC545         SMUGGLING GOODS INTO T



O.I. CASE NO:
COMMENTS:
CF4613 RECEIVED DESTROYED BY CUSTOMS



(PF1/2=SCRN/FIELD HELP) (PF3=MAIN/PREV MENU) (PF12=NARRATIVES)
(PF13=GQPQ) (PF17=FPBQ) (PF18=FPSQ)
```

T-JH 06782

REQUESTED BY:  MULVENNA, ELLEN

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

053099                         TECS II PERSON SUBJECT                    PAGE    1

TECS RECORD ID: P9217986100C04                              SUB RECORD 01


*** NAME INFORMATION ================================================================
    NAME: ROBINSON, WENDELL

*** PHYSICAL CHARACTERISTICS ========================================================

*** ADDRESS AND TELEPHONE INFORMATION ==============================================
ADDRESS-  STREET: 9 SEPTEMBER LANE                       APT/SUITE:
          CITY: BURLINTON               STATE: MA COUNTRY: US
          ZIP: 018030000 COUNTY:

*** IDENTIFYING INFORMATION =========================================================

*** OTHER INFORMATION ===============================================================

*** RECORD OWNERSHIP INFORMATION====================================================
STATUS: SM MINOR VIOLATOR FROM S/A/S (CF-151)       DATE: 071492
AGENCY: C04 USCS FIELD OPS - BOSTON MA       NAME: TRACY SHEA
TELEPHONE: 617 567 1843 TITLE: IMPORT SPECIALIST
REMARKS:
 STEROID SEIZURE/MAIL SEIZURE/US CUSTOMS

*** PRIMARY ACCESS INFORMATION=====================================================
PRIMARY ACTION: 0 NOT ON PRIMARY                 LOOK OUT LEVEL:

T-JH 06783

REQUESTED BY: MULVENNA, ELLEN

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

053099                        TECS II PERSON SUBJECT                        PAGE   1

TECS RECORD ID: P9217986100C9X                              SUB RECORD 02


*** NAME INFORMATION ===========================================================
     NAME: ROBINSON, WENDELL

*** PHYSICAL CHARACTERISTICS ===================================================

*** ADDRESS AND TELEPHONE INFORMATION =========================================

*** IDENTIFYING INFORMATION ====================================================

*** OTHER INFORMATION ==========================================================

*** RECORD OWNERSHIP INFORMATION================================================
STATUS: NN                                    DATE: 071492
AGENCY: C9X INCIDENT VIOLATOR RECORD       NAME: BERNARD DER
TELEPHONE: 617 568 1810 TITLE: CHIEF INSPECTOR
CASE NUMBER: 9204010037401   DATE ENTERED: 071492 LAST UPDATE: 071498
            9204010037401

REMARKS:
  CREATED AS PART OF AN INCIDENT

*** PRIMARY ACCESS INFORMATION=================================================
PRIMARY ACTION: 0 NOT ON PRIMARY              LOOK OUT LEVEL: 0

T-JH 06784



EXHIBIT
4

THE FOLLOWING HAS BEEN SEIZED AND DESTROYED.

ITEM: 12 units Somatropin 12 units Genotropin

SEIZURE #: 92040400374

T-JH 07126



EXHIBIT
5

371-052

7 317961 665203

For use as directed by the physician.
Genotropin 12 IU Multidose  PL 0022/0079
Water for Injections with
m-Cresol. 0.25%  PL 0022/0081
Genotropin 12 IU Multidose and Water for
Injections with m-Cresol. 0.25%  PA 187/32/2

**Kabi Pharmacia Ltd,**
Davy Avenue, Milton Keynes,
Bucks. MK5 8PH

Distributed for
**Kabi Pharmacia (Ireland) Ltd,** by:
Cahill May Roberts Ltd,
Pharmapark, Chapelizod, Dublin 20

GERBO

T-JH 07127



Combined package 1 (I + II)

# Genotropin 12IU Multidose
somatropin (rbe)

For s.c. injection

I. Vial containing sterile powder of
   somatropin (rbe)                         12 IU

II. Ampoule containing
    Water for Injections with m-Cresol. 0.25%  3 ml

Solution is prepared by adding 3 ml Water for
Injections with m-Cresol. 0.25% to the dry
substance in the vial.

Swirl gently to dissolve.

**The solution should not be shaken.**

Protect from light.

Reconstituted Genotropin 12 IU Multidose may
be stored in the refrigerator for three weeks.

**Keep out of the reach of children.**

**Store at 2 to 8 °C.**

POM

Kabi Pharmacia

SEPT 93
66645B51

Use before
Batch No.

T-JH 07128

**EXHIBIT 7**

**Cornell University
Law School**

LII / Legal Information Institute

# U.S. Code collection

<div style="border:1px solid">

## Help us provide free legal information for everyone—please give!

</div>

TITLE 19 > CHAPTER 4 > SUBTITLE III > Part V > § 1595

## § 1595. Searches and seizures

**(a) Warrant**

**(1)**  If any officer or person authorized to make searches and seizures has probable cause to believe that—

**(A)**  any merchandise upon which the duties have not been paid, or which has been otherwise brought into the United States unlawfully;

**(B)**  any property which is subject to forfeiture under any provision of law enforced or administered by the United States Customs Service; or

**(C)**  any document, container, wrapping, or other article which is evidence of a violation of section 1592 of this title involving fraud or of any other law enforced or administered by the United States Customs Service,

is in any dwelling house, store, or other building or place, he may make application, under oath, to any justice of the peace, to any municipal, county, State, or Federal judge, or to any Federal magistrate judge, and shall thereupon be entitled to a warrant to enter such dwelling house in the daytime only, or such store or other place at night or by day, and to search for and seize such merchandise or other article described in the warrant.

**(2)**  If any house, store, or other building or place, in which any merchandise or other article subject to forfeiture is found, is upon or within 10 feet of the boundary line between the United States and a foreign country, such portion thereof that is within the United States may be taken down or removed.

### (b) Entry upon property of others

Any person authorized by this chapter to make searches and seizures, or any person assisting him or acting under his directions, may, if deemed necessary by him or them, enter into or upon or pass through the lands, inclosures, and buildings, other than the dwelling house, of any person whomsoever, in the discharge of his official duties.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**EXHIBIT 8**

**Cornell University
Law School**

Search Law School     Search Cornell

LII / Legal Information Institute

# U.S. Code collection

## Help us provide free legal information for everyone—please give!

TITLE 18 > PART I > CHAPTER 27 > § 545

## § 545. Smuggling goods into the United States

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

Shall be fined under this title or imprisoned not more than 20 years, or both.

Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States.

The term "United States", as used in this section, shall not include the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or Guam.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**EXHIBIT 9**



EXHIBIT

*L. McMahon 35*
*3-23-99  S.T.*

## TITAN SPORTS, INC.
## BOOKING CONTRACT

This contract made effective this 18th day of **February, 1996,** is by and between Titan Sports, Inc., a Delaware corporation d/b/a The World Wrestling Federation ("WWF") with its principal place of business at 1241 East Main Street in Stamford, Connecticut (hereinafter *now address* referred to as "PROMOTER"), and **WARRIOR** residing at ~~c/o Warrior Gym, 10320 North~~ Scottsdale Road, Scottsdale, Arizona 85253 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions throughout the world and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and PROMOTER has established a network of cable television organizations which regularly broadcast PROMOTER's professional wrestling exhibitions on a pay-per-view basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such wrestling exhibitions constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange wrestling matches for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, press conferences, public appearances, and merchandising activities, or otherwise;

master rev 4/18/95
Draft rev 2/20/96

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

*11*

T-JH 00413

NOW THEREFORE, in consideration of the premises and of their mutual promises and agreements as herein set forth, the parties intending to be legally bound do hereby agree as follows:

## 1. BOOKING

1.1        WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)        During the term of this Agreement, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler or relating to sports entertainment (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast), or otherwise.

(b)        During the term of this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing any or all of the Events, as well as any closed circuit television, pay-per-view television or other video exhibition of the Events.

(c)        During the term of this Agreement, and thereafter as provided in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined hereinbelow) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2        In consideration of WRESTLER's grant of rights, license and other services, as hereinafter set forth, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER in wrestling matches at various Events, and during the term of this Agreement provided WRESTLER is not in breach of this Agreement, PROMOTER guarantees WRESTLER a minimum of ten (10) bookings per year.

1.3        Notwithstanding anything herein to the contrary, WRESTLER shall be obligated to provide services to PROMOTER for a minimum of fourteen (14) days per month. Twelve (12) days per month shall be allocated to wrestling services either at live arena events, Pay-Per-View telecasts, or personal appearances, press conferences, and/or for other promotional or related services. Two (2) days per month shall be allocated to taping of PROMOTER's cable and syndicated programming. Additional days shall be determined by agreement of the parties, and WRESTLER shall be compensated by PROMOTER for such extra days pursuant to Section 7.3 of this Agreement.

The parties also agree to mutually plan the dates of a "Warrior World Tour" to be scheduled. In the event that after good faith discussion the parties cannot agree on dates,

master rev 4/18/95
Draft rev 2/20/96

T-JH 00414

WRESTLER understands and agrees that PROMOTER shall make the final decision.

## 2. WORKS

2.1        If PROMOTER books WRESTLER to appear and perform at Events, each such booking shall be a special commission; and WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereafter created, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events.  (These recordings by tape, disc, film, or otherwise are collectively referred to herein as "Programs").

2.2        Notwithstanding the termination of this Agreement for any reason, and as elsewhere provided in this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use, and to authorize others to do so, the Programs in perpetuity in any manner or media and by any art, method or device, now known or hereafter created (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture).

2.3.       WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own in perpetuity all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material written, composed, submitted, added, improvised, or created by WRESTLER in connection with his appearance in the Programs).

2.4        If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such direction shall be a special commission and such Development shall be deemed work for hire and PROMOTER shall own such Development.  All Programs referred to in this Agreement and Developments are collectively referred to as "Works."

2.5        All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C.

-3-                          master rev 4/18/95
                                  Draft rev 2/20/96

T-JH 00415

§ 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

## 3. INTELLECTUAL PROPERTY

3.1     (a)     The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to his legal name, his ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described on Schedule A attached hereto and made a part hereof. WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts all worldwide right, title and interest in and to the Original Intellectual Property, including, but not limited to the exclusive rights, **during the term, extended term or renewal of this Agreement,** to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner or media and by any art, method or device now known or hereafter discovered. Notwithstanding, during the term of this Agreement, or any extended term or renewal, **WRESTLER may also exploit the character, marks, indicia, personal performances, and/or image and likeness of "Ultimate Warrior", in any capacity** except **in live wrestling or the promotion of live wrestling and subject to the provisions of Section 3.2, below.**

    (b)     The parties hereby acknowledge that as part consideration and/or inducement for this Agreement, PROMOTER agrees that notwithstanding PROMOTER'S prior claim to all right, title and interest in and to the character and ring name of "Ultimate Warrior", such character and ring name shall, as of the effective date of this Agreement, be transferred to WRESTLER and thus be treated as Original Intellectual Property in all respects hereunder. Accordingly, "Ultimate Warrior" is hereby listed on the attached Schedule A. Any and all variations thereto, whether variations in name, likeness, character, or other indicia of "Ultimate Warrior", which are created during the term of this Agreement, whether by WRESTLER or PROMOTER, shall be included in the definition of New Intellectual Property hereunder.

    (c)     PROMOTER and WRESTLER agree to mutually discuss and plan creative design of merchandise and character representations. Further, PROMOTER and WRESTLER also agree to mutually discuss opponents for WRESTLER and the schedule of matches to work together in developing story lines for character development.

master rev 4/18/95
Draft rev 2/20/96

T-JH 00416

Notwithstanding, in the event that the parties cannot reach agreement as to the above after such mutual discussion, WRESTLER understands, acknowledges, and agrees that PROMOTER may make the final decision.

3.2     (a)     With the exception of the Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines, themes, used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement or any prior agreements between the parties (collectively the "New Intellectual Property") are hereby assigned to and shall belong to PROMOTER in perpetuity with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

(b)     Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that PROMOTER, its licensees, sublicensees and assigns may continue to **exclusively exploit materials, goods, merchandise, videos, programs or broadcasts and any and all other items incorporating or including WRESTLERS's appearances or performances or Original Intellectual Property. This right shall be exclusive to PROMOTER, even to the exclusion of WRESTLER, and shall survive termination of this Agreement at any time, for any reason whatsoever, in perpetuity. Further, in this regard, WRESTLER acknowledges and agrees that he shall not, at any time, even after the termination of this Agreement at any time and for any reason, license, assign, consent or grant the right to the use or exploitation of any such marks or intellectual property with respect to such materials, merchandise, videos, programs or broadcasts to any person, entity, or organization involved in the promotion of professional wrestling.**

3.3     It is the intention of the parties that the New Intellectual Property belongs to PROMOTER in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason. PROMOTER shall have the exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, whether during or after the term of this Agreement and notwithstanding termination of this Agreement for any reason.

3.4     The Original Intellectual Property and the New Intellectual Property are collectively referred to as "Intellectual Property."

3.5     (a)     WRESTLER agrees to fully secure and preserve PROMOTER's rights in and to the Intellectual Property at his expense. At PROMOTER's request, PROMOTER and WRESTLER shall take such steps as PROMOTER deems necessary for any service mark, copyright, trademark or other registration throughout the world, or for any litigation or other proceeding, including any proceeding including infringement by others, to protect and/or enforce PROMOTER's rights in the Original and/or New Intellectual Property and/or Works, at

master rev 4/18/95
Draft rev 2/20/96

T-JH 00417

WRESTLER's expense, including, without limitation, legal fees and costs.

(b)   As referenced hereinabove, upon termination or expiration of this Agreement at any time and for any reason, all right, title and interest in and to the character and ring name of "Ultimate Warrior" shall be governed by the provisions of this Section 3.

## 4. MERCHANDISING

4.1   WRESTLER hereby agrees that PROMOTER shall have the exclusive right (i) during the term of this Agreement and thereafter as provided in this Agreement, to use the Original Intellectual Property  and (ii) in perpetuity to use the New Intellectual Property, in connection with the manufacture, production, reproduction, broadcast, rebroadcast, distribution, sale, and other commercial exploitation of materials, goods, merchandise, and any other items. As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the term of this Agreement using the Original Intellectual Property, PROMOTER shall have the exclusive right to sell and exploit such materials, goods and merchandise in perpetuity as provided in Section 3.2 above. As to all such materials, goods, merchandise or items using the New Intellectual Property, PROMOTER shall likewise have exclusive right in perpetuity, to sell and exploit same forever.  By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material goods, merchandise, or items relating to WRESTLER or his performance as a professional wrestler.

4.2   It is the intention of the parties that PROMOTER's rights described under Section 4.1 are exclusive to PROMOTER even to the exclusion of WRESTLER, except as provided in Paragraph 3.1. WRESTLER shall ensure that all copyright trademark, service mark or other registrations are maintained to protect all PROMOTER's rights as provided in this Agreement, at his sole cost and expense.

4.3   WRESTLER represents that he is currently involved in the publication and/or production of a comic book series incorporating the Original Intellectual Property as herein defined.   In further consideration of the assignment by PROMOTER to him of the ownership in and to the trade name "Ultimate Warrior" subject to the terms of this Agreement, WRESTLER agrees that he shall pay to PROMOTER a royalty equal to twelve (12%) percent of the gross profits earned in connection with the sales of such comic book. For purposes of this paragraph, "gross profits" shall be defined as before tax, or gross revenues earned from such sales, less the actual, out-of-pocket costs to WRESTLER. Such royalties shall be paid to PROMOTER quarterly, and shall be accompanied by an accounting provided by WRESTLER. WRESTLER shall maintain books of account related to the payment of such royalties to PROMOTER, and understands that PROMOTER may, upon reasonable advance notice, and at its sole expense, examine and copy WRESTLER's books insofar as they pertain to this Agreement primarily for the purpose of verifying the accuracy thereof.

master rev 4/18/95
Draft rev 2/20/96

T-JH 00418

Further, PROMOTER agrees to provide advertising or promotional space in its monthly magazines and during its television programming whenever appropriate, as deemed solely by PROMOTER, to market or promote the comic book and other products as mutually agreed by the parties.

## 5. EXCLUSIVITY

5.1        It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER, and, unless otherwise provided herein, even to the exclusion of WRESTLER.

5.2    In the event WRESTLER desires to participate in any commercial activity in which PROMOTER is not otherwise engaged and which is not addressed by this Agreement, and WRESTLER's participation in such activity requires use of the Original and/or New Intellectual Property, PROMOTER may, in its sole and unfettered discretion, upon WRESTLER's written request, execute a sublicense to WRESTLER for the limited purpose of authorizing WRESTLER to participate in such specific commercial activity upon mutually agreeable terms and conditions. PROMOTER's sublicense to WRESTLER shall constitute an exception to Paragraphs 3 and 4 herein, solely with respect to WRESTLER's participation in such specific commercial activity and shall not license, sublicense, authorize, grant or permit any other or further appropriation or infringement of PROMOTER's rights whatsoever.

## 6. TERM AND TERRITORY

6.1        The term of the Agreement shall be eighteen (18) months  from the effective date hereof.  Thereafter, this Agreement shall automatically renew for successive one (1) year terms, unless either party shall serve written notice to the other party at least ninety (90) days prior to the end of the term of this Agreement of such party's decision to terminate this Agreement as at the end of the term.  Reference herein to the term hereof means the initial term and any such renewed or extended term.  During any such extended term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein. Notwithstanding anything herein to the contrary, termination of this Agreement for any reason shall not affect PROMOTER's ownership of and rights in, including but not limited to, any Works, New Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER's performance as a professional wrestler during the term of this Agreement; and the exploitation of the rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereafter developed.

6.2        The territory of this Agreement shall be the World.

## 7. PAYMENTS

7.1        As total compensation for all appearances and performances, or other services

master rev 4/18/95
Draft rev 2/20/96

T-JH 00419

of any nature, pursuant to and as provided in this Agreement, including the provisions of Section 1.3, and for any and all grants of intellectual property or any other rights herein by WRESTLER to PROMOTER, PROMOTER shall be paid the sum of ONE MILLION DOLLARS ($1,000,000.00) for the entire initial 18-month term of this Agreement.

7.2     The compensation set forth in 7.1, above, shall be paid to WRESTLER by PROMOTER in equal, bi-weekly installments.

7.3     In addition, in the event that WRESTLER provides services to PROMOTER in excess of fourteen (14) days in any month as set forth in Section 1.3 of this Agreement, WRESTLER shall, in addition to that compensation set forth in 7.1 hereof, be paid an additional sum of TWO THOUSAND FIVE HUNDRED ($2,500.00) for each day in excess of the fourteen (14) days in said month.

7.4     WRESTLER shall not be entitled to any additional compensation including, without limitation, royalties, residuals, and the like, and hereby acknowledges and agrees that PROMOTER shall be entitled to retain all sums resulting from the exploitation of any of the intellectual property or other rights granted herein by WRESTLER to PROMOTER.

7.5     If PROMOTER instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, such instruction shall be a special commission and WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to PROMOTER and PROMOTER shall own all rights to all of WRESTLER's commentary and WRESTLER shall likewise not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of PROMOTER's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, video disks or otherwise.

7.6     It is further the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of his Original and/or New Intellectual Property in PROMOTER's wrestling magazine known as the WWF Official Magazine, or any of PROMOTER's other magazines or other publications, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail.

7.7     All payments made to WRESTLER are in full without withholding of any Federal, state or local income taxes, and/or any social security, FICA or FUTA taxes.   After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER.

7.8     The parties acknowledge that WRESTLER has in place or pending as of the effective date of this Agreement contracts, licenses, or other arrangements with third parties concerning use or exploitation of the character or ring name of "Ultimate Warrior" or

-8-

"Warrior"; e.g., "Warrior's Gym". All such contracts, licenses, or other arrangements have been specifically listed on the attached Schedule C, and are specifically excluded from this Section 7. WRESTLER hereby represents and warrants that he has listed all such contracts, licenses, or other arrangements on the attached Schedule C, and that PROMOTER is relying on such material representation in entering into the terms of this Agreement.

## 8. PROMOTER'S OBLIGATIONS

8.1        Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining his licenses, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2        PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance as professional WRESTLER and his standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)        In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)        In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication.

(c)        In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing arrangements; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3        PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event.

master rev 4/18/95.
Draft rev 2/20/96

T-JH 00421

PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance 24 hour notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then WRESTLER shall be subject to a fine to be determined by PROMOTER, in accordance with PROMOTER's costs for arranging the substitutions.

8.4        Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fine shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; a strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite his best efforts prohibits his performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1        WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2        WRESTLER shall be responsible for his own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)        WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining his physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise.

(b)        WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select his time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are also prohibited by PROMOTER's Drug Policy.

9.3        WRESTLER shall be responsible for supplying all wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events, as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events. However, PROMOTER shall be responsible to pay for those transportation costs which are covered by PROMOTER's current Travel Policy and

master rev 4/18/95
Draft rev 2/20/96

T-JH 00422

notwithstanding the terms of such current travel policy, WRESTLER shall be provided First Class flight accommodations at PROMOTER's expense.

9.4       WRESTLER shall use his best efforts in employing his skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5       WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to other wrestlers in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or his partners and opponents during a wrestling match; WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6       WRESTLER shall use his best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of his wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment then due WRESTLER pursuant to Section 7, shall terminate PROMOTER's guarantee as provided in Paragraph 1.2 above, as well as all other obligations of PROMOTER to WRESTLER hereunder, shall entitle PROMOTER to terminate this Agreement, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement.

9.7       Subject to Paragraph 1.3 hereof, WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, and to appear at and participate in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter created, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture), at times and places designated by PROMOTER. In connection therewith WRESTLER will receive only that compensation provided in Section 7 hereof.

9.8       Subject to the provisions of Section 3.1(c), WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with

<div align="center">-11-</div>

master rev 4/18/95
Draft rev 2/20/96

T-JH 00423

respect to any agreements disposing of the rights to the Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9      WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER'S appearance and/or performance in a professional wrestling match.

9.10     WRESTLER shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, and affiliates and their respective officers, directors, employees, and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, proceedings or expenses, incurred by any of them by reason of WRESTLER'S breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. And, WRESTLER shall indemnify and defend PROMOTER against any and all claims arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

9.11     WRESTLER shall be responsible for payment of all his own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to his retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon his retirement from professional wrestling.

9.12     (a)  WRESTLER shall be responsible for his own commercial general liability insurance, workman's compensation insurance, professional liability insurance, as well as any excess liability insurance, as he deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of his own acts, transactions, or conduct as a professional wrestler.

          (b)  WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with his performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury. WRESTLER knowingly and freely assumes full responsibility for all such inherent risks as well as those due to the negligence of PROMOTER, other wrestlers or otherwise.

          (c)  WRESTLER hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage

-12-

master rev 4/18/95
Draft rev 2/20/96

T-JH 00424

on account of injury to the person or property or resulting in serious or permanent injury to WRESTLER or in WRESTLER'S death, whether caused by the negligence of the PROMOTER, other wrestlers or otherwise.

        (d)      WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

9.13      (a) WRESTLER may at his election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of his professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of his professional activities.

        (b)  In the event of physical injury arising out of WRESTLER'S professional activities, WRESTLER acknowledges that he is not entitled to any workman's compensation coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.14      WRESTLER shall act at all times with due regard to public morals and conventions during the term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings him/her into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures his reputation in PROMOTER's sole judgment, or diminishes the value of his professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to suspend and/or terminate this Agreement forthwith.

## 10. WARRANTY

10.1      WRESTLER represents, warrants, and agrees that he is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; he has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no pending claims or litigation affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto., and the Rider to the Letter of Agreement dated February 19, 1996 which

master rev 4/18/95
Draft rev 2/20/96

T-JH 00425

shall be considered a Rider to this Agreement and which is thereby incorporated by reference as if fully set forth herein.

10.2         WRESTLER· represents, warrants and agrees that he is in sound mental and physical condition; that he is suffering from no disabilities that would impair or adversely affect his ability to perform professional wrestling services; and that he is free from the influence of illegal drugs or controlled substances, which can threaten his well being and pose a risk of injury to himself or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for wrestlers, as well as any and all amendments, additions, or modifications to the PROMOTER's drug policy implemented during the term of this Agreement and consents to the sampling and testing his urine in accordance with such policy. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER. PROMOTER'S current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated herein.

10.3   WRESTLER further represents, warrants and agrees that this Agreement supersedes all prior agreements between him and Titan, whether written or oral, except for the Rider to the Letter of Agreement dated February 19, 1996, which shall be considered a Rider to this Agreement, and is thereby incorporated by reference as if fully set forth herein.

## 11.  EARLY TERMINATION

11.1         This Agreement may be terminated prior to the end of its term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.

11.2         This Agreement will be terminated by WRESTLER's death during the term.

11.3         Upon the termination of this Agreement for any reason, including for breach as set forth in Paragraphs 12.1 through 12.4, the parties acknowledge and agree that PROMOTER shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and PROMOTER shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items as provided in **Paragraph 3.2(b).**

## 12.  BREACH

12.1         In the event PROMOTER breaches this Agreement, WRESTLER may recover such actual direct damages as may be established in a Federal or State court **of competent jurisdiction.**

12.2         In the event WRESTLER breaches this Agreement, PROMOTER may in its sole discretion in addition to its rights under PROMOTER's drug policy, (i) terminate this Agreement; and/or (ii) suspend WRESTLER for a period of up to three  (3) months for each breach of the

-14-

master rev 4/18/95
Draft rev 2/20/96

T-JH 00426

Agreement, provided that during each suspension period PROMOTER shall not book WRESTLER and WRESTLER may not appear or perform services relating to professional wrestling or sports entertainment throughout the world; and/or (iii) recover such actual direct damages as may be established in a court of law. In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to **Section 7.** WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the term and the New Intellectual Property forever.

12.3        The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief which shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4        In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement, or otherwise, are expressly waived.

### 13.  MISCELLANEOUS

13.1        Nothing contained in this Agreement shall be construed to constitute WRESTLER as a partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER his attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or the rights granted to PROMOTER herein.

13.2        This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3        This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

-15-

master rev 4/18/95
Draft rev 2/20/96

T-JH 00427

13.4      Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5      PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any person, firm or corporation, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6      Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

> Titan Sports, Inc.
> ATTENTION:
> J.J. Dillon
> Vice President, Talent Relations
> 1241 E. Main Street
> P.O. Box 3857
> Stamford, Connecticut 06902
>
> TO WRESTLER:
>
> **WARRIOR**
> c/o Warrior Gym
> 10320 North Scotsdale Road
> Scotsdale, Arizona  85253

The date of mailing shall be deemed to constitute the date of service of any such notice.

## 14. CONFIDENTIALITY

Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that further in consideration of PROMOTER'S entering into this Agreement, and continued Agreement, WRESTLER shall not, at any time during this Agreement, or after the termination of this Agreement for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit for WRESTLER for any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees,

<div align="center">-16-</div>

master rev 4/18/95
Draft rev 2/20/96

T-JH 00428

independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding WRESTLERS engaged by PROMOTER.

## 15. BUSINESS PLAN FOR WARRIOR UNIVERSITY

PROMOTER and WRESTLER acknowledge and agree to proceed to develop a business plan and budget to operate "Warrior University" ("WU"), a business concept proposed by WRESTLER to audition and train potential new talent of or for PROMOTER at WRESTLER's gym facility. PROMOTER shall endeavor to develop such business plan by the end of March 1996, and to implement the advertising and marketing program by the end of May 1996. The parties may enter into a licensing agreement relative to the operation of WU, the terms and conditions of which are to be determined when the business plan is finalized.

WRESTLER agrees to be reasonably on site at WU when he is not performing services for PROMOTER, and to be actively involved in the development of the business plan, concepts, training program, and other elements relative to the operation of WU. WRESTLER understands, acknowledges and agrees that his personal time and involvement with WU are integral to the negotiation and ultimate consummation of such licensing agreement. In the event the licensing agreement is not finalized, WRESTLER agrees that he shall not be owed any compensation whatsoever for any of the services he provided in this respect. WRESTLER further acknowledges that none of the time he spends in connection with this effort shall be considered part of the time spent on the services to be rendered under this Agreement as specified in Section 1 or any other term hereof.

Further, PROMOTER agrees to provide advertising or promotional space in its monthly magazines and during its television programming whenever appropriate, as deemed solely by PROMOTER, to market or promote WU.

master rev 4/18/95
Draft rev 2/20/96

T-JH 00429

All of the terms and conditions of any Riders, Addenda or Schedules are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

TITAN SPORTS, INC.

By:_____

     **Linda E. McMahon**
     **President, COO**

**WARRIOR**_____

     WRESTLER's legal name, or
     professional corporation

_____

     WRESTLER's signature and title,
     if a professional corporation

-18-

master rev 4/18/95
Draft rev 2/20/96

T-JH 00430

STATE OF CONNECTICUT )
                                         ) ss:
COUNTY OF FAIRFIELD )

On                          1996, before me
personally came Linda E. McMahon, President and COO of Titan Sports, Inc., to me known, and
known to me to be the individuals described in, and who executed the foregoing Release, and
duly acknowledged to me that she is a duly authorized corporate officer of Titan Sports, Inc., and
that he executed the same on behalf of said company.

WITNESS my hand and notarial seal this _____ day of _____, 1996.


_____
Notary Public


My commission expires:


STATE OF _____ )
                                             ) ss:
COUNTY OF _____ )

I,_____, a Notary Public for said County and State,
do hereby certify that Warrior personally appeared before me this day and acknowledged the due
execution of the foregoing instrument to be his free act and deed for the purposes therein
expressed.

WITNESS my hand and notarial seal this _____ day of _____, 1996.


_____
Notary Public


My commission expires: _____


-19-                                   master rev 4/18/95
                                              Draft rev 2/20/96


T-JH 00431

SCHEDULE A
ORIGINAL INTELLECTUAL PROPERTY

-20-

master rev 4/18/95
Draft rev 2/20/96

T-JH 00432

SCHEDULE B
EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS

-21-

master rev 4/18/95
Draft rev 2/20/96

T-JH 00433