# EXHIBIT 19

SUPERIOR COURT, STATE OF ARIZONA
COUNTY OF MARICOPA

WARRIOR and ULTIMATE CREATIONS, INC.,)
             Plaintiffs,    )
        vs.            ) No. CV 96-15377
TITAN SPORTS, INC.; WORLD WRESTLING )
FEDERATION; VINCENT K. McMAHON and )
LINDA McMAHON, husband and wife; )
INTERNATIONAL PROMOTIONS, INC.; )
STANLEY TORGERSON; MACFRUGALS )
BARGAINS CLOSE OUTS, INC., and JOHN )
DOE 1-15, )
             Defendants.    )
_____)
TITAN SPORTS, INC., a Delaware )
corporation, )
           Counterclaimants,  )
        vs.           )
WARRIOR and ULTIMATE CREATIONS, INC.,)
           Counterdefendants. )
_____)
STANLEY TORGERSON'S INTER-NATIONAL )
PROMOTIONS, INC., )
           Counterclaimants,  )
        vs.           )
WARRIOR and ULTIMATE CREATIONS, INC.,)
           Counterdefendants. )
_____)

### DEPOSITION OF VINCENT McMAHON

VOLUME I

(Pages 1 through 220)

Stamford, Connecticut
February 18, 1999
10:34 a.m.

REPORTED BY:
PAMELA J. MAYER, RMR-CRR

PREPARED FOR:
MR. SHAWN K. AIKEN

(Copy)

*Griffin and Associates*

3030 North Central Avenue, Suite 605
Phoenix, Arizona 85012
(602) 264-2230   Fax (602) 264-2245

1   Q.   And how many?  Do you recall?

2   A.   No, I don't.

3   Q.   What did Titan Sports do, then, to

4   obtain talent for those events?

5   A.   Made an announcement and probably

6   offered everyone to get their money back.

7   Q.   Do you remember Titan Sports having

8   made that announcement?

9   A.   I'm sure we did.

10   If someone was advertised -- it is a

11   generally accepted practice, if a star is advertised

12   in a main event and they're not going to be there, for

13   whatever reason -- sometimes they're sick, sometimes

14   they're hurt, or whatever -- we generally make an

15   announcement.

16   Q.   And you say "we."  Who makes that

17   announcement, generally?

18   A.   The ring announcer would make it.

19   Q.   Is that announcement also made with

20   respect to televised events?

21   A.   Sure.  As soon as we could get the word

22   out that Mr. Hellwig had been suspended, we did.

23   And I might add that, when something

24   like this occurs, it is at great expense and

25   aggravation on the part of the company, especially in



SUPERIOR COURT, STATE OF ARIZONA
COUNTY OF MARICOPA

WARRIOR and ULTIMATE CREATIONS, INC.,)
                         Plaintiffs,     )
              vs.                        ) No. CV 96—15377
TITAN SPORTS, INC.; WORLD WRESTLING      )
FEDERATION; VINCENT K. McMAHON and       )
LINDA McMAHON, husband and wife;         )
INTERNATIONAL PROMOTIONS, INC.;          )
STANLEY TORGERSON; MACFRUGALS            )
BARGAINS CLOSE OUTS, INC., and JOHN      )
DOE 1—15,                                )
                         Defendants.     )
_____  )
TITAN SPORTS, INC., a Delaware           )
corporation,                             )
                         Counterclaimants, )
              vs.                        )
WARRIOR and ULTIMATE CREATIONS, INC.,)
                         Counterdefendants. )
_____  )
STANLEY TORGERSON'S INTER—NATIONAL       )
PROMOTIONS, INC.,                        )
                         Counterclaimants, )
              vs.                        )
WARRIOR and ULTIMATE CREATIONS, INC.,)
                         Counterdefendants. )
_____  )

## DEPOSITION OF VINCENT McMAHON

VOLUME II

(Pages 221 through 433)

Stamford, Connecticut
February 19, 1999
10:10 a.m.



Griffin and Associates

**REPORTED BY:**
**PAMELA J. MAYER, RMR—CRR**

**PREPARED FOR:**
MR. SHAWN K. AIKEN

**(Copy)**

3030 North Central Avenue, Suite 605
Phoenix, Arizona 85012
(602) 264-2230   Fax (602) 264-2245

1    they are granting us the rights to book them at

2    events, pay-per-view, house shows, and things of that

3    nature, so that they can derive income and we can too.

4    So it would be a discussion.  But -- as to where that

5    person would be booked.  But normally, the talent

6    received a booking sheet as to where they are and

7    where they've been booked.

8            Q.    And my question, in Mr. Hellwig's case,

9    is, did he simply receive a booking sheet, or do you

10   remember discussing with him what his own appearance

11   schedule would be?

12           A.    There could likely have been some

13   discussion with him.

14           Q.    With, I'm sorry?

15           A.    There could likely have been some

16   discussion with Mr. Hellwig about that.

17           Q.    With you or someone else?

18           A.    Could have been me.  Could have been

19   whomever it was that was assisting me in talent

20   relations at the time.

21           Q.    Do you remember whether Mr. Hellwig

22   participated in all of Titan Sports' pay-per-view

23   events under the second agreement and until his

24   termination later that year?

25           A.    Probably was.  Not necessarily would

```
 1    have to be, because we skip some.  But in all

 2    likelihood, he probably was in all of our

 3    pay-per-views during the term of this contract until

 4    he breached the second time.

 5              Q.   You mentioned that adherence to Titan

 6    Sports' drug policy was important.

 7              A.   Yes.

 8              Q.   Do you remember discussing just Titan's

 9    drug policy with Mr. Hellwig in connection with his

10    return in April of 1992?

11              A.   I'm sure that was discussed.  I'm sure

12    that we discussed it with all of our talents.  We were

13    under a great deal of scrutiny by the federal

14    government, and we developed what we thought was the

15    best -- by far, the best drug policy in terms of

16    rehabilitation and in terms of the technical aspect of

17    testing.  We thought ours was better than the

18    International Olympic Committee.

19                   And it was very important that, at that

20    time, given the scrutiny we were under, that everyone

21    comply completely, as Mr. Hellwig had not done prior

22    to Summer Slam of '91, on two occasions just prior to

23    that.  So it was very important that everyone, and not

24    having any exceptions, comply with our drug policy.

25                   So it would have been -- surely, it
```

1        Q.    Do you recall what those were?

2        A.    No, I don't.

3        Q.    Do you recall what the range was, the

4    least punitive to the most punitive?

5        A.    I'm sorry.  I don't.

6        Q.    In any event, those would be described

7    in the written drug policy?

8        A.    Yes.

9        Q.    Were the prohibited substances also

10    described in the written drug policy?

11        A.    I believe they were, yes.  Again,

12    because of the technicality and things of that nature

13    that go on, I don't know that each and every thing

14    that -- I don't know if you could list -- I don't know

15    if there's enough paper to list everything that you

16    should not take, because, again, there are new

17    steroids coming out every day, there's new medicines

18    coming out every day, there's all that sort of stuff.

19    But, again, the general rule of thumb was, whatever

20    the government said was illegal is illegal, "Don't

21    take it."

22        Q.    And was that stated in the drug policy?

23        A.    No.  I think -- and it may be.  Again,

24    it's certainly implied.  I mean -- so -- you know,

25    there was a whole list, as I recall, of things not to

```
 1              A.   Yes.

 2              Q.   Did you have any role in the drafting

 3    of the policy?

 4              A.   Probably.

 5              Q.   Do you remember any role, either

 6    drafting it or participating in the process?

 7              A.   No.  I mean, I'm not an attorney.  I'm

 8    not someone who would draft a drug policy.  I don't

 9    know the technical terms and so forth.  And so --

10              Q.   When you say "probably," what was your

11    role?  Do you recall?

12              A.   I mean, I may have read the drug

13    policy.  You know, I may have said what I thought was

14    fair, you know, in terms of a three-strike-type

15    situation and you're out, you know, or things of that

16    nature.  But I would not be drafting a drug policy.

17              Q.   All right.  Let's set aside drafting

18    the policy.

19                   Tell me what you remember about your

20    role in the formulation of the policy.

21              A.   Again, it's not anything that I would

22    have been specifically involved with, other than in

23    terms of generalities.  I would have been concerned

24    that everyone be treated fairly.  I'd have been

25    concerned that this program had great integrity.  I
```

1          Q.    Another reason, I take it, that you and

2   Titan Sports would have been sensitive to drug testing

3   was the federal scrutiny that Titan Sports was under,

4   as you put it.  Is that right?

5          A.    That came later.  That came at a later

6   time.  As a matter of fact, we were subpoenaed -- as I

7   recall, we received our first subpoena on the day that

8   this contract was signed, April.

9          Q.    So prior to the April contract, the

10   Zahorian trial had started and concluded.  Is that

11   right?

12          A.    Yes.

13          Q.    And on the day of the Warrior's second

14   contract in April of 1992, Titan Sports received its

15   first federal subpoena?

16          A.    As it relates to -- we were notified

17   that there was a grand jury investigation.  And,

18   therefore -- again, the publicity factor, the adverse

19   publicity factor, preceded the grand jury

20   investigation.

21          Q.    When the second Warrior contract was

22   signed, Exhibit 3, the April 1992 agreement, did you

23   know that Jim Hellwig was known as the Anabolic

24   Warrior?

25          A.    You mean had been referred to as the

1    And I would expect everyone else -- all of our

2    performers to also adapt.  So there would have been a

3    conversation with Jim Hellwig about steroids.

4         Q.   It's simply that you can't recall the

5    specifics of that conversation today.  Is that right?

6         A.   No.

7         Q.   Okay.  You've mentioned the metabolite.

8    Do you have any medical training?

9         A.   Oh, no, I don't.  I would rely on the

10   drug program advisor and can only tell you what he

11   would tell me, that he could determine whether or

12   not -- given a baseline, given that first test, he

13   could determine -- there's something known as a T/E

14   ratio.  There's something known as a hormonal profile.

15   And then when you take a second test to see, how does

16   it compare to the first -- again, I'm not a

17   technician, and I'm certainly far from a doctor.  I

18   relied, really, on Dr. DiPasquali's knowledge.

19        Q.   Was there anyone else on whom you

20   relied for that knowledge?

21        A.   Oh, no.  No.  He was the drug program

22   advisor.  He was the man.

23        Q.   And let me just make sure I understood

24   your earlier point.  There's no advisor currently

25   today for Titan Sports.

1   purposes, we're still on the test that was received

2   May 6th?

3                Q.   BY MR. AIKEN:  Yes.   This is the

4   May 6th, 1992, report from Aegis Analytical

5   Laboratories.

6                A.   Okay.  I'm with you.

7                Q.   Do you know whether that ratio reflects

8   an appropriate baseline for Mr. Hellwig?

9                A.   I haven't the vaguest idea.

10               Q.   You don't have any way to --

11               A.   I'm not a doctor.

12               Q.   You don't have any way to make a

13   judgment about that one way or the other?

14               A.   No.  I rely strictly on the doctor's

15   judgment.

16               Q.   And similarly, do you know what these

17   test results mean?  Are you able to interpret whether,

18   for Mr. Hellwig's size, his weight, whether these are

19   appropriate figures?

20               A.   I'm sorry.  I'm not a doctor.

21               Q.   Okay.  You rely on Dr. DiPasquali --

22   you relied, in May of 1992, on Dr. DiPasquali to

23   interpret those results?

24               A.   Yes.  Of course.  He's the drug program

25   advisor.

1          Q.   Does the drug policy that was in effect

2    in May of 1992 describe an acceptable T/E ratio?

3          A.   I'm not certain.

4          Q.   We'd have to look to that written

5    policy?

6          A.   Yes.  Right.

7          Q.   The next test, if you'll turn with me,

8    please --

9          A.   That would be June 19, '92?

10         Q.   Yes.

11              MR. McDEVITT:  Actually, the test is

12   June --

13         Q.   BY MR. AIKEN:  It looks like it's a

14   June 7th test and then a June 19th report, if you'll

15   look at the second page from Dr. Black at Aegis

16   Laboratories.

17         A.   Okay.

18         Q.   Take a moment, please, to review those

19   two pages.

20         A.   All right.

21         Q.   Now, this is the second test result

22   that at least we have copies of.  Would this be a

23   baseline or a nonbaseline test, as you understand it?

24         A.   I think I said two times -- I'll say it

25   three times.  The general policy for someone joining

1    dispute that he had ever received this human growth

2    hormone and that sort of stuff and, as a matter of

3    fact, filed a lawsuit, coincidentally, in the eastern

4    portion of Long Island, in which, then, the grand

5    jury -- or I had been charged with -- and the company

6    had been charged with some sort of conspiring to

7    distribute steroids, if I have my chronology correct.

8            But nonetheless, he did file a lawsuit

9    in the same area in which the federal government

10   charged me, eastern portion of Long Island, which,

11   just for the record, I was vindicated on all counts.

12           But aside from that, when he brought

13   that lawsuit against me, claiming that indeed he --

14   that it was false that he had breached his contract,

15   false, in essence, that he had purchased this drug, we

16   then -- as a matter of fact, there may be something, a

17   piece of paper there, on that too.  I then responded

18   to that lawsuit in affidavit form, and there may be a

19   piece of paper on that.  And then subsequent to that,

20   Mr. Hellwig dropped that lawsuit, became a government

21   witness, and then, under oath, stated that in fact,

22   yes, everything that I said was true, that in fact all

23   of this was true.

24           So he had filed a lawsuit, knowing damn

25   well that it was a false lawsuit, and knowing very

1            MR. McDEVITT:  Wait a minute.  Let him

2    ask a question.

3            Q.   BY MR. AIKEN:  Following that

4    conversation with Mr. Hellwig, what did you do in

5    response to what you've learned?

6            A.   I was flabbergasted.  I didn't know

7    what to do.

8            Q.   Okay.  Did you contact counsel?

9            A.   Eventually, yes.

10           Q.   When did you first contact counsel?

11           A.   Sometime after the conversation.

12           Q.   Was it a matter of hours or days?  Do

13   you remember when?

14           A.   It wouldn't have been any more than a

15   matter of days.  It may have been a matter of hours.

16   I don't know.

17           Q.   Was it before the November 9th

18   conversation reflected in Exhibit 14?

19           A.   Probably.

20           Q.   And who did you contact in particular?

21   Was it Mr. McDevitt?

22           A.   Mr. McDevitt, of course.

23           Q.   Did you do anything else in response to

24   the disclosure by Mr. Hellwig?

25           A.   Like?

1      Q.   Well, besides contacting counsel.  Did

2  you contact any of the doctors?

3      A.   No.

4           MR. McDEVITT:  He's already described

5  some things he did.  I assume you're asking in

6  addition to that, Shawn?  In fairness to the witness,

7  he's already told you some things other than what you

8  incorporated in your question.

9           MR. AIKEN:  Why don't we do this.

10          (Deposition Exhibit 15 was marked for

11  identification.)

12     Q.   BY MR. AIKEN:  I'm showing you what's

13  been marked as Exhibit 15.  Please take a moment and

14  review that affidavit.

15     A.   I've read it and reviewed it.

16     Q.   Thank you.

17          In paragraph 2 of this affidavit --

18  first of all, is that your signature on the last page

19  of the affidavit?

20     A.   It appears to be, yes.

21     Q.   In paragraph 2 of the affidavit, you

22  state that you're the sole shareholder of Titan

23  Sports, Inc.?

24     A.   Yes.

25     Q.   Is that still the case?

```
 1              A.    Yes, it is.

 2              Q.    Has that always been true?

 3              A.    I don't think so.

 4              Q.    Can you tell me what period of time

 5   that wasn't true?

 6              A.    A very brief period of time, I think,

 7   in the first -- I would imagine the first couple

 8   months of the company.

 9              Q.    All right.  Since the first year of the

10   formation of the company, have you been the sole

11   shareholder?

12              A.    I believe so.

13              Q.    All right.  In paragraph 3 of the

14   affidavit, you state that you terminated Mr. Hellwig's

15   contractual relationship with Titan on November 9,

16   1992.

17              A.    Right.

18              Q.    Did you do so during the telephone

19   conversation that we've already talked about on

20   November 9th, 1992, which is reflected, more or less,

21   in Exhibit 14?

22              A.    I believe so.

23              Q.    Now, before you terminated

24   Mr. Hellwig's contract on November 9th, 1992, had you

25   notified Mr. Hellwig of any breaches of the 1992
```

1  agreement?

2          A.   I don't know.

3          Q.   Do you know whether anyone at Titan

4  Sports had notified Mr. Hellwig that he had breached

5  in some fashion the 1992 agreement?

6          A.   No.

7          Q.   You conclude paragraph 3 by saying that

8  at that time, that is, November of 1992, Mr. Hellwig

9  was one of the top talents within the WWF.

10         A.   Yes.

11         Q.   Is that still your view?

12         A.   At that time?

13         Q.   Yes.

14         A.   Absolutely.

15         Q.   In paragraph 4 of the affidavit, you

16  state that the termination of Mr. Hellwig came after

17  an internal investigation, which culminated over the

18  weekend of November 7th and 8th, 1992.

19         A.   Yes.

20         Q.   Is that also still true?

21         A.   Yes.

22         Q.   Did you prepare this affidavit, by the

23  way?

24         A.   I'm not -- did I prepare -- did I write

25  it?

1    Q.   Did you write the affidavit?

2    A.   No, I didn't write it.

3    Q.   Tell me how the affidavit came to be

4    prepared and presented to you for signature.

5    A.   I don't recall.  I mean, I'm not in the

6    habit of -- during my normal course of duties, I don't

7    generally sit down and write affidavits.

8    Q.   Sure.

9         Did someone request you to do so?

10   A.   I don't recall.

11   Q.   You testify in the affidavit that your

12   wife, Linda McMahon, and you had left Connecticut on

13   Friday, November 6th, to spend the weekend in Florida.

14        Is that still your recollection?

15   A.   Yes.

16   Q.   During that weekend, you testify in the

17   affidavit, you spent a considerable period of time on

18   the telephone relative to the investigation of

19   Mr. Hellwig's activities.  Is that also still your

20   recollection?

21   A.   Yes.

22   Q.   Can you tell me what you recall about

23   that considerable period of time on the telephone.

24   A.   That would be, you know, again, in the

25   throes of this.  This would be something that was of

1    extreme importance, based on, again, what I said

2    earlier of a grand jury investigation, you know, this

3    rumor from someone in the federal prosecutor's office

4    to Henry Holmes that there was some sort of

5    international drug trafficking of some kind going on.

6    This would have been a matter of great importance to

7    me and my company.

8              So I would have -- I certainly would

9    have called counsel and discussed with counsel, you

10   know, the ramifications of this and how it related to

11   what was going on in the grand jury investigation or,

12   you know, all of that.  I would have done that.  I may

13   have sought advice from others -- I don't recall -- at

14   the time.  But this would have been a bad weekend for

15   me.

16             Q.   By "counsel," do you mean Mr. McDevitt?

17             A.   Yes.

18             Q.   The internal investigation that's

19   referenced in paragraph 4, what does that refer to?

20   Is that something more than the considerable period of

21   time on the telephone?

22             A.   I don't think so.  It may be.  There

23   may be something I'm forgetting.  But --

24             Q.   Who was involved in the internal

25   investigation?

1   whatever that legal term is."  What is the illegal

2   substance that you're referring to?

3               A.    Human growth hormone.

4               Q.    Can we call that HGH?

5               A.    Sure.  HGH.

6               Q.    Do you know what amount of HGH you're

7   referring to?

8               A.    $5,000 worth.

9               Q.    Okay.  Do you know --

10              A.    Now, whether or not that is a thumbnail

11   portion or whether or not it's an amount that would

12   fill this room, I don't know.  It just seems like --

13   it seems like $5,000 is a lot of money to spend for a

14   drug.

15              Q.    Do you know whether that was a

16   sufficient amount to distribute?

17              MR. McDEVITT:  You mean beyond -- wait

18   a minute.  Sufficient amount -- any amount is

19   sufficient to distribute.  Distribution is a legal

20   term.

21              MR. AIKEN:  Let me rephrase --

22              MR. McDEVITT:  It doesn't turn on

23   quantity.

24              MR. AIKEN:  Let me rephrase the

25   question.

1          Q.    BY MR. AIKEN:  You don't know what

2    amount of HGH Mr. Hellwig purchased.  Is that correct?

3          A.    $5,000 worth.

4          Q.    Beyond the monetary measure, do you

5    know what Mr. Hellwig purchased?

6          A.    No.

7          Q.    Have you learned since what that amount

8    was?

9          A.    No.

10         Q.    You've described HGH as an illegal

11   substance.  What state or federal law are you

12   referring to?

13         A.    It is my understanding that HGH is in

14   the same category as steroids and -- I think it's a

15   class 3 category, I think it's called.

16              It's not -- I mean, if this were not an

17   illegal drug, then Mr. Hellwig would have gone to his

18   normal -- his drugstore or to his doctor and said,

19   "I'd like to have some, please," and it would have

20   been fine.

21              This whole subterfuge of finding

22   someone in the United Kingdom and paying them $5,000

23   and then going through this whole rigmarole of not

24   having it sent to you but sent to a third party and

25   all of that, I mean, that tells me, from a layman's

1  standpoint, that's an illegal drug.

2            In terms of what the FDA classifies as

3  an illegal drug, that's not like aspirin or something

4  like that.  I'm sure you would find that on the FDA's

5  list.

6            Q.   In any event, in 1992, in or around

7  November 7th or 8th, you determined that HGH was an

8  illegal drug.

9            A.   That's correct.

10           Q.   Okay.  Did you consult with anybody

11  about that?  Did you speak with counsel or a physician

12  or somebody else?

13           A.   I'm sure that I --

14           MR. McDEVITT:  Don't reveal the

15  substance of discussions you've had with counsel.

16           THE WITNESS:  I'm sure I spoke with

17  Mauro DiPasquali about that.

18           Q.   BY MR. AIKEN:  Do you remember speaking

19  with Mr. DiPasquali about that during the internal

20  investigation in November 1992?

21           A.   In all likelihood, I did, because,

22  again, a number of these test results, I don't believe

23  I had gotten back at that time.  There's quite a lag

24  time between when they are taken and when they come to

25  the lab and when we get the results back.  It can be

GRIFFIN AND ASSOCIATES - (602) 264-2230

1    quite a long time.

2                But, nonetheless, I wanted to determine

3    in my own mind this suspecting that Mr. DiPasquali

4    had, but, again, could not prove, that Mr. Hellwig,

5    from his point of view, was taking small dosages of

6    testosterone.  But, again, that was not relevant,

7    because I had to wait until something could be proven

8    to take action on it.  This admission by Jim Hellwig,

9    he just came right out and said it.

10               Q.   As I say, you testified that the reason

11   for the termination of Mr. Hellwig was "the

12   importation of an illegal substance and the attempted

13   distribution or whatever that legal term is."

14               A.   Um-hum.

15               Q.   Let me ask you what your understanding

16   of what Mr. Hellwig was trying to do is.

17               A.   Well, my understanding of what he's

18   trying to do, again, from a layman, common-sense

19   standpoint, is you go to a foreign country, you pay

20   some cash for a drug, an illegal drug you can't get

21   back home, and instead of, you know, having some sort

22   of direct line of communication, he set up this thing

23   of, you send it to a third party, this Wendell

24   Robinson, I think his name is, and then Wendell

25   Robinson was supposed to give it to him.  So he's

1    involving a lot of individuals in some sort of effort

2    to cover whatever it is he's doing.  Otherwise, why

3    wouldn't he just have it sent to him?

4         Q.   Well, during your internal

5    investigation, did you learn whether Mr. Hellwig was

6    intending to resell all or part of the HGH to another

7    person?

8         A.   Oh, I would have no idea about that.

9    I'd have no idea whether or not it was for his

10   personal use.  As a matter of fact, Mr. Hellwig may

11   have told me that it was for his personal use, could

12   very well have told me.  Whether or not I accepted

13   that as truth or not, I don't know.

14        Q.   Do you remember hearing that, in other

15   words, from Mr. Hellwig, that he intended it for his

16   personal use, during the internal investigation?

17        A.   He may have told me that.

18        Q.   Did you do anything to confirm or deny

19   that he intended it for his personal use?

20        A.   I don't believe so.

21        Q.   Did you speak with Davey Boy Smith, for

22   example, to learn whether he knew what Mr. Hellwig

23   intended once he received the HGH?

24        A.   I don't think Mr. Smith could know what

25   Mr. Hellwig intended to do.

1    Q.   Well, let me ask -- during the internal

2    investigation, did you speak with Mr. Smith?

3    A.   Yes.  Of course.

4    Q.   And we're referring to Davey Boy Smith?

5    A.   Yes.

6    Q.   Do you remember that conversation?

7    A.   Generally, yes.

8    Q.   Were you at your home in Boca Raton?

9    A.   I believe so.

10   Q.   Do you remember whether it was

11   November 7th or 8th?

12   A.   No.  I'm sorry.

13   Q.   Okay.  Do you remember any of the

14   particulars of the conversation?

15   A.   I remember that Jim Hellwig had said

16   that Davey Boy also did the same thing, had purchased

17   this drug, and had it sent.

18         I confronted Davey Boy with that, and

19   Davey Boy said that, well, that's what he told Jim

20   Hellwig.  That he really had not, but he did tell Jim

21   Hellwig that he did.  So I don't know who's zooming

22   whom in this whole scenario.  All I know is that they

23   both admitted to doing what they did.  And they sealed

24   their fate.

25   Q.   And during that conversation with

1  Mr. Smith, is that when he related whether Mr. Hellwig

2  intended it for personal use or not, that is, the HGH?

3          A.   I don't think he made reference to

4  that.  I mean, I don't recall anything about personal

5  use at all.

6          Q.   Was that fact important to you during

7  the investigation, that is, whether he intended it for

8  personal use?

9          A.   No.  I mean, the infraction was the

10  infraction, whether he intended it for personal use or

11  he intended to distribute it.  I don't know that it

12  would have made any difference.

13          Q.   In November of 1992, while you were

14  conducting this internal investigation, did you know

15  whether there were different forms of HGH?

16          MR. McDEVITT:  I'm going to object to

17  the form.  What do you mean, "different forms of HGH"?

18          Q.   BY MR. AIKEN:  Do you understand the

19  question, Mr. McMahon?

20          A.   No.  I'm sorry.  I don't.

21          Q.   In November of 1992, while you were

22  conducting this internal investigation, what did you

23  think HGH was?

24          A.   I really wasn't sure.  I mean, if you

25  put HGH in front of me and said, "Identify that as

1  HGH," right at this moment, I couldn't do that.  I

2  don't know what HGH looks like.

3        Q.  Did you know what it did when it's

4  ingested?

5        A.  I knew it was an anabolic agent, and I

6  know that if you take too much of it, apparently one

7  of the side effects is that your bones grow, your

8  facial -- maybe all of your bones, but your face

9  changes.  It's almost like you develop, like, a

10  Cro-Magnon kind of a look, and your jaw -- you know,

11  it changes the look of your face.

12        Q.  Did you know how much use was required

13  before those sorts of changes occurred?

14        A.  No.  I don't know anything about that.

15        Q.  Was it important to you during the

16  internal investigation to understand what HGH was or

17  how it operated?

18        A.  No.  What was important to me is

19  whether or not this was a legal substance or an

20  illegal substance.

21        Q.  Did you know in November of 1992

22  whether HGH was a legal or illegal substance in the

23  United Kingdom, where this was first purchased?

24        A.  No.

25        MR. McDEVITT:  Legal substance obtained

1   from who?  I mean, you're asking him legal questions

2   here.

3            Q.   BY MR. AIKEN:  Let me ask you this,

4   Mr. McMahon.  In November of 1992, did you know what

5   the United Kingdom laws were in any respect relating

6   to HGH?

7            A.   No.

8            Q.   Was that important to you?

9            A.   Well, I don't want our guys breaking

10  the law, no matter where they are.  If we're in the

11  United Kingdom, I would expect to abide by the laws of

12  the United Kingdom.  If we're in the United States,

13  then likewise.  I wouldn't have any idea whether or

14  not that was -- the use or the acquisition of HGH was

15  legal in Great Britain or not, and can't tell you

16  today.

17           Q.   Are you able to recall what specific

18  provision in the Titan drug policy the importation of

19  HGH violated?

20                MR. McDEVITT:  Object to the form.

21                THE WITNESS:  It is generally

22  regarded -- I think there's a reference to

23  performance-enhancing drugs.  And HGH would be a

24  performance-enhancing drug.

25           Q.   BY MR. AIKEN:  And who made that

1    determination in November of 1992 that HGH is a

2    performance-enhancing drug?  Was that something you

3    learned from someone?

4           A.    Sure.  I mean, again, there have been

5    articles written about human growth hormone and the

6    enhancement of athletic performance and strength and

7    things of that nature.

8           Q.    Do you remember from whom you learned

9    that HGH was a performance-enhancing drug?

10          A.    No.  I can -- I remember distinctly,

11   again, this fella, Dave Meltzer, I made reference to,

12   talking about -- that was one of his criticisms of our

13   drug policy, was that talent could take human growth

14   hormone, if they had access to it in some way, and

15   that it's very difficult to catch, something called a

16   half life or something, which I don't understand.  But

17   it's very difficult to actually catch somebody.  When

18   you do a test and so forth, it's very difficult to

19   catch.  And it's a way to circumvent a policy but yet,

20   at the same time, using some sort of performance

21   enhancer.

22          Q.    In any event, it's your testimony that

23   in November of 1992, you determined that the

24   importation of HGH was a violation of Titan's drug

25   policy.  Is that correct?

1          MR. McDEVITT:  Object to the form.

2    That's not his testimony.

3          THE WITNESS:  It's my belief that Jim

4    Hellwig attempted to circumvent our drug policy.

5    That, in and of itself, is a reason -- and he admitted

6    it -- is a reason to terminate him.

7          In addition to that, not being an

8    attorney, or not being a customs agent of the

9    United States of America, I can't tell you the

10   specifics, in terms of the legality or illegality of

11   the use of that drug, other than a general knowledge

12   that you can't go buy it at a drugstore.  You can't

13   buy it over the counter.

14          I would suggest that, in the way that

15   Jim Hellwig told me he bought this and had it sent to

16   a third party and all of that, this was an illegal

17   substance.

18          Q.   BY MR. AIKEN:  Did you determine, in

19   November of 1992, that the use and the possession and

20   the distribution and the importation of HGH was all a

21   violation of the drug policy?

22          MR. McDEVITT:  Object to the form.

23          THE WITNESS:  I would suggest, the very

24   fact that someone admitted to me, whether all of those

25   were a violation or whether one of them was a

1  violation, if any one of those you just mentioned is a

2  violation and someone is trying to circumvent our drug

3  policy, that is sufficient reason to say goodbye.

4         Q.   BY MR. AIKEN:  Let me ask you the first

5  question, though, and that is, apart from the attempt

6  to circumvent the policy, first, is it your testimony

7  that, in November of 1992, you determined that simply

8  the importation of HGH itself constituted a violation

9  of Titan's drug policy?

10         A.   It wouldn't have mattered to me.  Let's

11  start with what I know.  Let's start with the

12  admission of what he said he did.

13         Q.   I understand that.

14         A.   Which is a violation.  To try to

15  circumvent our drug policy, in and of itself, is a

16  violation.  Let's start with that.

17         In addition to that, if all of these

18  other mitigating circumstances are also violations,

19  then it just keeps adding on and adding on and adding

20  on.

21         Q.   Why did you conclude that Mr. Hellwig

22  intended to circumvent the drug policy?  What was the

23  basis for that conclusion?

24         A.   Because he intended to use HGH.  Why go

25  through all of this if he didn't intend to use it?  He

GRIFFIN AND ASSOCIATES - (602) 264-2230

1    intended to use it.

2         Q.    And how do you know that?

3         A.    He told me so.

4         Q.    Tell me what he said.

5         A.    In response to what he had done, he

6    told me this was for his personal use, as I recall.

7    Well, that tells me, if it's for his personal use,

8    he's probably going to use it.  Why spend $5,000 if

9    you're not going to use it?

10        Q.    Are you aware of any drug tests

11   performed on Mr. Hellwig during 1992 indicating that

12   he had actually used HGH?

13             MR. McDEVITT:  Object to the form.  It

14   presupposes such tests can be done.

15             THE WITNESS:  I don't recall.

16        Q.    BY MR. AIKEN:  Are you aware of any

17   test results indicating the use of HGH by Mr. Hellwig?

18        A.    No.

19        Q.    Have you had an opportunity to compare

20   the audiotape with the transcript marked Exhibit 14 to

21   your deposition?

22        A.    No.

23        Q.    If you'll look with me, please, at

24   Exhibit 15, your affidavit, over on page 3, paragraph

25   11 -- it's your affidavit.

1              So, I mean, again, it's like -- plus,

2    what about the poor licensee, you know, and how

3    they're hurt as a result of this, because now one of

4    our major characters is no longer here.  And the

5    Bulldog as well.  I mean, it's not just Jim Hellwig.

6    The Bulldog as well was involved in some of the

7    licensing.  Not to the extent of the Jim Hellwig

8    Ultimate Warrior character, but that was part of it as

9    well.

10             Q.   At the time of his termination, the

11   Ultimate Warrior character was one of Titan Sports'

12   major characters?

13             A.   Yes.

14             Q.   You've described a connection between

15   the success of licensing and the character's

16   appearance.  Is it true that if Mr. Hellwig hadn't

17   been terminated, he would have continued to make

18   regular appearances for Titan Sports during the rest

19   of 1992 and '93 and the term of his contract?

20             A.   You're asking me to give you a

21   supposition, a hypothetical, if in fact he had not

22   admitted to this --

23             Q.   Well, I guess my question is, there was

24   no guarantee that Mr. Hellwig was going to continue

25   appearing for Titan Sports during the rest of '92 and

1          A.   No, I don't.

2          Q.   It's attached to the letter.  Was it

3    attached to the letter when you signed the letter

4    itself?

5          A.   I don't know.

6          Q.   Between the time of Mr. Hellwig's

7    termination and this letter, in other words, from

8    November 9th through December 17th of 1992, do you

9    remember having a conversation with Mr. Hellwig?

10         A.   Specifically, no.

11         Q.   Following this letter, do you remember

12   a response from Mr. Hellwig?

13         A.   No.

14         Q.   Either by telephone or in writing?

15         A.   No.

16         Q.   Was the release sent back?

17         A.   I don't know.

18         Q.   One footnote.  I may have asked this.

19   Do you remember whether Mr. Hellwig signed a receipt

20   indicating that he had received a copy of the 1992

21   drug policy?

22         A.   I don't know.

23         Q.   Was it the practice of Titan to have

24   its talent sign a receipt for the policy?

25         A.   It could have been.  I'm not certain.

1          Q.   You don't remember that it was such a

2  practice?

3          A.   I'm not certain.

4          Q.   If there were such receipts, do you

5  know where they're kept?

6          A.   No.

7          Q.   Look with me briefly again, please, at

8  Exhibit 19.

9          A.   Um-hum.  What page?

10         Q.   Well, my question is, do you know why

11  the letter was prepared for you, why you signed it and

12  sent it?

13         A.   It says, "The purpose of this letter,"

14  if I may read --

15         Q.   Sure.

16         A.   "The purpose of this letter is to put

17  you on notice" -- "you" meaning Jim Hellwig -- "on

18  notice with respect to certain rights and obligations

19  which you are still bound by, notwithstanding such

20  termination."

21         Q.   Was it you who made a determination

22  what those rights and obligations were, or was that

23  whoever prepared the letter?

24         A.   Again, we would certainly, as good

25  business people, hope to protect whatever rights that

**EXHIBIT 20**

CAUSE NO.  CV-96-15377

| | |
|---|---|
| WARRIOR and ULTIMATE CREATIONS, INC. )<br>Plaintiffs ) | IN THE SUPERIOR COURT |
| )<br>V. ) | STATE OF ARIZONA |
| )<br>TITAN SPORTS, INC.; )<br>WORLD WRESTLING FEDERATION; )<br>VINCENT K. MCMAHON and )<br>LINDA MCMAHON, husband and wife; )<br>INTERNATIONAL PROMOTIONS, INC.; )<br>STANLEY TORGERSON; MACFRUGALS )<br>BARGAINS CLOSE OUTS, INC.; and )<br>JOHN DOE 1-15, )<br>Defendants ) | |

*************************************
DEPOSITION OF
DR. MAURO G. DI PASQUALE
*************************************

APPEARANCES:

Shawn Aiken
HEBERT, SCHENK & JOHNSEN, P.C.
1440 Missouri Avenue
Phoenix, Arizona  85014

Joseph T. Murray
HART, BAXLEY, DANIELS & HOLTON
59 John Street, 5th Floor
New York, New York  10038                    For the Plaintiffs

Mark E. Kozar
KIRKPATRICK & LOCKHART LLP
1500 Oliver Building
Pittsburgh, Pennsylvania
15222-2312                                   For the Defendants

Paul Burgess
Toronto, Ontario                             For Dr. Di Pasquale

```
 1        Q    Doctor, I'm showing you now what's been marked as
 2             Exhibit 7 to the transcript.  And would you take
 3             a moment and please tell me if that's the
 4             document you are referring to?  I.e., the WWF
 5             policy that was in effect at the time you began
 6             your work?
 7             MR. KOZAR:  Objection to the form of the
 8             question.  There was no testimony that that's
 9             when he began his work.
10             MR. BURGESS:  Go off the record while the doctor
11             is looking at the document.
12                 (DISCUSSION OFF THE RECORD)
13        A    This looks like the policy I have on the
14             computer.  I scanned in.  Or at least very
15             similar to it.
16             MR. AIKEN:
17        Q    If you'll note with me, please, it's dated in the
18             upper right hand corner on the second page --
19        A    March 16th.
20        Q    -- March 16th, 1992.  Does that assist you in
21             confirming, if that's true, that this was the
22             policy in effect when you worked on the May 1st
23             policy?
24        A    I may have an earlier one on the computer.  I
25             believe that they sent me a copy of the one that
```

6

| | | |
|---|---|---|
| 1 | A | Yes, I have that in front of me. |
| 2 | Q | Please take a moment to review that. |
| 3 | A | Okay.  I have reviewed it. |
| 4 | Q | Now, that provision was changed, correct? |
| 5 | A | Yes, it was, yes. |
| 6 | Q | And if you wish you may confirm the change in |
| 7 | | Exhibit 2 to your affidavit. |
| 8 | A | The change was made such that in the previous |
| 9 | | drug testing policy the, there was a two tier |
| 10 | | discipline system.  The first offence in the |
| 11 | | older policy was suspended without pay for 6 |
| 12 | | weeks.  And the second offence was termination of |
| 13 | | contract with the WWF.  In the new policy that |
| 14 | | was changed and the first offence was termination |
| 15 | | of contract, resulted in termination of the |
| 16 | | contract. |
| 17 | Q | Thank you.  Did you either suggest or draft the |
| 18 | | change in that provision? |
| 19 | A | I think this was a change that was a result of |
| 20 | | the, result of the general policy on page one of |
| 21 | | the new policy.  As against the general policy |
| 22 | | page one of the old policy.  And reflected a |
| 23 | | tightening up of the penalties secondary to |
| 24 | | possession, purchase, sale or distribution of |
| 25 | | illegal drugs, including anabolic steroids, |

22

1    amphetamines, cocaine, marijuana, narcotics, and

2    peptide hormone and analogues by World, by WWF

3    talent.

4        So what happened was because we tightened up

5    the general policy, subsequent to that we made

6    changes to Section 12 in the new policy where any

7    WWF talent who was convicted or who admits to a

8    violation of law relating to use, possession,

9    purchase, sale or distribution of drugs of abuse,

10    including steroids and growth hormone, will be in

11    breach of contract and immediately dismissed.

12        So the changes reflected the change in

13    general policy and changing attitude within the

14    WWF.  That's, and I believe that the revamping or

15    the change that was made in Section 12 in the new

16    policy was a joint change made with myself and

17    Titansports mainly at that time Vince McMahon.

18  Q  You say joint change, in what way did you

19    participate in making those changes?

20  A  I may have suggested that the policy be tightened

21    up in that aspect and they may have agreed.  Or

22    they may have suggested and I may have agreed.

23    I'm not sure which way it went.

24  Q  In any event, did you then draft the change?  In

25    other words, the text that we see in the May 1st

23

1      policy attached to your affidavit, did you

2      actually draft that?

3   A  That's my text.

4   Q  And when did you draft that?

5   A  Would have been probably the latter part of

6      April.  I can't give you an exact date.  It would

7      have been in progress the latter part of April.

8   Q  And how was that change communicated to the

9      talent?

10  A  I believe we, at least I, I believe I just told

11     the talent that that aspect had been changed and

12     that a first offence would result in termination

13     of the contract.

14  Q  And when did you tell the talent that?

15  A  It would be on the 28th.  As far as I can

16     remember, it would have been on the 28th of

17     April, 1992.

18  Q  Is that the Niagara Falls meeting that we've

19     already discussed this morning?

20  A  Yes, that is.

21  Q  That's the meeting of which you don't know

22     whether Mr. Hellwig was present or not?

23     MR. KOZAR:  Objection.

24  A  I don't know if he was present or not.

25     MR. AIKEN:

                        24

```
 1      Q    Was that the final version that was then
 2           distributed to the talent?
 3      A    I believe it was.
 4      Q    Do you have information confirming that?
 5      A    I do not.
 6      Q    Do you know whether it was distributed to the
 7           talent following your transmission to
 8           Titansports?
 9      A    I assumed it was; I can't tell you for sure.
10      Q    Did you receive back a printed final copy of the
11           policy for your files?
12      A    I can't remember, I can't remember.
13      Q    And if I understood your testimony, doctor,
14           you've never had in your files written
15           confirmation that any talent received a copy of
16           the new policy, is that correct?
17      A    As far as I can remember, I can't remember any
18           written confirmation.  But you know, it was a
19           long time ago and maybe memory is not perfect for
20           that.
21      Q    Well, is there a portion of your file existing
22           somewhere today that would refresh your
23           recollection on that point?
24      A    No, definitely not.  I looked everywhere.
25      Q    And in searching, you found nothing relating to
```

27

```
 1              this policy in your files?
 2      A     Except for the one on the computer.
 3      Q     Okay.
 4      A     And I did, I spent hours searching for that.   I
 5              tore things apart I shouldn't have torn apart.   I
 6              could find nothing.
 7      Q     And thank you.   I do appreciate that.
 8      A     Yes.
 9      Q     How was it then that you confirmed or even
10              learned that talent had received the new policy?
11      A     I'm not sure that I ever did that.   I think that
12              the -- I assumed the policy was distributed and
13              it was something that was left up to
14              Titansports.   It wasn't my position to
15              distribute, etc., it's just something I assumed
16              would have been done by the company.
17      Q     How important to you at the time was it that the
18              policy be distributed to talent?
19      A     Very important.
20              MR. KOZAR:   Objection.
21              MR. AIKEN:
22      Q     And why is that?
23      A     They need to have a written copy of the policy
24              that they're under.   As far as the drug testing
25              in the April 28th meeting I asked them to or gave
```

28

1      them the ability to call me at any time if they

2      had any questions.  And at that time it would be

3      difficult for them to remember everything that I

4      said at the time.  They would have to have a

5      written policy so they could look at it and if

6      they had any questions, phone me.

7   Q  And do you recall a call or any calls from

8      wrestlers in the April, the month of April,

9      1992?

10  A  I can't, I can't.  I do recall wrestlers asking

11     about certain things in the time that I was the

12     DPA but I can't give you specifics on that

13     because I just don't remember.

14  Q  What about May of 1992, do you recall calls from

15     wrestlers regarding the policy at that time?

16  A  I couldn't give you a 100% answer on that.  I

17     believe I did but I couldn't tell you who or when

18     they called.

19  Q  Was it your practice to log calls from talent?

20  A  Only in respect to drug testing as far as the

21     positive drug test, when I contacted them to get

22     more information and to do my duties as a medical

23     review officer, calling a test positive or

24     negative.  The other ones were casual.

25  Q  And how would you describe that log, the one

                          29

```
 1
 2                      "Following his baseline test...",
 3
 4          which I now understand to be the May 4th test, is
 5          that correct?
 6      A   That's correct.
 7      Q
 8                      "...Hellwig's testosterone/
 9                      epitestosterone ratio..."
10
11          And may we call that the TE ratio?
12      A   Yes.
13      Q
14                      "...began to decrease in subsequent
15                      tests, as would be expected if he ceased
16                      using testosterone."
17
18      A   Exactly.
19      Q   Are you able to say today, doctor, whether Mr.
20          Hellwig was in fact using testosterone in 1992?
21      A   Say there was a large probability that he was
22          using testosterone prior to his baseline test.
23          For various reasons.  But not necessarily 100%.
24      Q   In other words, you're not able to say with 100%
25          certainty that he was taking testosterone before
                                42
```

```
1              the baseline test, is that your reference?
2      A       That's true, that's true.  The suspicion is
3              there.  Under other say amateur rules, for
4              example, this would be considered definite
5              positive, but under our rules, in which I was
6              looking at many other factors, I wouldn't
7              consider this a definite positive.
8      Q       And you're referring to the May 4th test, Exhibit
9              3?
10     A       Yes, and subsequent tests as far as testosterone.
11     Q       I have the same question then as to anabolic
12             steroids of any kind.
13     A       What was the question, sorry?
14     Q       My question is are you able to say today whether
15             Mr. Hellwig was taking anabolic steroids --
16     A       Yes.
17     Q       -- during 1992?
18     A       Yes, I am.  Two reasons.  One is the methyl
19             testosterone metabolites that were picked up on
20             the test on August 16th, 1992.
21     Q       You're referring to Exhibit 7?
22     A       Exhibit 7, yes.  This is the first time the
23             methyl testosterone showed up in his urinalysis
24             and methyl testosterone is not endogenous.  It
25             has to be ingested or injected.  It doesn't occur
```

43

1            naturally in the body.  And the finding of the

2            two metabolites is consistent with the use of

3            methyl testosterone.

4      Q    Is it consistent with the use of any dietary

5            supplement?

6      A    No, not unless it was tainted with methyl

7            testosterone.  Not unless it was given to him

8            surreptitiously.  But it would have had to be an

9            ingestion of anabolic steroid.

10     Q    Did you contact Titansports following the August

11           16 test?

12     A    My usual policy was to contact the athlete

13           first.

14     Q    Do you recall contacting Mr. Hellwig?

15     A    Yes, I do remember contacting him and asking him

16           about this.

17     Q    And tell us what you recall?

18     A    Well, Mr. Hellwig said that he had gotten some, I

19           believe Yohimbe bark which he felt might have

20           been contaminated with methyl testosterone.  And

21           there's always a possibility of contamination.

22           Somebody contaminating an athlete's drink,

23           somebody contaminating an athlete's nutritional

24           supplement.

25                And one time contamination, although it's

                              44

```
1              considered positive under most federation, as
2              drug control officers, as the medical review
3              officer, I felt in this case that a warning to
4              Jim to, to Mr. Hellwig that he not use whatever
5              supplements he was using was adequate at that
6              time.  And as it happened it never showed up
7              again.
8         Q    Would you --
9         A    There is also -- going back to your first
10             question about whether or not he used anabolic
11             steroids, another problem would have been the
12             three metabolites of 19-nortestosterone or
13             nandrolone.
14        Q    And you're referring to which attachment to your
15             affidavit?
16        A    There are several but the first one where it
17             showed up was in the pre-screening of May the
18             4th, 1992 or the initial tests, baseline test.
19             And in subsequent, subsequent testing the
20             metabolites also showed up but there was a sign
21             that they were decreasing both in the ratios and
22             the number of metabolites that were being
23             detected which did not show an on-going use.  But
24             an initial use at some time prior to the baseline
25             test.
```

                                    45

```
 1              these things, so we can't make decisions on what

 2              happened.

 3              MR. AIKEN:

 4         Q    Was there any other time that Mr. Hellwig

 5              discussed with you dietary supplements or

 6              anything else that he had ingested or was

 7              taking?

 8         A    We may have talked about dietary supplements.  I

 9              can't specifically remember.  But I did and it's

10              my practice to answer questions from various

11              people about what possibly could be in a dietary

12              supplement that might cause a false positive or

13              positive drug test.  But I can't specifically

14              remember whether we did or not.

15         Q    You've mentioned, as you did just a moment ago,

16              the elevated TE ratio?

17         A    Right.

18         Q    Is it possible for a deficiency of certain

19              enzymes to cause an elevated TE ratio?

20         A    Yes, yes, it is.  And I took this into account as

21              I spoke to Mr. Hellwig.  In that if you look at

22              the, if you look at the testosterone levels and

23              the epitestosterone levels the first thing that

24              strikes you, or at least strikes me, for someone

25              who is used to looking at this, is that the
```

65

1        nanograms for a millilitre of testosterone at the

2        concentration of the specific gravity of the

3        urine sample is not great amounts.

4            For example, in the very first test, May

5        4th, 1992, your nanograms per millilitre at a

6        fairly concentrated urine was only 71.  Now, with

7        a level of 71, I would have expected an epi-

8        testosterone of around at least 30.  Somewhere

9        around 30 to 50 range and that would give him a

10       ratio of one to two roughly.

11           Now we're looking at a ratio which is 78.

12       My conclusion when I looked at this was that he

13       has an unusually low epitestosterone level.

14       Which would give him a high ratio.  And I looked

15       at this and I thought, well, I can't see any

16       on-going use of testosterone because I'm not

17       seeing the levels I would ordinarily see.

18           If there was on-going use of the

19       testosterone, for example, I would have expected

20       a higher level of testosterone first of all

21       because it's so hard to predict what levels you

22       would get.  His levels were fairly consistent

23       around the 60 -- 40, 50, 60, 70, 80, 90, which is

24       normal for that concentration.  The

25       epitestosterones are always so much lower.  Now

66

1      there are people who secrete low levels of epi-

2      testosterone and we have positive tests from

3      these people.

4          The other things is that the use of any

5      anabolics in the past may decrease your epi-

6      testosterone secretion for long periods of time.

7      Longer than you would pickup metabolites or

8      pickup any evidence that he had actually used

9      these compounds.

10         I took all this into consideration when I

11     didn't call this a positive test.  Another aspect

12     you have to look at is looking at the luteinizing

13     hormone.  The levels of luteinizing hormone

14     invariably were at levels that showed that it

15     wasn't acute use of testosterone.  Because what

16     happens when you use testosterone, it decreases

17     the feedback mechanism to the pituitary and

18     decreases the trophic hormone for testosterone,

19     so you would expect a lower luteinizing hormone

20     here.

21         And I often will use a testosterone

22     luteinizing hormone ratio to see whether the

23     person's HPTA, hypo thalamic pituitary testicular

24     axis, whether that was depressed or not.  So for

25     all these reasons I didn't call it a positive

67

1          test.   For testosterone.

2     Q    Did your view that Mr. -- well, did you conclude

3          that Mr. Hellwig was in the class of people whom,

4          as you put, secreted low levels of epi-

5          testosterone?

6          MR. KOZAR:  Objection.

7     A    My conclusion at the time was I didn't know.

8          That there was doubt in my mind.  And because of

9          the doubt, I didn't call it a positive test.  So

10         that -- these are fairly consistent.  Most of the

11         tests are fairly consistent.  So I just kept, I

12         just kept on really just watching.

13              And there is a possibility that someone

14         using very low doses of testosterone, either by

15         patch or orally, could come up with some kind of,

16         this kind of a profile.

17              But it I wasn't sure so that I didn't call

18         it a positive test at any time.  And I did talk

19         to him about it as far as the possibility of

20         on-going small doses, maintenance doses of

21         testosterone.

22         MR. AIKEN:

23    Q    And what did you conclude regarding maintenance

24         doses after speaking to Mr. Hellwig?

25         MR. KOZAR:  Objection.

                              68

1    A   I concluded that the possibility, the possibility

2        was still there but I still couldn't call it a

3        positive test because it just, there was too much

4        doubt in my mind that in fact, I gave him the

5        benefit of the doubt.

6    MR. AIKEN:

7    Q   Would a serum test or blood panel have assisted

8        you in determining whether these were in fact

9        positive results reflected in Exhibits 3 through

10       10?

11   A   No, it wouldn't because the serum values would

12       actually -- using low doses of testosterone and

13       serum values would be just as questionable.

14   Q   We started a moment ago by discussing enzyme

15       deficiencies and whether they may cause elevated

16       TE ratios.  How is it that one might test for

17       such enzyme deficiencies?

18   MR. KOZAR:  Objection.

19   A   There are tests.  You could do challenge tests

20       which elevate serum levels of testosterone.  I'll

21       give you an example of the various tests you

22       could do.  One is the ketoconazole, which is an

23       anti-fungal agent which decreases testosterone

24       synthesis, biosynthesis.  If someone was taking

25       exogenous testosterone, it would widen the gap.

69

1        So there are tests you can use that might

2        show you whether someone is using it, but they're

3        difficult to apply and you really have to use

4        almost like an isolation technique so the person

5        can't contaminate things.  It wasn't

6        appropriate.

7    MR. AIKEN:

8  Q  It wasn't appropriate in 1992?

9  A  Right.

10 Q  Regarding Mr. Hellwig?

11 A  Right.

12 Q  Were those tests available in 1992?

13 A  I don't think so, I don't think so.

14 Q  Was there a test or were there methods available

15       in 1992 that would have tested for an enzyme

16       deficiency that in turn might result in elevated

17       TE ratios?

18 A  Not definitively.  Most of the work has been done

19       I'd say in the last three or four years in the

20       papers.  It wasn't really necessary because I

21       felt at the time that there was no need for

22       this.  I didn't call it a positive.

23       Had I been inclined to say okay, this is a

24       definitive positive, at that point I would have

25       had to have something else to substantiate it.  I

70

1          as being a lawyer or being able to interpret

2          these.  I would use them as anybody would use

3          them.  I really have no, nothing else to say on

4          that as far as elaborations.

5          MR. AIKEN:

6     Q    Okay.  Doctor, do you know whether it was a

7          violation of law simply to use growth hormone in

8          the U.S. in 1992?

9          MR. KOZAR:  Objection.  Asked for a conclusion.

10    A    I don't think it was just to use, no.

11         MR. AIKEN:

12    Q    And why do you say that?  What information do you

13         have?

14    A    Well, growth hormone is used clinically for, you

15         know, pituitary in dwarfs, or potential in

16         pituitary in dwarfs to regulate the system.  It's

17         used as replacement therapy.  It's used for

18         certain, I won't use the right word, wasting

19         diseases such as AIDS and cancer.

20              It has use post-surgically in some

21         debilitated patients.  So a lot of clinical uses

22         of growth hormone to, I can't see to use it would

23         be a problem as far as my knowledge.

24    Q    In 1992 then human growth hormone was not a

25         controlled substance, was it?

89

```
 1    A     No.
 2          MR. KOZAR:  Objection.  Calls for a legal
 3          conclusion.
 4    A     You know, there was a change in the U.S. in the
 5          Controlled Substances Act which included anabolic
 6          steroids as Schedule Three drugs, and I believe,
 7          but I'm not positive, I don't know for sure,
 8          whether growth hormone was included as a Schedule
 9          Three drug.
10          MR. AIKEN:
11    Q     Isn't what you've just said exactly the case,
12          that there was a distinction in that legislation
13          between anabolic steroids and growth hormones in
14          the Controlled Substances Act?
15          MR. KOZAR:  Objection.  You're asking for a legal
16          conclusion.
17    A     I'm not sure, I'm not sure.  I don't remember
18          exactly.  Just sort of a vague feeling I have
19          that they may have separated them.  I don't know
20          for sure.
21          MR. AIKEN:
22    Q     You have prescribing power and authority under
23          your license to practice medicine here in
24          Ontario, correct?
25    A     Yes, I do.
```

90

```
 1              conclusion.
 2      A       I don't know for sure.
 3              MR. AIKEN:
 4      Q       I'm not asking for a legal conclusion, just
 5              doctors --
 6      A       I'm not sure.  In Canada, again even then I'm not
 7              100% sure, I believe it is in Canada.  In the
 8              U.S. I'm not sure.  I guess the reason for that
 9              is because if there was a clinical use of these
10              compounds it really wouldn't make a difference if
11              it was scheduled or not scheduled.  If a patient
12              needs a specific compound, then it's used, you
13              know.
14      Q       What is Somatropin?
15      A       That's just another name for growth hormone.
16      Q       Is that a brand name?
17      A       No.
18      Q       It's a generic name?
19      A       Yes, I think it may have been a brand name at one
20              time but it's definitely a generic name.
21      Q       What about Somatropin specifically?  Are you
22              aware whether in 1992 it was a controlled
23              substance in the U.S.?
24      A       No.
25      Q       Or today?
```

92

| | | |
|---|---|---|
| 1 | | MR. KOZAR:  Objection. |
| 2 | A | I'm not 100% sure. |
| 3 | | MR. AIKEN: |
| 4 | Q | Again you've looked to the same sources in Canada |
| 5 | | and the U.S. to see whether that was a controlled |
| 6 | | substance? |
| 7 | A | Definitely. |
| 8 | Q | To come back full circle to where we started a |
| 9 | | moment ago, Somatropin then is a peptide hormone? |
| 10 | A | Yes. |
| 11 | Q | Not a steroid? |
| 12 | A | Not a steroid. |
| 13 | Q | Is there in Canada an analogue to the Controlled |
| 14 | | Substances Act, in other words, is there a |
| 15 | | similar piece of legislation -- |
| 16 | A | Yes. |
| 17 | Q | -- that governs -- |
| 18 | A | Yeah. |
| 19 | Q | -- the prescription of controlled substances? |
| 20 | A | Yes, there is. |
| 21 | | MR. KOZAR:  Objection.  That is not relevant. |
| 22 | | MR. AIKEN: |
| 23 | Q | What's the short name for that, please? |
| 24 | | MR. BURGESS:  Controlled Drug and Substances |
| 25 | | Act. |

93

```
1              I would suggest something to him.

2      Q      There is evidence in this case that Mr. Hellwig

3              and Mr. McMahon had a phone call the day before

4              November 10th.  In other words, November 9th.

5              And during that phone call, doctor, the evidence

6              is that Mr. Hellwig was terminated from his WWF

7              contract?

8      A      On November 9th?

9      Q      Yes, sir.

10     A      The day before this one?

11     Q      Yes, sir.

12     A      Then I didn't know about it.  I wouldn't have

13             known about it.  Or else I probably wouldn't have

14             talked to him.  Not maybe not have talked to him

15             but not gone into what we were going to be doing,

16             etc., you know.

17                  See I wasn't told much about the

18             termination.  I mean when I found out it was

19             probably likely well after November the 10th.

20             And what I was told basically is, I think I may

21             have even perhaps even mentioned that we were

22             going on and doing some more testing with some

23             people and I mentioned maybe Mr. Hellwig and then

24             I heard he is no longer with us.  He was

25             dismissed for other reasons.  And that's all I
```

106

```
 1              knew.  I didn't have a clue about why or
 2              anything.
 3         Q    Do you remember from whom you heard that
 4              information?
 5         A    It was either Vince or one of the people that
 6              also worked with the talent like J.J. or I can't
 7              remember, I really can't.
 8         Q    You're referring to J.J. Dillon?
 9         A    Yeah, J.J.  I don't think he's with him any
10              more.  It could have been even somebody else.
11              I'm not sure.  I wasn't, I wasn't notified
12              officially that this talent is no longer with us
13              until I think well after the fact.
14         Q    Did you learn what those other reasons were?
15         A    No.  Only just recently when I was presented with
16              the affidavit.  I was very surprised.  I didn't
17              know anything about it.  I mentioned this to
18              Paul.  I said I don't know anything about this.
19         Q    What was surprising to you about the facts
20              presented in the affidavit?
21         A    Oh, the only thing was I thought it was for some
22              reason of non-performance or something that he
23              was terminated.  I didn't know it was for
24              involving growth hormones there.  I had no clue.
25         Q    So in November of 1992 you had no information
```

107

Rosenberger & Weir
Toronto, Canada
Appointments: (416) 367-EXAM

```
 1        A    Okay.

 2        Q    Do you have that?

 3        A    Yes, it's right here.

 4        Q    Now, although it's dated May 1, 1992 up in the

 5             upper right hand corner, it says received 5-7-92

 6             from Mauro Di Pasquale.  Do you see that?

 7        A    Right.

 8        Q    Do you recall transmitting this document to

 9             Titansports?

10        A    Not specifically but it's possible.

11        Q    On page eight of the draft policy, there are some

12             handwritten notes down at the bottom.

13        A    Those aren't mine.

14        Q    They are or --

15        A    They are not mine.

16        Q    So assuming that the 5-7-92 date is correct, is

17             it true that the new drug policy was not yet set

18             as of May 7th, 1992?

19             MR. KOZAR:  Objection.

20        A    All I can say is that the final, final policy

21             that I have on my computer, which is identical to

22             the one that was in there, was dated May 4th.

23             And that's the absolute last time I dealt with

24             that.  And it had in it, so I'm not sure, I don't

25             understand why this would have been sent May the
```

135

## CERTIFICATE OF REPORTER

I, NANCY LOWREY, a Steno-mask Court Reporter in and for the Province of Ontario, Canada, do hereby certify that I reported the Deposition of DR. M.G. DI PASQUALE, a witness called in the above-styled action;  that the said witness was duly sworn;  and that the foregoing pages constitute a true and accurate transcription of my notes of the Deposition of the said witness to the best of my skill and ability.

I FURTHER CERTIFY that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

WITNESS MY HAND, this 11th day of June 1999.